# C & J ASSOCIATES PEST CONTROL

# v.

# RAYBURN HORNSBY, et al.

# JANICE  DUNCAN

## April 11, 2006



DEFENDANT'S
EXHIBIT

ALDOT 12

**Reagan Reporters, LLC**
**Phone: 334.262.7556**
**Fax: 334.262.4437**
**www.ReaganReporters.com**

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

C & J ASSOCIATES
   PEST CONTROL,
Plaintiff,

vs.                          CIVIL ACTION NO.
                             2:05-CV-557-WHA-
                             DRB
RAYBURN HORNSBY,
et al.,
Defendants.

*      *      *      *      *      *

DEPOSITION OF
JANICE DUNCAN,
taken pursuant to notice and
stipulation on behalf of the
Defendants, in the Jury Room of
Courtroom 4A of the United States
Federal Courthouse, One Church Street,
Montgomery, Alabama, before Mishan
Williamson, Certified Shorthand
Reporter and Notary Public in and for
the State of Alabama at Large, on
April 11, 2006, commencing at
approximately 9:10 a.m.

**Page 2**

APPEARANCES

FOR THE PLAINTIFF:
   CURTIS DUNCAN, pro se

FOR THE DEFENDANTS:
   HARRY LYLES, ESQ.
   Assistant Counsel
   Alabama Department of
   Transportation
   1409 Coliseum Blvd.
   Montgomery, Alabama 36110

   JEFFREY H. LONG, ESQ.
   General Civil and
   Administrative Law Division
   Office of the Attorney
   General
   Alabama State House
   11 South Union Street
   Montgomery, Alabama 36130

ALSO PRESENT:
   PAT ANTLE
   ISAAC KERVIN
   STAN CARLTON

**Page 3**

STIPULATIONS

     It is stipulated and agreed
by and between counsel representing
the parties that the deposition of
JANICE DUNCAN may be taken before
Mishan Williamson, Certified Shorthand
Reporter and Notary Public in and for
the State of Alabama at Large, without
the formality of a commission; and all
formality with respect to other
procedural requirements is waived;
that objections to questions, other
than objections as to the form of the
questions need not be made at this
time, but may be reserved for a ruling
at such time as the deposition may be
offered in evidence or used for any
other purpose by either party as
provided by the Federal Rules of Civil
Procedure.
     It is further stipulated and
agreed by and between the parties

**Page 4**

hereto and the witness, that the
signature of the witness to this
deposition is hereby not waived.

*  *  *  *  *  *  *  *

INDEX

EXAMINATION                    PAGE
MR. LYLES....................... 5
MR. LONG........................ 94

EXHIBITS                       PAGE
1   (Screenshot from         18
    Computer screen)
2   (Order on Motions)        6
3   (Invitation to Bid)      23
4   (Isaac Kervin's         137
    Affidavit)
5   (Application for         12
    Employment)
6   (Employee Performance   137
    Appraisal)
7   (Receipt for Department  66
    of Transportation
    Handbook)
8   (Complaint)              10
9   (State Requisition       43
    Document)

JANICE DUNCAN - 4/11/2006

**5**

1    JANICE DUNCAN, of lawful
2  age, having first been duly sworn,
3  testified as follows:
4
5    EXAMINATION
6  BY MR. LYLES:
7  Q.   As we get started, Mrs. Duncan, let me
8    explain a couple of things we're going
9    to be doing to you.  One of the things
10   that we'll be doing in this case or in
11   these depositions is called "invoking
12   the rule."  And what that means is, is
13   that Mr. Duncan is a party to the
14   suit.  He's also acting as his own
15   lawyer.  He's got the right to be in
16   your deposition, absolute right.  He
17   can be in any deposition in this case.
18   You on the other hand are not a party,
19   so you can be in your own deposition,
20   and that's the only one that you can
21   be in.  So when we get through with
22   yours, you'll be excused and go on
23   back to work or wherever you need to

**6**

1    be -- wherever you need to go.  But
2    that's the way the rule works, and my
3    client has instructed me to invoke the
4    rule so that's what we're going to do.
5    That stated, let's go ahead and get
6    started.
7        State, if you will,
8    please, ma'am, for the record, your
9    full name.
10  A.   Janice Duncan.
11  Q.   Okay.  And you're employed with the
12    Alabama Department of Transportation?
13  A.   Yes.
14  Q.   Have you seen a copy of what I've
15    marked as Defendant's Exhibit 2; it's
16    entitled, Order on Motions, in this
17    case?
18  A.   Yes.
19        (The referred-to document was
20        marked for identification as
21        Defendants' Exhibit No. 2.)
22  Q.   Okay.  Page 4 of that order provides
23    that you and Mr. Duncan shall provide

**7**

1    certain documents to this deposition.
2    What I'd like to do is go through and
3    make sure we got them all here.  The
4    first thing is your tax returns from
5    the past five years.  Did y'all bring
6    those?
7  A.   I didn't bring those.  Mr. Duncan
8    brought those.
9  Q.   Okay.  Well, let's just -- let's just
10   make this part short then.  Did
11   Mr. Duncan bring all the documents
12   listed here rather you bring some and
13   he bring some?
14  A.   He brought everything.
15  Q.   Okay.  All right.  Okay.  Now, first
16   thing I want to -- for the purposes of
17   when this trial -- when this case goes
18   to trial, we need certain information,
19   and I'd like to go ahead and get that
20   from you first, and then we'll talk
21   about the case itself.  What is your
22   home address at this point in time?
23  A.   2224 --

**8**

1  Q.   Okay.
2  A.   -- Halcyon Boulevard, Montgomery,
3    Alabama.
4  Q.   Any what's the zip?
5  A.   36117.
6  Q.   And how long have you lived there?
7  A.   Several years.
8  Q.   Do you have any relatives living in
9    the Montgomery area?
10  A.   Yes, I do.
11  Q.   Okay.  Who are they, please, ma'am?
12    The reason I'm asking that is, if we
13    -- when we select a jury, both sides
14    are entitled to know the names of
15    anybody -- for example, if your uncle
16    was on the jury, Mr. Long and I would
17    be entitled to take him off the jury.
18    If Mr. Long's long lost brother was on
19    the jury, you'd be entitled -- your
20    husband would be entitled to take him
21    off the jury.  That's why I'm asking
22    these question.
23  A.   I have a sister and a brother-in-law.

2 (Pages 5 to 8)

JANICE DUNCAN - 4/11/2006

9

```
   Q.   And what their names?
2  A.   Jamie Cobb and Darrell Cobb.
3  Q.   Anybody else?
4  A.   And I have two daughters.
5  Q.   And what --
6  A.   And a son-in-law.
7  Q.   What their names, please, ma'am?
8  A.   Kennita Marshall.
9       THE COURT REPORTER:  Can you
10         spell Kennita?
11      THE WITNESS:  K-E-N-N-I-T-A.
12 A.   And Kaneisha Richardson.
13 Q.   Okay.
14 A.   And son-in-law, Cory Marshall.
15 Q.   All right.  Anybody else?
16 A.   No.
17 Q.   Now, what I've marked as one of the
18      exhibits in this case is the complaint
19      in the lawsuit.  I've marked that as
20      Defendant's Exhibit 8.  Are you
21      familiar with that complaint?
22         (The referred-to document was
23          marked for identification as
```

10

```
1          Defendants' Exhibit No. 8.)
2  A.   I know that my husband filed it, yes.
3       But --
4  Q.   Did you --
5  A.   -- I've --
6  Q.   I'm sorry.
7  A.   I'm not familiar with all the details.
8  Q.   Okay.  Are you -- did you assist in
9       the drafting of the complaint?
10 A.   My husband did the drafting of the
11      complaint.  I may have proofread it
12      for errors -- typo -- typographical
13      errors.
14 Q.   Okay.  But you did not participate in
15      the actual drafting of the substance
16      of the complaint; is that right?
17 A.   My husband drafted the complaint.
18 Q.   Okay.  Did anybody assist him as far
19      as you know?
20 A.   I have no - no, I don't.
21 Q.   Okay.  Do you understand this lawsuit
22      is over some contracts; is that
23      right -- or a bid -- what do you
```

11

```
1       understand the substance of this
2       lawsuit to be?
3  A.   I'm trying to remember what it's --
4       yes.  It's a contract -- a bid
5       contract, yeah.
6  Q.   Okay.  And that is with an entity
7       known C & J Associates Pest Control.
8       Are you familiar with that entity?
9  A.   Yes.
10 Q.   And for a period of time you were
11      employed by that entity; is that
12      right?
13 A.   I assisted my husband with the
14      business because I'm his wife.
15 Q.   I understand.  But you were employed
16      by that entity, were you not?
17 A.   I'm Mr. Duncan's wife, and I assisted
18      him.
19 Q.   Yes, ma'am.  I understand that.  My
20      question is:  Were you an employee of
21      C & J --
22 A.   No.
23 Q.   Okay.  I've got what I've marked as
```

12

```
1       Defendants' Exhibit No. 5, and I'll
2       show you a copy of that.  Are you --
3       have you seen that document before?
4  A.   Yes.
5          (The referred-to document was
6           marked for identification as
7           Defendants' Exhibit No. 5.)
8  Q.   And that is -- appears to be an
9       application you filled out; does it
10      not?
11 A.   Yes, it is.
12 Q.   If you could, could you turn to the
13      fourth page of that application?
14 A.   Uh-huh.
15 Q.   Up at the top, as one of your prior
16      employers, you show C & J Associates,
17      does it not?
18 A.   Yes.
19 Q.   And your job title was chief
20      accountant?
21 A.   Yes.
22 Q.   And you were in that job approximately
23      99 months?
```

3 (Pages 9 to 12)

JANICE DUNCAN - 4/11/2006

13

1   A.   I've worked with my husband for a long
2        time, and I assisted him in this
3        company.
4   Q.   Does the application reflect that you
5        were in that -- in that position for
6        approximately 99 months?
7   A.   It shows that I did work in the area
8        of chief accountant.
9   Q.   Okay. Worked about 15 to 20 hours a
10       week, and you were paid anywhere
11       between 15 and $26; is that right, per
12       hour?
13  A.   I was not directly paid. My husband
14       would take care of any utilities, pay
15       me expense payments. So that's just
16       an average of how much I would be
17       worth.
18  Q.   Okay. So you didn't really receive a
19       salary; is that what you're saying?
20  A.   Right.
21  Q.   So this application is incorrect?
22  A.   No, it's not.
23  Q.   Explain it to me. I don't understand

14

1        the difference.
2   A.   In order to put a figure on the work
3        that I assisted my husband in, I
4        estimated how much that worth would
5        be, and I felt like I needed to put
6        something here.
7   Q.   Okay. And it goes on to say that you
8        prepared financial statements and
9        reports, prepared cost reports,
10       composed letters, computed overhead
11       rates, processed receipts, reconciled
12       bank accounts, and represented C & J
13       concerning all accounting,
14       administrative tax concerns, and
15       helped developed administrative
16       policies and procedures; is that
17       right?
18  A.   Yes. That's what I'm reading.
19  Q.   Okay. Is that what you put on this
20       application?
21  A.   Yes.
22  Q.   Is that the truth?
23  A.   Yes.

15

1   Q.   Okay. Tell me the policies and
2        procedures that you developed?
3   A.   Whatever Mr. Duncan would have me to
4        assist him with.
5   Q.   Okay. Tell me about some of them.
6        Give me some particulars about the
7        policies that you developed.
8   A.   Okay. It's been a while, so I can't
9        remember right off.
10  Q.   Okay. Well -- all right. The
11       administrative tax concerns, tell me
12       about some of those.
13  A.   Well, I would fill out tax returns,
14       look up a policy or a procedure on
15       tax.
16  Q.   Okay. And process payment to vendors.
17       What vendors did you process payments
18       for?
19  A.   He had several vendors.
20  Q.   Who were those, please, ma'am?
21  A.   I can't remember all of them.
22  Q.   What about the letters and memorandum?
23       Who -- tell me some folks you wrote

16

1        letters to and drafted memorandum?
2   A.   I would compose letters and memorandum
3        for Mr. Duncan, and there's several
4        others that I would -- well, let me
5        see. Let me see if I can remember
6        some.
7   Q.   Okay.
8   A.   It could be to -- for a bid or
9        contract.
10           THE COURT REPORTER: A bid?
11           THE WITNESS: A bid or
12              contract.
13  Q.   Okay. Now, the time that you worked
14       for that company began in October of
15       '92; is that correct?
16  A.   Yes.
17  Q.   And at the time you submitted this
18       application in 2002, you were still
19       employed by C & J; is that right?
20  A.   I'm Curtis' wife, and I still assist
21       Mr. Duncan.
22  Q.   Yes, ma'am. But you showed it as an
23       employer, and on the blank where it

4 (Pages 13 to 16)

JANICE DUNCAN - 4/11/2006

17

1 says "from/until," you've got October
2 '92 to current part-time.
3 A.   Uh-huh.
4 Q.   So you up -- as far as November 20th
5     of 2002, according to this application
6     you filled out and signed, you were
7     still an employee of C & J Associates;
8     is that right?
9 A.   Yes. I'm still assisting Curtis as
10     his wife.
11 Q.   Okay. And do you draw a salary for
12     that?
13 A.   No.
14 Q.   Now -- so the part on the application
15     that is incorrect is about how much
16     you make or how much you claimed you
17     were paid by C & J Associates, 15 to
18     $26 an hour?
19 A.   I'm sorry. I didn't --
20 Q.   Is that correct or incorrect that you
21     were paid 15 to $26 an hour?
22 A.   As I have previously stated, that was
23     not a direct salary to me. That was

18

1 an estimate based on the worth of the
2 work.
3 Q.   So your answer is, then, you were not
4     paid a salary; is that right?
5 A.   Right.
6 Q.   Look with me, if you will, at
7     Defendants' Exhibit No. 1; have you
8     ever seen a document like that before?
9 A.   No.
10     (The referred-to document was
11       marked for identification as
12       Defendants' Exhibit No. 1.)
13 Q.   That is a screening showing the status
14     of C & J Associates, is it not?
15 A.   Is it not a report showing the status
16     of C & J?
17 Q.   Yes, ma'am.
18 A.   I have no idea what this means.
19 Q.   All right. Well, let's look at it
20     together. Look at vendor name, No. 1
21     on there, do you see that?
22 A.   Uh-huh. Yes.
23 Q.   What does that say?

19

1 A.   Vendor number?
2 Q.   The vendor name.
3 A.   Name, C & J Associates.
4 Q.   Okay. And look a little further down,
5     where it says "organization type,"
6     what does that say?
7 A.   It says, "woman-owned, small
8     minority."
9 Q.   No. That's business ownership. What
10     does the organization type right above
11     that say?
12 A.   Partnership.
13 Q.   Okay. And the business ownership is
14     -- says what? What you just read --
15 A.   Oh, small owned --
16 Q.   Woman-owned --
17 A.   Woman-owned, small minority.
18 Q.   And ethnicity is black; is that right?
19 A.   Yes. That's what it says here.
20 Q.   Okay. And it says, "number of
21     employees" down towards the bottom,
22     look over towards the right. You see
23     that?

20

1 A.   I see.
2 Q.   What does it say for that?
3 A.   Five zeros and a two.
4 Q.   Would you take that to mean two
5     employees?
6 A.   I'm not -- well, based on this report
7     what they're saying is -- it says,
8     "number of employees, two."
9 Q.   Are you the owner of C & J Associates?
10 A.   No.
11 Q.   Was there some other woman of the
12     black race that owned C & J
13     Associates?
14 A.   No. Not -- I mean, not that I know
15     of. Whose report is this?
16 Q.   This is your report --
17 A.   It's not my report.
18 Q.   -- that's on file with the State of
19     Alabama. It's the status of C & J
20     Associates.
21 A.   Okay.
22 Q.   Do you know anything about that
23     report?

5 (Pages 17 to 20)

JANICE DUNCAN - 4/11/2006

21

1    A.    No. It's not C & J's report, no.
2    Q.    Okay. Well, let's look back at your
3          application. It says that, from
4          October of '92 to 2002, you prepared
5          financial statements and reports.
6          Would this be one of the reports or
7          applications that you prepared?
8    A.    No.
9    Q.    Did you ever prepare anything saying
10         it was a partnership, or it was a
11         woman-owned minority?
12   A.    No.
13   Q.    Does it come to you as a surprise that
14         this report reflects this?
15   A.    Well, yes.
16   Q.    Is that an error?
17   A.    Yes.
18   Q.    Does the part where it says
19         partnership an error?
20   A.    Yes.
21   Q.    What about the part where it says two
22         employees?
23   A.    Yes.

22

1    Q.    Okay. Well, let's back up a little
2          bit. The application says you were
3          employed by C & J Associates. So who
4          else was employed besides Mr. Duncan?
5    A.    You know, when I -- I explained that
6          earlier, that I assisted my husband as
7          his wife.
8    Q.    Yes, ma'am. I understand that. What
9          I'm asking is: Who else works there?
10   A.    Mr. Duncan -- you will have to ask him
11         that.
12   Q.    So you don't know if there's any other
13         employees there?
14   A.    Right.
15   Q.    Let me make sure I understand you.
16         This company that you said you were
17         the chief accountant of, you don't
18         know how many employees it has or who
19         they are?
20   A.    Right.
21   Q.    Okay. If you will, please, ma'am,
22         look at -- let's look at Defendants'
23         Exhibit No. 3. Have you got that

23

1          ma'am?
2    A.    Yes.
3              (The referred-to document was
4               marked for identification as
5               Defendants' Exhibit No. 3.)
6    Q.    What does that appear to be to you?
7    A.    Invitation to Bid.
8    Q.    And do you recognize it to be such;
9          that that's what that is?
10   A.    Yes.
11   Q.    Okay. And you work with those in your
12         job, do you not?
13   A.    No, I don't. In my job?
14   Q.    With the Department of Transportation
15         not with C & J.
16   A.    Neither one.
17   Q.    You've never seen that kind of, report
18         before?
19   A.    Yes. I have seen this before.
20   Q.    But that is in your role with C & J
21         that you've seen that kind of report?
22   A.    Yes.
23   Q.    Okay. And that report, down at the

24

1          bottom, has some signatures, does it
2          not?
3    A.    Yes, it does.
4    Q.    And it's signed by you, Janice Duncan;
5          is that right?
6    A.    Yes.
7    Q.    And what do you show your title as
8          being?
9    A.    Vice president.
10   Q.    Okay. And are you vice president of
11         C & J Associates?
12   A.    I'm Mr. Duncan's wife, and whatever he
13         asked me --
14   Q.    Yes, ma'am. I understand that you and
15         Mr. Duncan are married. But my
16         question to you is: Are you the vice
17         president of C & J Associates?
18   A.    Curtis is my husband. And, as his
19         wife, whatever role he asked me to
20         assume for him, then that's what I
21         used. I'm his wife. I'm his
22         assistant in every area.
23   Q.    Yes, ma'am. I understand you're his

6 (Pages 21 to 24)

JANICE DUNCAN - 4/11/2006

25

```
          wife. We got that part covered.
 2    A.  Uh-huh.
 3    Q.  I understand that. I think Mr. Long
 4        and I will stipulate for the record
 5        that our understanding is that you are
 6        Mr. Duncan's wife.
 7    A.  I'm his assistant in any kind of way
 8        that he asked me to be.
 9    Q.  The title of vice president, how long
10        have you held that title?
11    A.  As long as Mr. Duncan, my husband,
12        needed me to.
13    Q.  All right. When did you start being
14        the vice president?
15    A.  When I signed this document.
16    Q.  Okay. On March 26 of 2003, you became
17        vice president of C & J Associates; is
18        that right?
19    A.  Yes, I -- well, I signed it based on
20        what Mr. Duncan asked me to sign.
21    Q.  Okay. But my question is: On
22        March 26, 2003, did you became vice
23        president of C & J Associates? You
```

27

```
 1        Mr. Duncan needs me to be, that's what
 2        I am. I'm his wife.
 3    Q.  Would you like a break so y'all can
 4        confer to see if you are vice
 5        president today?
 6              We -- we can take a break
 7        for a moment and y'all can step out in
 8        the hall and you can confer. But I
 9        want an answer to the question, ma'am,
10        and we're going to sit here until you
11        give me an answer. I'm not trying to
12        be disrespectful, but we're entitled
13        the answers to these questions. If
14        you would like to take a break and
15        discuss it with Mr. Duncan, we'd be
16        happy to do that.
17              MR. LYLES: Yes, sir?
18              MR. DUNCAN: Am I permitted to
19          speak, or do I just
20          remain silent?
21              MR. LYLES: You can interpose
22          objections. Let me
23          explain to you about an
```

26

```
 1        can answer that.
 2    A.  Mr. Duncan, my husband, asked me to
 3        sign that, and I signed it as vice
 4        president.
 5    Q.  Okay.
 6    A.  I take different roles depending on
 7        what he asked me to --
 8    Q.  I'm sorry?
 9    A.  I signed it as vice president as my
10        husband asked me to.
11    Q.  And as we sit here today, are you vice
12        president?
13    A.  As we sit here today, I'm Mr. Duncan's
14        wife, and whatever he needs me --
15    Q.  Yes, ma'am. We understand --
16    A.  -- to assist him then that's the role
17        that I take.
18    Q.  Okay. My question to you is: As we
19        sit here today, being Mr. Duncan's
20        wife -- I think we got that part down
21        -- are you the vice president of C & J
22        Associates?
23    A.  As I sit here today, the role that
```

28

```
 1        objection. Objection
 2        notes that you object to
 3        the question. It does
 4        not mean she doesn't have
 5        to answer it.
 6              So you can object.
 7        If there's a problem you
 8        have with the question,
 9        you can state your reason
10        for the objection. She
11        still has to answer the
12        question.
13        MR. DUNCAN: Well, I'm not
14          technically objecting to
15          your question.
16        MR. LYLES: Then you can't.
17        MR. DUNCAN: Well --
18        MR. LYLES: Mr. Duncan, you
19          can't -- unless you're
20          objecting, you can't
21          talk.
22        MR. DUNCAN: Well, I'm
23          objecting to the
```

7 (Pages 25 to 28)

JANICE DUNCAN - 4/11/2006

29

1    question.
2        My wife has stated
3    that she served various
4    roles for me. I'm the
5    sole proprietor of the
6    company. She served
7    various roles, be it when
8    she's doing the
9    accounting, typing up an
10    invoice, or whatever.
11    MR. LYLES: All right.
12    MR. DUNCAN: According to the,
13        you know, federal --
14        state law, sole
15        proprietor -- husband's
16        wife, the wife can
17        perform various roles in
18        the company.
19    MR. LYLES: All right.
20    MR. DUNCAN: She doesn't have
21        to be paid.
22    MR. LYLES: Okay.
23    MR. DUNCAN: And the documents

31

1    then I would say today the answer
2    would be no.
3    Q.    Okay. Tell me what date you ceased
4        being vice president, if you will,
5        please, ma'am.
6    A.    I don't remember.
7    Q.    Well, do you think it was -- was it,
8        like, this week that you stopped being
9        vice president?
10    A.    No. It would have been a while back.
11    Q.    Okay.
12    A.    But, like I say, the role changes. If
13        I'm needed to be vice president, then
14        I'm vice president.
15    Q.    What is your role today?
16    A.    Curtis Duncan's wife.
17    Q.    Yes, ma'am. We've got that part. But
18        what is your role with C & J
19        Associates today?
20    MR. DUNCAN: I'm going to
21        object again. I mean,
22        she said she serves in
23        various roles.

30

1    that you reviewed up to
2    this point, it just
3    showing her various roles
4    in assisting me in my
5    business.
6    MR. LYLES: Okay. Is that
7        your objection?
8    MR. DUNCAN: Sir?
9    MR. LYLES: Is that your
10        objection?
11    MR. DUNCAN: Yeah. That's my
12        objection. I just, you
13        know --
14    Q.    Mrs. Duncan, you may go ahead and
15        answer the question.
16    A.    Could you repeat the question?
17    MR. LYLES: Could you read
18        that question back to her
19        please?
20    (Requested portion of record
21    read, Page 26, Line 17.)
22    A.    Based on the fact that my role changes
23    depending on what my husband needs,

32

1    MR. LYLES: Yes, sir. I
2        understand that.
3    MR. DUNCAN: She's here
4        because y'all, you know,
5        asked us to come to the
6        deposition.
7    MR. LYLES: Yes, sir. I
8        understand.
9    MR. DUNCAN: And she just
10        explained the various
11        roles that she -- that
12        she performed for my
13        company.
14    MR. LYLES: Okay.
15    MR. DUNCAN: I just don't --
16    A.    The answer -- the answer would be that
17    my role at C & J has been Curtis
18    Duncan's wife, the owner of C & J Pest
19    Control.
20    Q.    Okay. Well, let me ask it another
21    way. Maybe I just don't understand.
22    Maybe everybody in the room does
23    except me.

8 (Pages 29 to 32)

JANICE DUNCAN - 4/11/2006

33

Do you have a role in
2  C & J Associates as we sit here today,
3  other than being Curtis Duncan's wife?
4       MR. DUNCAN: I'm going to
5          object again because she
6          just said she assists me
7          in --
8       MR. LYLES: Okay. Well, I
9          understand your objection
10         --
11      MR. DUNCAN: -- a variety of
12         --
13 A.  Yes. Yes. I have a role at C & J.
14 Q.  Okay. What is it?
15 A.  My role is to be whatever my husband
16     needs me to be; that's my role.
17 Q.  Okay. How much do you get paid for
18     being whatever it is that your husband
19     needs you to be?
20 A.  If I -- I don't get paid for whatever
21     it is my husband needs me to do. If I
22     were to estimate it, I would take how
23     much -- he pays the bills and how much

34

1      that's worth as far as the work I do
2      for him --
3  Q.  Okay.
4  A.  -- as my husband.
5  Q.  Well, let me ask this about this
6      application then -- let's go back to
7      that because I'm apparently still
8      missing the boat on that. It says
9      currently part-time, and that was in
10     2002.
11         Is that still true, that
12     you currently work part-time in
13     performing these functions that you
14     said you performed as chief
15     accountant?
16 A.  I performed different roles --
17 Q.  Whatever your husband --
18 A.  -- as needed by my husband.
19 Q.  Okay. Well, let's do it this way.
20     Today is April the 10th, or is it the
21     11th -- it's the 11th. Since January
22     of this year, January through April,
23     tell me the various offices, titles,

35

1      or roles that you have performed with
2      C & J Associates.
3  A.  It's so varied, I would have to sit
4      here and think for a while.
5  Q.  Okay. Well, we've got plenty of time.
6       MR. DUNCAN: I'm going to
7          object one more time.
8          The objection is -- I
9          mean, she done made it
10         clear that she performs
11         various roles with my
12         company.
13      MR. LYLES: Okay.
14      MR. DUNCAN: And I'm the sole
15         proprietor of it.
16      MR. LYLES: Mr. Duncan, we
17         understand your
18         objection. She still has
19         to answer the question.
20      MR. DUNCAN: I mean, the
21         answer to that question
22         would be that she --
23      MR. LYLES: No, sir. No, sir.

36

1          You're not going to
2          answer the question.
3       MR. DUNCAN: Well, I'm not
4          answering the question.
5       MR. LYLES: Yes, you are. And
6          you're not going to do
7          it. We're going to stop
8          the deposition and get it
9          reset.
10      MR. DUNCAN: Okay. I
11         understand what you're
12         saying. But what I'm
13         saying, she served --
14         she's serving various
15         roles. She's stated that
16         several times.
17      MR. LYLES: Okay. And you can
18         say that when it's your
19         turn to testify. But
20         right now, it's her time.
21         I want to know what
22         roles she's performed
23         since January the 1st of

JANICE DUNCAN - 4/11/2006

---

37

1    2006, up until today.
2  A.  What role?
3       MR. DUNCAN:  That would be any
4         role that --
5       MR. LYLES:  Mr. Duncan --
6       MR. DUNCAN:  Okay.  What I'm
7         saying is she's served
8         various roles --
9       MR. LYLES:  Mr. Duncan, this
10        is not your deposition,
11        sir.
12      MR. DUNCAN:  Okay.
13 Q.  Now, Mrs. Duncan, what I'd like to
14      know from you is:  What roles have you
15      performed since January the 1st of
16      2006 to the present for C & J
17      Associates?
18           If you need a moment to
19      think about it, that's fine.  If y'all
20      need to take about a five-minute break
21      and discuss it, that's fine.  But I'd
22      like to know the roles besides being
23      Curtis Duncan's wife.

---

38

1  A.  Well, that would be the number one
2      role.
3  Q.  Okay.
4  A.  And if he needs me to be -- do
5      accounting work, I would serve in that
6      role.
7  Q.  Well, let's start -- let's start with
8      that then.  Since January the 1st of
9      2006, have you done accounting work?
10 A.  Yes.
11 Q.  Since January 1, 2006, have you
12      performed as vice president of the
13      company?
14 A.  I don't remember that I have.
15 Q.  Since January 1, 2006, have you
16      performed as chief accountant of the
17      company?
18 A.  Yes.
19 Q.  Okay.  And in doing that, you've done
20      various things that are on your
21      application since January 1, 2006; is
22      that right?
23 A.  Yes.

---

39

1  Q.  Okay.  All right.  Now, the day that
2      you were vice president on March 26,
3      2003, tell me how you came to sign
4      this Invitation to Bid that day as
5      vice president; just tell me what
6      happened.
7  A.  I'm not sure if I understand your
8      question.
9  Q.  The day that this Invitation to Bid
10      was signed by you as vice president,
11      tell me how you came to sign it as
12      vice president.
13 A.  Well, I signed it.  My husband asked
14      me to sign it.
15 Q.  Okay.  Was he, like, out of town or
16      something and needed you to sign it so
17      you could get it turned in or -- just
18      tell me what happened.  Were y'all
19      having breakfast that morning and he
20      said, I want you to be vice president
21      today, and I want you to sign this
22      document?
23 A.  Well, Mr. Duncan asked me to sign it,

---

40

1      so I guess he could give the whole
2      details --
3  Q.  Yes, ma'am.  I'm going to ask him
4      about --
5  A.  -- because he was --
6  Q.  -- it, I promise you.  But I want you
7      to tell me what you remember.
8  A.  He was absent, and so he wasn't
9      available to sign it.  So he asked me
10      to sign for him.
11 Q.  And then when you got to work, you
12      took it down to Ms. Conway to notarize
13      for you?
14 A.  Ms. Conway asked if she could notarize
15      it.
16 Q.  Okay.  Tell me about that.  How did
17      she come to ask you if she could
18      notarize this document?  How did she
19      know about it?
20 A.  I was getting other documents
21      notarized, and that reminded me that I
22      needed to get Mr. Duncan's signed and
23      notarized because he asked me to.

---

10 (Pages 37 to 40)

41

Q. Okay.
A. She said, Let me do that for you.
   I said, No, I could get
   it done.
   And she said, No, I can
   do that for you.
   I said, You don't get in
   any trouble for doing this?
   She said, no.
   So I took it by there
   during lunchtime.
Q. During lunchtime on the 26th of March?
A. Yes.
Q. Well, had you ever been vice president
   before, or was this your first day as
   vice president?
A. I can't remember being that my role
   changes.
Q. Have you been other officers in the
   company before? Have you been, like,
   treasurer or secretary?
A. Chief accountant would include
   treasurer, so yes.

42

Q. Oh, okay. Well, tell me the different
   offices you've held in the company,
   besides whatever your husband asked.
   Tell me the names of the different
   offices you've held in the company.
A. I'm sorry. I could hardly hear you.
Q. Please tell me the names of the
   different offices you've held in the
   company. I understand it's whatever
   your husband asked you to do --
A. Uh-huh.
Q. -- but tell me the names of the
   offices that you remember holding in
   the company.
A. Chief accountant, vice president,
   secretary.
Q. And that would just vary from whatever
   your husband needed you to perform at
   that point in time; is that right?
A. Yes.
Q. All right. Let's look for a moment --
   if you could, hand me those back so we
   can keep them straight, because we're

43

going to be talking about them a lot
today.
   Let's look at Exhibit
No. 9 for a moment. Do you recognize
that document?
A. Yes.
Q. What kind of document is that, please,
ma'am?
   (The referred-to document was
   marked for identification as
   Defendants' Exhibit No. 9.)
A. State requisition.
Q. And what is that requisition for?
A. Well, it has requisition title, Pest
Control.
   MR. DUNCAN: I'm going to
   object for a second. Is
   that part of this -- the
   deposition?
   MR. LYLES: I'm sorry?
   MR. DUNCAN: Is that part of
   the deposition that you
   required us to bring?

44

MR. LYLES: No. That document
   is not. That's an
   exhibit that I'm asking
   questions about.
MR. DUNCAN: Is that -- are we
   supposed to go outside of
   what you required us to
   --
MR. LYLES: Oh, yeah.
MR. DUNCAN: -- to bring?
   That's for the record?
MR. LYLES: Uh-huh.
MR. LONG: Mr. Duncan, when I
   take your deposition,
   I've got a lot of records
   to ask you about.
MR. DUNCAN: I didn't hear
   you.
MR. LONG: I've got a lot
   records, when I take your
   deposition, to ask you
   about.
MR. DUNCAN: Bring it on.

11 (Pages 41 to 44)

JANICE DUNCAN - 4/11/2006

45

1   Q.   And that is a requisition for pest
2        control in the amount of $1,320; is
3        that right?
4   A.   That's what it reads -- shows here.
5   Q.   Okay. And who is that requisition
6        for? Who gets the $1,320?
7   A.   I don't know. I'm sorry. I don't
8        know.
9   Q.   You don't know?
10  A.   Who gets the $1,300?
11  Q.   Uh-huh. Is there anything on here
12       that identifies the vendor or the
13       contractor that that money is going
14       to?
15  A.   I -- I don't see it.
16  Q.   Do you know who it's for?
17  A.   It says pest control.
18  Q.   Yes, ma'am. I understand that. Is
19       there anything on that document that
20       reflects that it's C & J Pest Control?
21       Take a moment and look at it.
22  A.   I'm looking at the front page. Are
23       you looking at other pages?

46

1   Q.   You look through it and you let me
2        know.
3             MR. DUNCAN: I'm going to
4             object to -- you know --
5             and the reason behind the
6             objection is, you know,
7             you gave us a list, which
8             you were going to depose
9             us on.
10            MR. LYLES: Okay. Your
11            objection is on the
12            record, Mr. Duncan.
13  Q.   Go ahead and answer the question,
14       Mrs. Duncan.
15            MR. DUNCAN: So I just want it
16            for the record that we're
17            objecting to that
18            question.
19            MR. LYLES: Okay. That's
20            fine.
21  Q.   Look on the next page, if you will,
22       please, ma'am. Let's see, there's two
23       pages that appear to be the agency

47

1        requisition pages; is that right?
2   A.   I see a agency requisition, yes.
3   Q.   Okay. And on the second page -- well,
4        that's part of that same form, is it
5        not? It says agency requisition up at
6        the top of it. Are you with me?
7   A.   Uh-huh, yes.
8   Q.   And then stapled to that, what is
9        that? Turn the page.
10  A.   I'm not sure.
11  Q.   Okay. Well, take a moment. What does
12       it appear to be?
13  A.   It's on C & J letterhead.
14  Q.   Okay.
15  A.   And it proposal on it.
16  Q.   Okay. And does it also have the
17       amount of $1,320?
18  A.   I see 1,320 in this proposal.
19  Q.   Okay. And that's the same amount as
20       that requisition, isn't it?
21  A.   1,320 and 1,320, yes.
22  Q.   So do you think maybe that requisition
23       is for C & J Pest Control?

48

1   A.   I have -- I do not know.
2   Q.   Have you ever seen that before?
3   A.   Yes. I've seen this requisition.
4   Q.   In fact, you approved it, did you not?
5   A.   No, I didn't.
6   Q.   Look up at the top, right-hand corner.
7   A.   Uh-huh.
8   Q.   Isn't that "JD"?
9   A.   Yes.
10  Q.   Isn't that your initials?
11  A.   Yes.
12  Q.   Isn't that the way you designate
13       documents when you approve them?
14  A.   I don't approve or award a contract.
15  Q.   Mrs. Duncan, does that document have
16       "JD" at the top of that form?
17  A.   Yes, it does.
18  Q.   Did you put that on there?
19  A.   Yes, I did.
20  Q.   What does your initials on that mean?
21  A.   It means that I approved the
22       accounting distribution on the second
23       page.

12 (Pages 45 to 48)

JANICE DUNCAN - 4/11/2006

49

Q.   You approved the money to be paid out;
2    is that right?
3    A.   No.
4    Q.   Okay.  Tell me what accounting
5    distribution means?
6    A.   Okay.  Where it says
7    "interdepartmental distribution," it's
8    got 8010 -- a long line of numbers:
9    8010, 910, 653.
10   Q.   Okay.  What does that mean?
11   A.   That means that the object code, 653,
12   is for pest control services.  The
13   8010 is the account that DOT wants to
14   pay for pest control services from.
15   Q.   Okay.  So you approved that
16   requisition for payment; is that
17   right?
18   A.   I approved the accounting distribution
19
20   Q.   When you did that -
21   A.   -- for payment with that -- for
22   payment with that distribution.
23   Q.   Okay.  Let's back up a little bit.

50

1    I'm confused again; I apologize.  A
2    while ago, you told me that since
3    January 1 of 2006, up until April
4    11th, you have performed various
5    functions for C & J Associates.  Do
6    you remember telling me that?
7    A.   Yes.
8    Q.   And during this same period of time,
9    according to this document, you
10   approved or processed a requisition
11   for payment to C & J, and, in fact,
12   went as far as putting your initials
13   on them, didn't you?
14   A.   No.  I did not approve a
15   requisition --
16   Q.   Did you process this requisition,
17   Mrs. Duncan?
18   A.   No.  No.
19   Q.   Who snuck in there and put your
20   initials on it?
21   A.   That's my initials.  To say that --
22   Q.   You put them on there yourself?
23   A.   I put my initials on there, yes.  But

51

1    that's to show that I approved the
2    accounting distribution.  Stan Carlton
3    approved requisitions.  I did not.
4        THE COURT REPORTER:  Stan who?
5        THE WITNESS:  Carlton.
6    Q.   So this had already been to
7    Mr. Carlton when put your initials on
8    it?
9    A.   I'm not sure.
10   Q.   How does it normally work?
11   A.   Mr. Carl --
12   Q.   How does it normally work?
13   A.   How does it normally work?
14   Q.   Yes, ma'am.
15   A.   How does the flow of the requisition
16   normally work?
17   Q.   Uh-huh.
18   A.   It would come to my office, my
19   section, from the mail clerk in the
20   finance and audits bureau.
21   Q.   Okay.  Would it go to Mr. Carlton
22   before it comes to you?
23   A.   Normally, it should.

52

1    Q.   Could you show me on this document
2    where it's reflected whether or not it
3    went to him before you put your
4    initials on it?
5    A.   (No response.)
6    Q.   Mrs. Duncan?
7    A.   I don't know if it went to Mr. Carlton
8    or not looking at this document.
9    Q.   Mrs. Duncan, do you see perhaps some
10   kind of conflict with you approving
11   paperwork for a company that you've
12   told us that you performed various
13   functions in, from chief accountant to
14   vice president to doing whatever your
15   husband asked, and you've admitted
16   doing that up until today?  And this
17   requisition was dated, was it not --
18   well, help me with it.  You're the
19   expert on this.  What's the date of
20   this requisition?
21   A.   I'm not the expert on this document.
22   Q.   Okay.
23   A.   Mr. Carlton would be the expert on

13 (Pages 49 to 52)

JANICE DUNCAN - 4/11/2006

53

1    this document.
2  Q.  All right. Tell me -- you know more
3    about it than I do, let's put it that
4    way. Tell me what the date of this
5    document is, please, ma'am.
6  A.  I can tell you what the accounting
7    distribution is because that's what my
8    field is.
9  Q.  All right. Tell me that knowledge --
10   using that knowledge, tell me what the
11   date of this document is.
12  A.  I am not sure what the date of the
13   document is.
14  Q.  Okay. How would you be able to tell
15   what date you put your initials on
16   that?
17  A.  I wouldn't.
18  Q.  Well, do you think it was before
19   January 1, 2006?
20  A.  I have no idea. I'm sorry. I
21   wouldn't know.
22  Q.  Okay. Do you think it -- well,
23   obviously, it's not after today,

54

1    because we got it here today. So you
2    don't know whether it was done before
3    then --
4  A.  No.
5  Q.  -- or not?
6  A.  No, I do not.
7  Q.  Have you ever seen that document
8    before, other than putting your
9    initials on it?
10  A.  I'm not sure if I understand that
11   question.
12  Q.  Other than the day it came through and
13   you put "JD" up in the top, right-hand
14   corner of that document, have you seen
15   it before?
16  A.  No.
17  Q.  Let me show you a cover page of a
18   document. It's got Exhibit 9 on it.
19   And that appears to be dated
20   February 15, 2006, does it not?
21  A.  Yes.
22  Q.  That appears to be something from
23   Mr. Jackson to Mr. Carlton, does it

55

1    not?
2  A.  Yes.
3  Q.  So it would appear that that document
4    was done somewhere around that time
5    frame, does it not?
6  A.  Which document was done by that time,
7    the memo --
8  Q.  The one that you put "JD" up in the
9    top, right-hand corner.
10  A.  Oh, I have -- I don't know.
11  Q.  Oh, okay. Well, let me ask you this:
12   On that document that you put "JD" up
13   in the top, right-hand corner, it says
14   the requisition -- the requisition
15   setup date, it's got 02-02-06, what
16   does that mean?
17  A.  I don't know.
18  Q.  You don't know what that -- what that
19   requisition setup date means?
20  A.  No.
21  Q.  What about the requisition title --
22   you solved that for us. The
23   requisition document type, what's an

56

1    "A" and 1?
2  A.  What's a -- oh, an "A" 1?
3  Q.  Uh-huh.
4  A.  I'm not sure. Mr. Carlton is an
5    expert in that area so he could tell
6    you that.
7  Q.  All right. Let me ask you this: The
8    letter that's attached to it, C & J
9    Pest Control, did you draft that
10   letter as part of your duties as chief
11   accountant when you said you'd draft
12   correspondence and so forth?
13  A.  Mr. Duncan --
14  Q.  Mr. Duncan is pointing down to the
15   bottom. I think he wants you to tell
16   me who signed it, so we'll agree that
17   he signed it. But do you know whether
18   you drafted it or not?
19  A.  Mr. Duncan drafted it.
20  Q.  Okay. And how can you tell -- how do
21   you tell the difference between the
22   ones you drafted and the ones he
23   drafted?

14 (Pages 53 to 56)

JANICE DUNCAN - 4/11/2006

57

MR. DUNCAN: What was that
2    question?
3    MR. LYLES: The question was,
4        how does Mrs. Duncan tell
5        the difference between
6        the documents she drafts
7        as chief accountant for
8        you and the documents you
9        draft.
10   A.   I don't remember drafting this one.
11   Q.   Okay. You'd agree with me, though,
12       that letter from C & J Pest Control,
13       up at the top -- up in the top,
14       right-hand corner, it's got some
15       handwritten notations, doesn't it?
16   A.   Yes, uh-huh.
17   Q.   Okay. And one of them is "G" -- looks
18       like G09600553. See that?
19   A.   Yes.
20   Q.   Okay. Flip back to the first page of
21       this agency requisition form.
22   A.   Uh-huh.
23   Q.   Look a little bit down, under your

58

1    initials, does that have G09600553?
2    A.   Yes.
3    Q.   Let's look back at the C & J letter
4        for just a moment. The other number
5        up there is 1337161. You see that?
6    A.   Yes.
7    Q.   Let's flip back over to -- look right
8        up there, under your initials, and
9        it's got 1337161. Is that the same
10       number?
11   A.   It appears to be.
12   Q.   Okay. Does it look, then, that
13       perhaps this requisition was for the
14       payment of monies to C & J Pest
15       Control?
16   A.   I'm sorry. Repeat that first part of
17       the question.
18   Q.   Does it look like the money in this
19       requisition, the $1,320 dollars, which
20       also matches the $1,320 in the letter,
21       was indeed that this requisition was
22       for payment of monies to C & J --
23       MR. DUNCAN: I'm going to

59

1        object to that because --
2        THE WITNESS: No. I can
3        answer.
4        MR. DUNCAN: Okay. Go ahead.
5    A.   It doesn't -- I have no idea if it was
6        in order to C & J or not. All I can
7        say is that the numbers match.
8    Q.   Okay. The numbers match and the
9        amount matches; is that right?
10   A.   From what I can see, the numbers match
11       and the money amount, but I have no
12       idea if it was in order to C & J.
13   Q.   Okay. Well, when you approved these
14       things, are you supposed to know what
15       they're for?
16   A.   The requisition title is Pest Control,
17       and it says pest control. So that's
18       why I verify, on Page 2, the
19       accounting distribution.
20   Q.   Well, when get those things like that,
21       what are you supposed to look for in
22       order to put your initials on it?
23   A.   The accounting distribution on Page 2.

60

1    Q.   Okay.
2    A.   And the title from the requisition.
3    Q.   All right. And explain -- I don't
4        understand the accounting
5        distribution. What does that mean?
6    A.   It's the object code that the funds --
7        money would be paid or -- and the name
8        of this payment is pest control
9        services and so is the account.
10   Q.   Okay. And so -- but you have to put
11       those initials on there and review
12       this before it's processed further for
13       payment?
14   A.   Before -- yes.
15   Q.   Before the check is cut?
16   A.   Before a purchase order is issued, the
17       accounting distribution.
18   Q.   As chief accountant or vice president
19       or treasurer of C & J, do you know of
20       other lawsuits that C & J has filed
21       against various -- against any other
22       state agencies?
23   A.   My husband, Mr. Duncan, could answer

15 (Pages 57 to 60)

JANICE DUNCAN - 4/11/2006

61

1    that question.
2  Q.  Yes, ma'am. But I'm asking you what
3      you know.
4  A.  My husband and I have confidential
5      conversations. So that would be
6      confidential --
7  Q.  No, ma'am, it's not. I'm sorry.
8      You're going to have to answer the
9      question.
10  A.  And what was the question?
11  Q.  What other lawsuits do you have
12      against state agencies; and, by you, I
13      mean C & J Associates?
14  A.  I don't know of any.
15  Q.  All right.
16  A.  I can't remember any.
17  Q.  Now, Mrs. Duncan, your background --
18      tell me your educational background,
19      please, ma'am.
20  A.  I have a BS in accounting.
21  Q.  Okay. Let's see -- Oh, I found it
22      here on your application. I'm sorry.
23      It's Massey Draughn Business. You've

62

1      got a diploma from them in 1980 for
2      accounting and general business; is
3      that right?
4      MR. DUNCAN: Mr. Lyles, I'm
5          going to object. What's
6          the relevance of her
7          qualifications?
8      MR. LYLES: Mr. Duncan, I
9          don't have to explain the
10          relevance to you. If you
11          want to object, go ahead.
12      MR. DUNCAN: Well, I object to
13          the line of questioning.
14          I just don't -- I'm
15          trying to find out the
16          relevance of her
17          educational background.
18      MR. LYLES: You're certainly
19          entitled to put your
20          objection on the record.
21      MR. DUNCAN: Okay. Well, I
22          want it to be reflected
23          on the record.

63

1      MR. LYLES: Okay.
2  Q.  And you're -- I didn't hear your
3      answer. I'm sorry. You got a diploma
4      from Massey Draughn in 1980?
5  A.  Yes.
6  Q.  And a business degree from Troy State
7      in accounting in 1996?
8  A.  Yes.
9  Q.  And you've done some work for your
10      master's --
11  A.  Yes.
12  Q.  -- in business at AUM; is that right?
13  A.  Yes.
14  Q.  Have you finished those requirements
15      yet? Have you gotten your master's
16      yet?
17  A.  No.
18  Q.  Based on your educational background,
19      what you've taken, what is your
20      understanding of the corporate makeup
21      or the structure of C & J and
22      Associates?
23  A.  Sole proprietor.

64

1  Q.  And how long has it been a sole
2      proprietor?
3  A.  Ever since it's been in business.
4  Q.  And does sole proprietors usually have
5      various officers like secretary,
6      treasurer and vice president and so
7      on?
8  A.  Sole proprietor has a lot of
9      flexibility in that they can -- it's a
10      one-man company. They can have people
11      perform different duties, tasks, or
12      roles.
13  Q.  Okay. Do you know what DBE status is?
14  A.  (No response.)
15  Q.  Mrs. Duncan?
16  A.  Disadvantaged Business Enterprise.
17  Q.  Okay. Is C & J registered under --
18      for DBE status?
19  A.  I don't know.
20  Q.  DEB status, one of the classifications
21      of that would be a woman-owned, small
22      minority, would it not?
23  A.  I believe it would.

16 (Pages 61 to 64)

JANICE DUNCAN - 4/11/2006

65

Q. As we sit here today, do you have --
let's look back at Defendants' Exhibit
No. 1. Do you have any idea how that
information got to the State Finance
Department, or wherever that form came
from, about it being a partnership?
A. No.
Q. You have any recollection whatsoever
of you filling out any forms or
applications to get that status?
A. No.
Q. Do you have any recollection of
looking over any forms, requests, or
documents that your husband filled
out?
A. Filled out for?
Q. To get that status.
A. No.
Q. Before I showed you that document,
before you saw that document, did you
know that it was registered that way?
A. No.
Q. As chief accountant, are you going to

66

take some steps to try to correct that
registration after today?
A. If my husband wants me to correct it,
I will.
Q. Let me show you what I have marked as
No. 7. Do you recognize that?
A. Yes.
(The referred-to document was
marked for identification as
Defendants' Exhibit No. 7.)
Q. And is that a receipt where you got a
handbook or something from the
Department of Transportation that's
distributed to employees?
A. Yeah. It says, Principles of Business
Conduct Handbook.
Q. Do you remember getting that?
A. I don't remember getting it, no.
Q. Obviously, you signed the form.
Apparently, you got one at some point;
right?
A. Yes. Uh-huh.
Q. All right. Can I have that back,

67

please, ma'am?
Now, the reason I asked
you about that the book is it has a
section that says (as read:) "ALDOT
employees are prohibited from engaging
in activities where a conflict or
perceived conflict of interest may
exist."
Do you remember ever
seeing that in that book?
A. No. I can't remember seeing that in
the book.
Q. You understand that term, though, what
that would be?
A. Yes.
Q. Mrs. Duncan, do you see how that can
possibly be perceived as a conflict of
interest for you to process any of the
paperwork for payment of monies to
your husband's company --
A. No, I --
Q. -- which you are employed?
A. Okay. No. I did not see where

68

there's a conflict because I do not
process the paperwork.
Q. All right --
A. And you have in your hand a
requisition.
Q. Let's back up. I misunderstood
something. I see initials "JD" on
that; right?
A. Yes.
Q. This piece of paper has to go by you;
is that right?
A. For the accounting distribution.
Q. Yes, ma'am. But it is paperwork,
nevertheless, in the process of
getting your husband paid; right?
A. No. Not for getting my husband paid.
Q. So if this step in the -- let me make
sure I understand you. If this step
in the process is just left out --
okay -- this step where it goes to
someone in your office for approval,
if that's just left out of the process
entirely, then checks still go out?

17 (Pages 65 to 68)

JANICE DUNCAN - 4/11/2006

69

1  A.  That's right.
2  Q.  Then why would it come to you?
3  A.  It comes to me to verify the
4      accounting distribution so that
5      payment will be properly applied to
6      the correct accounting code or object.
7  Q.  Okay. What happens if you don't
8      verify it?
9  A.  Then, hopefully, the accounting
10     distribution is proper and payment
11     gets made.
12 Q.  What if it's -- what if it's wrong?
13 A.  If it's wrong, then the --
14 Q.  Do you say, No, this isn't right; I'm
15     not going to approve it? What happens
16     then?
17 A.  If -- okay. When you say, "if it's
18     wrong --
19 Q.  If for some reason this document comes
20     to you and you look at it for whatever
21     you look at it for and you say, No,
22     this isn't right; I'm not going to put
23     my initials on it, what happens?

70

1  A.  Well, if I wouldn't put my initials on
2      it, it's because the accounting
3      distribution is not proper.
4  Q.  Okay. What happens then?
5  A.  So I would contact the bureau or
6      division to verify.
7          The title says, Pest
8      Control. Pest control is an object
9      code that if I needed to look, and I
10     see no problems, I would look at the
11     accounting distribution and approve
12     it. But if it were a more
13     difficult-type accounting code, then I
14     would call the division or bureau and
15     let them know that the accounting
16     distribution does not agree to what
17     the title description -- I mean, a
18     description of the requisition.
19 Q.  What if I said, well, Mrs. Duncan, we
20     don't care what you say; we're not
21     going to fix it; we're not changing
22     it? What happens then?
23 A.  Then I would pass it along to my chief

71

1      accountant.
2  Q.  Who is that?
3  A.  Actually, to my immediate supervisor,
4      Sylvia Stafford.
5  Q.  What would happen then? As long as
6      y'all -- let me ask you this: As long
7      as this paper is being passed around
8      to make sure the right code is got on
9      it, would the requisition get paid?
10 A.  Requisitions do not get paid.
11 Q.  Would the person -- would that $1,320
12     go anywhere until you sorted out
13     whatever you disagreed with on that
14     piece of paper?
15 A.  The purchase order would not get
16     issued until the accounting --
17 Q.  What happens when a purchase order is
18     issued?
19 A.  The customer -- the vendor does the
20     work and then an invoice is submitted
21     and then payment is made.
22 Q.  Okay. So the purchase order wouldn't
23     go out until whatever is wrong with

72

1      this got straightened out?
2  A.  Well, there has to be many different
3      factors that would determine if it
4      actually got held up.
5  Q.  But if it got held up, all that has to
6      be straightened out before the
7      purchase order goes out; right?
8  A.  Hopefully so, yes.
9  Q.  Now, let me make sure I understood
10     something you told me a while ago.
11     You didn't participate in the drafting
12     of this complaint; is that right?
13 A.  I --
14 Q.  Other than proofreading?
15 A.  I may have assisted somewhat in maybe
16     looking up a policy or procedure or
17     something and may have helped typed
18     something.
19 Q.  Tell me what you remember doing with
20     the process of getting this lawsuit
21     filed against these people down here
22     at the end of the table.
23 A.  I can't remember anything specific

18 (Pages 69 to 72)

JANICE DUNCAN - 4/11/2006

73

that I did on it.
2  Q.  Well, tell me what you know about this
3      lawsuit.
4  A.  That my husband filed this lawsuit in
5      the Federal Court.
6          MR. LYLES:  Let's take a
7          ten-minute break.
8          (Brief recess was taken at
9          10:06 a.m., and deposition
10         testimony reconvened at
11         10:18 a.m.)
12 Q.  Mrs. Duncan, I'm going to ask you a
13     couple more questions about this
14     Exhibit 9 we looked at, and that was
15     about the requisition.  I just
16     realized one of the pages is stapled
17     in here out of order.
18         Could you look at that
19     for me, please, ma'am.  Does that page
20     of the document reflect anywhere who
21     the $1,320 was to be paid to?
22 A.  Not sure.  Stan Carlton is the expert
23     --

74

1  Q.  Yes, ma'am.  I understand.
2  A.  -- on awarding contracts --
3  Q.  I'm asking you about that page right
4      in front of you.  Does it have the
5      name C & J Associates on it?
6  A.  I see C & J Associates, yes.
7  Q.  And are you telling me you don't know
8      whether or not that means that they
9      get the money?
10 A.  Right.  That's what I'm telling you.
11     Mr. Carlton is the expert on --
12 Q.  Yes, ma'am.
13 A.  -- purchasing and procurement.  I'm
14     the accounting expert -- hopefully,
15     expert.
16 Q.  Okay.  So where it says "recommended
17     vendor, C & J Associates," you're
18     telling me you don't know whether that
19     means that's who the requisition is
20     for; is that right?
21 A.  Right.  Mr. Carlton could answer that
22     for you.  I'm account -- accounting
23     distributions.

75

1  Q.  So when you see that page in the
2      documents that you approve, that just
3      doesn't mean anything to you?
4  A.  Right.  Because I approve the
5      accounting distribution.  It means
6      nothing to me.
7  Q.  Okay.  Now, I think right when we
8      stopped, I was asking you about
9      knowledge that you have about this
10     lawsuit.  And you told me that --
11     well, I forgot what you told me.  Tell
12     me what knowledge you do have about
13     this lawsuit, please, ma'am.
14 A.  Okay.  My husband filed the suit.
15     He's attended a hearing.  We're here
16     at the deposition.
17 Q.  Okay.  Are you telling me that you
18     don't know anything about any of the
19     facts of this lawsuit?
20 A.  I've sat through the hearing so, yes,
21     I know some of the facts.
22 Q.  And that was the hearing when we were
23     over here with Judge Boyd, over in the

76

1      courtroom?
2  A.  Yes.  Yes.
3  Q.  When was that?  Do you remember?
4  A.  No, I don't remember.
5  Q.  But it was sometime after the lawsuit
6      was filed; is that right?
7  A.  Yes.
8  Q.  Let me show you a pleading of this
9      lawsuit that your husband filed.  So
10     this pleading I'm showing you is
11     Plaintiff's Response to Initial
12     Disclosures.
13 A.  Yes, I see.
14 Q.  And as people that have knowledge of
15     the lawsuit, what does your husband
16     have down there?
17 A.  What does my husband have?
18 Q.  Uh-huh.  What did he put down there?
19 A.  Do I need to read this?
20 Q.  Yes, ma'am.  Right here where I'm
21     pointing.
22 A.  The names of Curtis Duncan and Janice
23     Duncan.

19 (Pages 73 to 76)

JANICE DUNCAN - 4/11/2006

77

1  Q.  Okay. As the --
2  A.  (As read:) "As the individuals most
3      likely to have discoverable
4      information relevant to this case."
5  Q.  Are you telling me today that that's
6      an error?
7  A.  No. It's not an error.
8  Q.  Okay. Tell me everything you know
9      about this case then?
10 A.  My husband was not available so he had
11     me to sign the document.
12 Q.  Which document?
13 A.  The bid document.
14 Q.  The Invitation to Bid?
15 A.  Yes.
16 Q.  And what else do you know?
17 A.  And he had me to proofread the
18     complaint for typographical errors.
19     He may have had me to look up a law or
20     a procedure or something.
21 Q.  Okay.
22 A.  And --
23 Q.  Do you remember whether you typed this

78

1      pleading or not?
2  A.  Mr. Duncan.
3  Q.  I'm sorry?
4  A.  Mr. Duncan typed that procedure.
5  Q.  Okay. Outside of what you just told
6      me, do you know anything else about
7      the facts of this lawsuit?
8  A.  If you could be a little more specific
9      than what you're saying. Because I
10     proofread it, so I would know --
11 Q.  I'm just -- I'm trying to find --
12 A.  -- some of the things --
13 Q.  -- out.
14 A.  -- but I don't remember a lot of it.
15 Q.  Yes, ma'am. I'm trying to find out
16     what this pleading means. It says
17     Curtis Duncan and Janice Duncan are
18     the individuals most likely to have
19     discoverable information relevant to
20     this case, and --
21 A.  Mr. Duncan put that in there so he
22     could answer.
23 Q.  No, ma'am. I'm asking you what you

79

1      know about this case, because your
2      name is on this pleading as filed by
3      Mr. Duncan.
4         MR. DUNCAN: I object.
5         MR. LYLES: You can go ahead
6      and object.
7            But you're going to
8      answer the question.
9         MR. DUNCAN: What I'm
10     objecting to is because I
11     prepared the document.
12     MR. LYLES: That's right. You
13     sure did.
14     MR. DUNCAN: And I prepared
15     the complaint.
16     MR. LYLES: Yes, sir.
17     MR. DUNCAN: My wife assist me
18     in business functions as
19     she's done all through
20     the years.
21     MR. LYLES: Mr. Duncan, let me
22     explain something to you.
23     The reason we filed these

80

1      disclosure documents is
2      to tell both sides who
3      the possible witnesses
4      are.
5      MR. DUNCAN: Right.
6      MR. LYLES: And who they have
7      to go talk to, to find
8      out about the other
9      side's case.
10     MR. DUNCAN: Right.
11     MR. LYLES: You have put
12     yourself and your wife.
13     That --
14     MR. DUNCAN: I put my wife --
15     MR. LYLES: -- entitles --
16     MR. DUNCAN: I want to explain
17     what -- I put my wife on
18     there because she signed
19     the document.
20     MR. LYLES: That may be.
21     MR. DUNCAN: That's -- that's
22     what --
23     MR. LYLES: But I'm entitled

81

```
          to ask her, since you
 2        filed this, and I will
 3        ask her --
 4    MR. DUNCAN: Okay.
 5    MR. LYLES: And I want to --
 6    MR. DUNCAN: Because outside
 7        of her signing this
 8        document, basically, I'll
 9        have all the direct, you
10        know, pertinent
11        information that you need
12        about the facts of the
13        case.
14 Q.   Mrs. Duncan, tell me everything you
15        know about the case, please, ma'am.
16 A.   I've stated that at least two or three
17        times. But, yes, I signed the
18        Invitation to Bid, and I proofread the
19        document.
20 Q.   Okay.
21 A.   And I may have looked up some
22        procedures or policies or laws or
23        something to assist Mr. Duncan.
```

82

```
 1 Q.   Okay.
 2 A.   And I attended hearings and now the
 3        deposition.
 4 Q.   But as far as the facts stated in his
 5        complaint, you're telling me that you
 6        don't know anything about it except
 7        what you've read here and what you've
 8        heard in court; is that right?
 9 A.   When you say "anything about it," if
10        I've read it by proofreading it --
11 Q.   Ma'am, all I want to know is the
12        facts. Your name is on this pleading.
13        I'm entitled to ask you everything you
14        know about this case --
15 A.   I understand that.
16 Q.   -- so that when you take the stand,
17        you've already told me -- so if you
18        come up with something on the stand
19        that you haven't told me about, then I
20        can point that out to you. You see
21        the people down at the end of this
22        table -- your husband has -- and I
23        want to know what you know about what
```

83

```
 1        they're supposed to have done wrong to
 2        cause them to get sued.
 3 A.   Well, let me take some time to read
 4        the complaint so that I'll be able
 5        answer that question.
 6 Q.   Outside of reading the complaint, I'm
 7        asking you, on your personal
 8        knowledge, what you know about these
 9        people at the end of the table and
10        what they did to cause them to get
11        sued. That's what I want to know,
12        what do you know about it, not what
13        you read in the document.
14 A.   I would have to read it again to
15        remember what the complaint is about.
16 Q.   So you have no independent
17        recollection what this complaint says?
18 A.   I would have to read it again to --
19 Q.   Ma'am, do you have an independent
20        recollection of what this complaint
21        says?
22 A.   I can't remember. I would have to
23        read the complaint again in order --
```

84

```
 1 Q.   Okay. Who is this lady right here?
 2        Do you know?
 3 A.   Pat Antle.
 4 Q.   Okay. Tell me everything you know
 5        that Ms. Antle did that caused her to
 6        get sued in this lawsuit.
 7 A.   I would have to --
 8 Q.   Not what it says in the complaint, but
 9        what you know.
10    MR. DUNCAN: I'm going to
11        object again because.
12    MR. LYLES: That's fine you
13        can object.
14 Q.   Tell me what you know.
15    MR. DUNCAN: What I'm saying
16        is, she -- the only way
17        she knows is what I told
18        her.
19    MR. LYLES: I know you're not
20        a lawyer, and I'm trying
21        to cut you some slack.
22        But I'm entitled to ask
23        these questions, and I'm
```

21 (Pages 81 to 84)

JANICE DUNCAN - 4/11/2006

85

1          going to ask them --
2          MR. DUNCAN: Yeah. I'm just,
3          you know --
4          MR. LYLES: -- with the
5          Court's assistance or
6          without it. That's up to
7          you.
8          MR. DUNCAN: With the -- what
9          now?
10         MR. LYLES: With the Court's
11         assistance or without
12         their assistance, I'm
13         going to ask the
14         questions. It's entirely
15         up to you.
16         MR. DUNCAN: I know you can
17         ask questions.
18   Q.  Tell me everything Ms. Antle did that
19       caused her to get sued in this
20       lawsuit.
21   A.  I can't remember.
22   Q.  What would you have to look at to
23       refresh your memory?

86

1    A.  The complaint.
2    Q.  What else?
3          MR. DUNCAN: Well, specific --
4          MR. LYLES: Mr. Duncan --
5    A.  I would have to look at the complaint.
6    Q.  Outside of reading about it, do you
7        know anything about this lawsuit?
8    A.  Yes. I've attended hearings. Yes, I
9        know about the lawsuit.
10   Q.  Mrs. Duncan, do you know what personal
11       knowledge means -- what the term
12       "personal knowledge" means?
13   A.  Yes.
14   Q.  What does that mean as far as you
15       know?
16   A.  Knowledge that I have -- my personal
17       knowledge.
18   Q.  Coming from your personal
19       observations; right?
20   A.  Yes.
21   Q.  Okay. Based on that personal
22       knowledge that you have about Ms. Pat
23       Antle, I want to know everything she

87

1        did that caused her to get sued.
2    A.  I don't know -- I don't know what
3        Ms. Antle did, other than by reading
4        the complaint.
5    Q.  Who is this other gentleman down here?
6    A.  I think that's Mr. Isaac Kervin.
7          MR. LYLES: Would you identify
8          yourself, please, sir?
9          MR. KERVIN: I'm Isaac Kervin.
10   Q.  All right. Tell me everything you
11       know, on your own personal knowledge,
12       that Mr. Isaac Kervin did that caused
13       him to get sued in this lawsuit.
14   A.  I don't -- I don't have a personal
15       knowledge of what Mr. Isaac Kervin
16       did.
17   Q.  Okay. Now, you've talked to me about
18       Mr. Carlton. He's the expert. That's
19       him right down here to my left, is it
20       not?
21   A.  Yes.
22   Q.  Tell everything that Stan Carlton
23       did that resulted in him getting sued

88

1        in this lawsuit.
2    A.  I don't know of everything that Stan
3        Carlton did that resulted in this
4        lawsuit.
5    Q.  Tell me everything that you know of,
6        of your own personal knowledge, that
7        he did that caused him to get sued.
8    A.  My husband, he's the owner of this
9        pest control. He disclosed those type
10       things, and he filed the lawsuit and I
11       don't know --
12   Q.  And he put your name down as having
13       discoverable evidence --
14   A.  -- other than what I read.
15   Q.  -- and I'm going to sit here and today
16       and tomorrow and the next day --
17          MR. DUNCAN: I object -- I
18          object to that --
19   A.  That's fine. You can. Because if I
20       don't have the knowledge -- if I don't
21       have the personnel knowledge, I just
22       don't have it so -- I mean, you can
23       ask over and over, but if you don't

22 (Pages 85 to 88)

JANICE DUNCAN - 4/11/2006

89

1 have the knowledge, I just don't have
2 it.
3 Q. All right. Rayburn Hornsby?
4 A. He's first division engineer.
5 Q. Tell me everything that Mr. Hornsby
6 did that you know of, from your own
7 personal knowledge, that caused him to
8 get sued in this lawsuit.
9 A. I don't have any personnel knowledge
10 of what Mr. Hornsby --
11 Q. Who is Johnny Harris?
12 A. Oh, I'm sorry. Mr. Raybum Hornsby is
13 the office manager at DOT.
14 Q. Okay.
15 A. And Johnny Harris is division
16 engineer.
17 Q. Tell me everything that Mr. Hornsby
18 did to cause him to get sued, that you
19 know about on your own personal
20 knowledge, not from reading what your
21 husband wrote.
22 A. I don't know anything on my own
23 personal knowledge.

90

1 Q. Outside of reading the things that
2 your husband wrote, you don't know
3 anything about this lawsuit other than
4 what you've heard in the hearing and
5 reading what your husband wrote?
6 A. I can't remember that I have any
7 personal knowledge.
8 Q. Now, you have assisted with the
9 company since October of '92; is that
10 right, like it said on your
11 application?
12 A. Yes.
13 Q. And as part of that you -- let's see;
14 make sure I got it right. Prepare --
15 you assist in preparing bids for
16 contract pest control services.
17 A. Yes.
18 Q. So then you know how the bid process
19 works and what documents get filled
20 out; is that right?
21 A. (No response.)
22 Q. Let me ask you this, Mrs. Duncan:
23 Based on your preparation of bids and

91

1 all the things you've done as chief
2 accountant since October of '92, do
3 you have to be an employee of the
4 company to be able to sign this
5 document?
6 A. Don't know.
7 Q. Well, during the time that you
8 performed these various functions that
9 you've listed on your application and
10 so forth, did you ever get a W-2 or a
11 1099 form?
12 A. No.
13 Q. We talked about the process a few
14 moments ago about getting a purchase
15 order issued and so forth.
16 And you work in what
17 division of the Department of
18 Transportation?
19 A. I work in the Finance and Audits
20 Bureau.
21 Q. Okay. And so the head of that bureau
22 is the finance director; is that
23 right?

92

1 A. Yes. The transportation finance
2 director.
3 Q. And in the end, he's the one that
4 signs the requisition or his signature
5 is placed on the requisition; is that
6 right?
7 A. No -- yes, I'm sorry. Yes.
8 Q. Okay. Now, isn't it true that if
9 verification of the different
10 distributions and so forth, if that's
11 not accomplished, he will not sign the
12 requisition?
13 A. If what is not accomplished, I'm
14 sorry?
15 Q. You told me about the accounting
16 distribution.
17 A. Right.
18 Q. Okay. Without verification of the
19 correct accounting distribution, he
20 won't sign that requisition, will he?
21 A. Yes; right.
22 Q. Okay. Right, he won't sign it? That
23 statement I just made is correct, is

23 (Pages 89 to 92)

93

1  that what you're saying?
2  A.  Yes.
3  Q.  Okay. All right.
4  A.  But then there's always other factors
5  that go into signing the document.
6  That would be Mr. Lamar's decision to
7  sign or not sign. I can't really
8  answer that.
9  Q.  I understand. The things that you
10  looked up for your husband, the
11  policies and procedures and laws and
12  so forth, where did you look to look
13  those things up?
14  A.  Well, I looked on the internet.
15  Q.  Like on your computer at home?
16  A.  Yes. On the work computer at home.
17  Q.  I'm sorry?
18  A.  Yes.
19  Q.  Okay. Did you ever use the computers
20  at ALDOT to look that information up?
21  A.  No.
22  Q.  When you proofed the complaint and so
23  forth, did you do any of that on ALDOT

94

1  time?
2  A.  No.
3  Q.  What about the bid document that you
4  had the lady at ALDOT sign, was that
5  all prepared at home, and you just
6  brought it to work?
7  A.  Yes.
8  Q.  So all you did was just sign it in
9  front of her?
10  A.  Yes. During a lunch hour.
11  Q.  I understand.
12  MR. LYLES: Okay. I think
13  Mr. Long has got some
14  questions for you.
15
16  EXAMINATION
17  BY MR. LONG:
18  Q.  Mrs. Duncan, I'm Jeff Long, and I
19  represent these two defendants here.
20  I'm going to ask you questions. I'm
21  not trying to trick you or anything.
22  If you don't understand my questions,
23  please ask me to rephrase it. I'm

95

1  going to assume, unless you tell me
2  you don't understand my question, that
3  you do understand it. Do you
4  understand that?
5  A.  Yes.
6  Q.  Also any questions I ask, if you later
7  come up -- learn something different,
8  such as your answer changes, I want to
9  inform you that you have a duty to
10  supplement your answers and contact us
11  and let us know that your answer was
12  wrong, and here's the correct answer.
13  Do you understand that duty to
14  supplement if something changes?
15  A.  Yes. Will I be provided these
16  transcripts?
17  Q.  If y'all order one.
18  A.  Okay.
19  Q.  We have to pay for ours. Y'all have
20  to pay for yours. He asked you
21  whether you had relatives in
22  Montgomery County.
23  A.  Uh-huh.

96

1  Q.  I'm going to give you a list of
2  counties that the jury is going to be
3  drawn from and ask you if you have any
4  relatives in these counties: Autauga,
5  Barbour, Bullock, Butler, Chilton,
6  Coosa, Covington, Crenshaw --
7  A.  Yes.
8  Q.  Okay. What relatives do you have in
9  Crenshaw County?
10  A.  Mother.
11  Q.  And what is your mother's name?
12  A.  Mary Liza, L-I-Z-A, Parham,
13  P-A-R-H-A-M.
14  Q.  And is she single, or does she have
15  other family members living with her?
16  A.  She's single.
17  Q.  Okay. Do you have any other relatives
18  in Crenshaw County?
19  A.  Yes.
20  Q.  And who are they?
21  A.  A host of uncles and aunties and
22  cousins.
23  Q.  Okay. And have you already named

24 (Pages 93 to 96)

JANICE DUNCAN - 4/11/2006

97

these relatives? I don't want to
2  repeat --
3  A.  Well, earlier, he asked me Montgomery
4      County.
5  Q.  Okay. So you did limit yourself to
6      Montgomery County. Tell me what
7      relatives -- all your relatives in
8      Crenshaw County, their names, and who
9      they are -- how they're related.
10  A.  I can't remember all of them. I can
11      name as many as I can.
12  Q.  Okay. Name the ones you know.
13  A.  Okay. Uncle Joe, Johnny Lee --
14  Q.  Does Uncle Joe have a last name?
15  A.  Parham -- all Parhams.
16          THE COURT REPORTER: These are
17          all Parhams?
18          THE WITNESS: Yes.
19  A.  And his wife, Nelly; S.D. Parham,
20      uncle; cousin, Jo Anne Pugh, and her
21      husband. I don't remember his name.
22  Q.  Okay.
23  A.  A cousin, Wayne Parham, and his wife.

98

1  I don't remember her name. An auntie,
2  Janey, she's not a Parham, and I don't
3  remember her last name. And there's
4  another auntie that lives across the
5  road, and I can't remember her name.
6  And I'm trying to visualize where they
7  live, and I -- those are the ones that
8  I can remember.
9  Q.  Okay. These relatives, would you
10      recognize them if you saw them by
11      face?
12  A.  Yes.
13  Q.  Okay. Would they recognize you?
14  A.  Yes.
15  Q.  Okay. Do you have any relatives in
16      Elmore County?
17  A.  No.
18  Q.  How about Lowndes?
19  A.  No.
20  Q.  How about Pike? Pike is Troy.
21  A.  Uh-huh, right. Well, what is your
22      definition of a relative?
23  Q.  The ones you know, particularly --

99

1  A.  I mean, are you talking about in-laws?
2  Q.  Well, yes.
3  A.  Well, if you're talking about in-laws,
4      then I have a host of in-laws in
5      Montgomery County. I have a host of
6      in-laws in Pike County. I have a host
7      of in-laws in Crenshaw County.
8  Q.  Okay. Can you name them, the ones you
9      recall?
10          See when we pick the
11      jury, one of the first things I'm
12      going to do is go through that list
13      and see if any of these names are on
14      there, and I get to strike them for
15      cause?
16  A.  Uh-huh. Pike County, there is Essie
17      Richardson; there is Nathaniel
18      Richardson; there's Tesia Richardson.
19          THE COURT REPORTER: Can you
20          spell Tesia?
21          THE WITNESS: T-E-S-I-A. I
22          think I got that right.
23  A.  And their children, all Richardson.

100

1  There's Pat Madison. There's Nelson
2  Madison. There's -- there's a lot of
3  them I can't remember. It's just so
4  many.
5          MR. DUNCAN: I was just
6          thinking of a question.
7          MR. LONG: We're going to take
8          your deposition later.
9          I'm going to ask you the
10          same question later.
11          MR. DUNCAN: I was just -- you
12          know, I was just
13          wondering if it's
14          possible -- if we could
15          write those names down
16          and get that to y'all?
17          MR. LONG: Well, yes, there is
18          a duty to supplement, but
19          I do want to get the ones
20          she remembers now.
21  A.  That's the ones I can remember now.
22  Q.  And I think that was my last county to
23      ask you on.

25 (Pages 97 to 100)

101

1       Now, let me make certain
2   I understand it. My clients are Pat
3   Antle and Isaac Kervin. You know of
4   no actions that they took that makes
5   them defendants in this case; is that
6   correct, you, personally?
7   A.  Right. Because I know what's in the
8       complaint.
9   Q.  But you don't have any personal
10      knowledge of any actions they took
11      that resulted in them being in this
12      complaint?
13  A.  Right.
14  Q.  Okay. You haven't taken any
15      medications today, have you, or
16      there's no reason why you can't
17      testify under oath is there?
18  A.  No.
19  Q.  C & J Associates stands for what?
20      What is "C" and "J" in C & J
21      Associates stand for?
22  A.  Curtis and Janice Associates.
23  Q.  Okay. Has that always been the name

102

1   of the business?
2   A.  Yes.
3   Q.  How long have y'all been married?
4   A.  Since '99.
5   Q.  And prior to '99, what was the name of
6       his business, if you know?
7   A.  C & J Associates.
8   Q.  Okay. I'm trying to be delicate. How
9       long have y'all been a couple then?
10  A.  1992.
11  Q.  Is that when the business became C & J
12      Associates, in '92?
13  A.  Yes.
14  Q.  Do you know what the name of the
15      business was prior to 1992?
16  A.  The business was started in 1992.
17  Q.  Okay.
18  A.  So there was no business before 1992.
19  Q.  Okay. Have you discussed with your
20      husband whether you plan to testify at
21      trial?
22  A.  No.
23  Q.  At the present time, are you planning

103

1   on testifying to any aspect at the
2   trial?
3   A.  I don't plan on testifying or doing
4       anything. I mean, I'm not sure if I
5       understand your question.
6   Q.  First of all, let me rephrase it. I'm
7       repeating myself. Have y'all
8       discussed whether you're going to
9       testify?
10  A.  No.
11  Q.  Do you anticipate that you're going to
12      be testifying at trial?
13  A.  Well, naturally, I would have to
14      anticipate it, yes.
15  Q.  Do you have any idea what the subject
16      matter of your testimony at trial
17      would be?
18  A.  Based on the complaint.
19  Q.  Okay. You're not going to testify
20      about anything that my clients did; is
21      that correct?
22  A.  I would say so, yeah.
23  Q.  If you don't have personal knowledge,

104

1   what do you expect to testify about my
2   clients?
3   A.  When I said, "I would say so," I
4       answering, yes, that I don't see where
5       I would be testifying against your
6       clients.
7   Q.  I misunderstood you. Thank you for
8       clarifying that. At y'all's
9       residence, do y'all have a work
10      typewriter or a word processor on the
11      computer?
12  A.  Yes.
13  Q.  Which ones do you have? Do you have a
14      typewriter?
15  A.  Oh, okay. We have a typewriter, yes.
16      We have three PCs, yes.
17  Q.  Okay. How about C & J Associates,
18      does it have a typewriter or computer
19      at that location?
20  A.  Yes.
21  Q.  Now, as the sometime chief accountant
22      for C & J Associates, do you have any
23      idea what the business's profit margin

26 (Pages 101 to 104)

JANICE DUNCAN - 4/11/2006

105

```
         is?
 2   A.   It varies.
 3   Q.   It would vary per contract; right?
 4   A.   Yes.
 5   Q.   Does the business do residential
 6        service?
 7   A.   Yes.
 8   Q.   Okay.  What is -- does the residential
 9        service depend on how big the
10        residence is?
11   A.   No.
12   Q.   Excuse me.  My question was bad.
13             Does the price of the
14        residential service depend on how
15        large the residence is?
16   A.   That's one factor, yes.
17   Q.   Okay.  What other factors are there?
18   A.   The problem, the condition of the
19        building.
20   Q.   Okay.  I guess -- let me rephrase
21        this.  Do rats cost more than roaches
22        maybe?
23   A.   It depends on the infestation of the
```

107

```
 1        state contract, what profit margin do
 2        y'all try to build -- put into the
 3        bid?
 4   A.   Mr. Duncan sets the profit margin.
 5   Q.   Do you have any knowledge of what that
 6        figure might be?
 7   A.   It varies.
 8   Q.   Okay.  If you would, give me the range
 9        of the profit margin that you have
10        knowledge of.
11   A.   Give you the range of the profit
12        margin that --
13   Q.   For the state contracts, which is --
14            MR. DUNCAN:  I object to that.
15            What's the relevance of
16            that?
17            MR. LONG:  I don't have to
18            answer relevance, but
19            your objection is noted
20            for the record.
21            MR. DUNCAN:  I'm just trying
22            to -- what's the
23            materialality of it?
```

106

```
 1        rats or the roaches.
 2   Q.   Okay.
 3   A.   I'm also a pest control operator, as
 4        well as whatever my husband needs me
 5        to do.
 6   Q.   Okay.  Now, what is a pest control
 7        operator?
 8   A.   A person that takes care of the
 9        problems.
10   Q.   You mean you actually spray the
11        product and locate the product?
12   A.   Actually do what now?
13   Q.   Do you actually go to a home and spray
14        it?
15   A.   Yes.
16   Q.   Are you licensed to do that?
17   A.   No.
18   Q.   It doesn't require a license?
19   A.   Mr. Duncan can answer that question.
20   Q.   Do you have any knowledge or not
21        whether it requires a license?
22   A.   It doesn't require a license.
23   Q.   Okay.  When C & J Associates bids a
```

108

```
 1   A.   Give you the range of the profit for
 2        state contracts?
 3   Q.   Yes.  First of all, let's state for
 4        regular pest control.
 5   A.   I guess it could range anywhere from 1
 6        percent to 50 percent.  It all depends
 7        on the contract.  I just can't really
 8        just sit here and say I can give you a
 9        range.  I would have to look at
10        something.
11   Q.   Termite contracts, do you have any
12        idea the range of profit margin in
13        termite control contracts with the
14        State of Alabama?
15   A.   1 to 50 percent; I mean, it various.
16   Q.   Okay.  Let me ask you this:  Do y'all
17        keep some sort of account for each
18        person, business, or entity you serve?
19        What type of records do you keep at
20        C & J Associates?
21   A.   Yes.  We try to -- off the computer,
22        uh-huh.
23   Q.   Are these computer accounts?  Do you
```

27 (Pages 105 to 108)

JANICE DUNCAN - 4/11/2006

109

1     have actual paper accounts, or do you
2     have computer accounts?
3 A.  We're having to keep up with it on
4     paper.
5 Q.  Okay. And on these records that y'all
6     keep, what type information do y'all
7     put in these records?
8         MR. DUNCAN: I object to this.
9         I just -- I'm just trying
10        to find the relevancy. I
11        object to that question.
12 A.  I don't see the relevance. The
13     questions are confusing, and I don't
14     see the relevance either.
15 Q.  Well, okay. But you still have to
16     answer what type records --
17 A.  If I don't understand it, I can't
18     answer it.
19         MR. DUNCAN: I don't under the
20        relevance of this.
21 Q.  Do you keep dates of service for each
22     account?
23 A.  The purchase order would have a date

110

1     of service, yes.
2 Q.  Do you keep a record of when they pay,
3     the person that you service?
4 A.  Try to, yes.
5 Q.  Do you -- and how do you keep that
6     record? Where do you keep it? How do
7     you enter it?
8 A.  I would write the date down that it
9     was paid.
10 Q.  And the amount?
11 A.  Uh-huh.
12 Q.  In your application with the Alabama
13     Personnel Department, you state that
14     you prepared financial statements for
15     C & J Associates. What type of
16     financial statements have you prepared
17     for C & J Associates?
18 A.  Balance sleets, income statements.
19 Q.  Do you prepare cost reports -- first
20     of all, what are cost reports?
21 A.  The cost of servicing a client, home,
22     or business.
23 Q.  So this thing says you prepared cost

111

1     reports used for estimating bid
2     prices; is that correct?
3 A.  Yes.
4 Q.  Okay. So each bid that y'all put,
5     you've done a cost report of how much
6     that project is going to cost; is that
7     correct?
8 A.  For each bid, no.
9 Q.  For each account, do y'all keep any
10     record of what it would cost to
11     service that account?
12 A.  For each account?
13 Q.  Yes.
14 A.  No.
15 Q.  Are y'all a member of any church?
16 A.  Is that relevant?
17 Q.  Yes.
18 A.  Yes, we are.
19 Q.  What's the name of the church?
20 A.  Shady Grove Baptist.
21 Q.  What county -- or where is it?
22 A.  Pike.
23 Q.  Have you ever met my client, Isaac

112

1     Kervin, other than today or at that
2     court hearing?
3 A.  I didn't meet him at the court
4     hearing.
5 Q.  Okay.
6 A.  I've met him one time. It was
7     something that my husband was
8     discussing with Mr. Kervin, and I was
9     along with my husband. I was there.
10     I don't know if I actually met him,
11     but I knew who he was.
12 Q.  Have you had more than one meeting or
13     encounter with my client, Isaac
14     Kervin?
15 A.  I can't remember that I did.
16 Q.  Okay. So you think that one meeting
17     you described is the only meeting had
18     with you and Isaac Kervin and your
19     husband?
20 A.  I just can't remember it. I remember
21     those that I just said.
22 Q.  Okay. That was one meeting with your
23     husband. And where was that at?

JANICE DUNCAN - 4/11/2006

113

A. In the lobby of his office.
Q. When you say his office, I think you
   mean --
A. Mr. Kervin's office, yes.
Q. Have you ever met my client, Pat
   Antle, before today?
A. Yes.
Q. When did you meet my client, Pat
   Antle?
A. I don't know exactly the first time I
   met her, but I've been in her
   presence.
Q. Approximately how many times?
A. I just never kept a total of how many
   times I met her. I know it's more
   than one time.
Q. Okay. You think it's less than 10?
A. Well, I would say less than 10 --
   maybe -- yeah.
Q. Anything about any of these meetings
   with Pat Antle that you're going to
   testify about at trial?
A. I don't know.

114

Q. Well, if you learn that you're to
   testify about anything, please
   supplement your deposition.
       I have the same thing
   question about Mr. Kervin. Are you
   going to offer any testimony at trial
   about any of those meetings that you
   might have had with Mr. Kervin?
A. Not that I know of.
Q. Okay. And, again, I remind you to
   supplement.
       You do realize we noticed
   these depositions several times; is
   that correct?
A. That we did what several times?
Q. We scheduled these depositions several
   times prior to today.
A. Okay.
Q. And on the date of one of those
   depositions, and I don't know the
   date, you took leave to go to a
   doctor. Do you recall that?
A. What date would that be?

115

Q. I don't have DOT records. I just know
   that's the --
A. I mean, I've been sick, and I've been
   to the doctor and -- yes.
Q. Okay.
A. Yes.
Q. Do you know what -- who -- which
   doctor you went to the date of that
   deposition that we did not have?
A. The deposition that you did not
   have -- I remember being sick during
   that time, yes.
Q. And did you go to a doctor?
A. I can't remember if I did or not. I
   think I just got a prescription
   filled. I don't remember.
Q. To the best of your knowledge has
   C & J Associates ever had any
   employees other than you and I guess
   -- besides the owner, Mr. Duncan?
A. Well, I know that his sister has
   helped him, and he's had some nephews
   to help, yes.

116

Q. In your accounting job, you would fill
   out their W-2s or reports of income --
   of paying them income; is that
   correct?
A. Maybe -- well, Mr. Duncan would take
   care of paying them.
Q. But paying them is writing them a
   check. But I'm talking about
   reporting it to the federal government
   that they made income. Did you do
   that for C & J Associates?
A. Depending on if they made enough
   income to be reported, yes.
Q. If you would, if you know, tell me how
   much income -- what's the threshold
   that must be reported?
A. I don't remember.
       MR. DUNCAN: Mr. Long, I'm
   going to -- I'm still
   trying to figure the
   relevance -- I'm trying
   to make relevance out of
   this.

29 (Pages 113 to 116)

JANICE DUNCAN - 4/11/2006

117

1 MR. LONG: Let me explain this
2 to you, my questions can
3 be broad so that --
4 they're calculated to
5 lead to discoverable
6 evidence or admissible
7 evidence -- reasonably
8 calculated. They don't
9 have to be relevant
10 themselves, but they do
11 have to be reasonably
12 calculated to lead to
13 admissible evidence. So
14 this is a lot broader --
15 MR. DUNCAN: I mean to the
16 issues of the case -- I
17 mean, not just to the
18 general everything. You
19 know, we are supposed to
20 be talking about the
21 issues of the case.
22 MR. LONG: I just want you to
23 know that this will be a

118

1 lot broader than it is at
2 trial. I know I can't
3 ask these questions at
4 trial, but I'm entitled
5 to at deposition.
6 MR. DUNCAN: I understand
7 about the deposition.
8 But what I'm saying
9 is the deposition is --
10 are you trying to
11 determine ownership of
12 the deposition by asking
13 her these questions?
14 MR. LONG: The ownership of
15 the deposition is going
16 to be whoever purchases
17 it.
18 MR. DUNCAN: Say again.
19 MR. LONG: The ownership of
20 the deposition is going
21 to be by whoever
22 purchases it.
23 MR. DUNCAN: I'm saying the

119

1 purpose of this
2 deposition -- Mr. Lyles
3 also -- the deposition,
4 the purpose of it is to
5 try to determine the
6 ownership. That's what
7 we're here for today.
8 MR. LONG: No. No. That's
9 not. Our purpose is to
10 discover any evidence she
11 might testify or have
12 knowledge of.
13 MR. DUNCAN: What I'm saying
14 is, this is --
15 MR. LYLES: The purpose of the
16 deposition is that you
17 were asked who has
18 knowledge about this
19 lawsuit. You named two
20 people and two people
21 only, yourself and your
22 wife. That entitles us
23 to take your depositions.

120

1 MR. DUNCAN: Right. Take the
2 depositions pertinent to
3 the issues of the case.
4 What I'm saying is,
5 when you asked us to
6 bring these -- this
7 information here -- I'm
8 trying to find out the
9 relevance of how we
10 figure up the bills and
11 all this.
12 How is that relevant
13 to the ownership of my
14 company.
15 MR. LYLES: Mr. Duncan --
16 MR. DUNCAN: I mean, that's on
17 the record. I'm
18 objecting to those
19 questions because --
20 MR. LYLES: You've got every
21 right to put whatever
22 objection you want on the
23 record.

30 (Pages 117 to 120)

JANICE DUNCAN - 4/11/2006

121

MR. DUNCAN: Okay. But that's
all. I'm just -- I'm
asking what relevance
does that have to
ownership; that's all I'm
asking.
    According to your
deposition, this is what
you wanted to depose us
on. But we're getting
questions that's
outside --
MR. LYLES: The reason that
your wife is in here
being deposed is because
you took it upon yourself
to name her in this
pleading.
MR. DUNCAN: No. I took it
upon myself to name her
because she signed the
document that was turned
in.

122

1    MR. LYLES: Once you do that,
2        then we can take her
3        deposition, and we are.
4    MR. DUNCAN: Well, I'm going
5        to, on the record, object
6        to this line questioning.
7    MR. LYLES: Sure. I
8        understand that --
9    MR. DUNCAN: We're here --
10      we're here to share any
11      information about the
12      ownership of the company.
13  Q.  And the time you met -- that you
14    recall meeting Ms. Antle, do you
15    remember the content of any of those
16    conversations that y'all had?
17  A.  We were at a bid opening. And I don't
18    know if I remember everything from the
19    conversation.
20  Q.  That was not a good question. Do you
21    regularly attend bid openings?
22  A.  No. If my husband is unavailable, he
'3    ask me to attend.

123

1  Q.  How many times do you think you've
2    attended bid openings?
3  A.  2, 3, 4 -- less than 10.
4  Q.  Okay. I understand.
5  A.  Is that a good recollection, less than
6    10?
7  Q.  I understand, within reason, you can't
8    say five and give me dates and all
9    that.
10  A.  I would say several, less than 10.
11  Q.  At any of those bid openings, have you
12    had conversations with Ms. Antle or
13    heard her say anything that you would
14    consider racially discriminatory?
15  A.  Racially discriminatory -- I can't
16    remember.
17  Q.  If you do remember something, remember
18    that you need to supplement.
19        Same with Mr. Kervin,
20    does he attend the bid openings? Do
21    you know?
22  A.  I don't remember.
23  Q.  Did he attend any of those that you

124

1    were present at?
2  A.  I don't remember seeing him in
3    attendance at any of the bid openings.
4  Q.  Have you ever heard Mr. Kervin --
5    Isaac Kervin make any remarks that you
6    would consider racially insensitive or
7    racially discriminatory?
8  A.  Well, maybe racially insensitive for
9    Ms. Antle and Mr. Kervin.
10  Q.  What --
11  A.  Insensitive. I was thinking back on
12    the bid opening, when it was clear
13    that C & J was the lowest bidder. And
14    on another occasion Mr. Antle -- not
15    Mr. Antle -- I'm sorry -- Mr. Kervin
16    asked Mr. Duncan not to bid on a
17    contract.
18  Q.  Okay. Tell me what you remember of
19    that conversation.
20  A.  And I was just present. I wasn't
21    participating. I was just present.
22    And, actually, it was concerning the
23    bid that the complaint is about, I

31 (Pages 121 to 124)

JANICE DUNCAN - 4/11/2006

125

1  believe, because there were two bids.
2  He asked Mr. Duncan not to bid on the
3  second contract because -- and I can't
4  remember all of his wording, but he
5  asked him not bid on it because he was
6  going to disqualify him.
7  Q.  Okay. Let me get this straight. Are
8  we dealing with the DOC contract or
9  the DOT contract?
10  A.  Both, I believe. I'm trying to
11  remember.
12  Q.  And what's -- where did this
13  conversation take place?
14  A.  In the lobby of Mr. Kervin's office
15  building, or in his -- the purchasing
16  lobby.
17  Q.  Okay. That's where. Approximately
18  when did this conversation take place
19  relative to these contracts?
20  A.  It was -- I can't remember.
21  Mr. Duncan would have to answer that.
22  I just -- I think it was after the
23  first and before the second bid.

126

1  Q.  Okay. Now, as best you can, state the
2  gist of what you allege or state that
3  Mr. Kervin said.
4  A.  I just remember that he asked him not
5  to bid on it because he was just going
6  to disqualify him -- disqualify his
7  product; so no sense in turning in his
8  bid.
9  Q.  Did he say why he was going to
10  disqualify the product?
11  A.  Okay. I'm trying to remember what he
12  said. I can't remember exactly what
13  he said. The main thing that stood
14  out, that he was asking him not to bid
15  on it because he was going to
16  disqualify his product.
17  Q.  What is your husband's termite control
18  product?
19  A.  What? I'm sorry?
20  Q.  What termite control product does your
21  husband use?
22  A.  It varies depending on the job.
23  Q.  If you recall, in this bid that

127

1  Mr. Isaac Kervin was discussing in
2  your presence, what product was your
3  husband proposing to use?
4  A.  I can't -- I -- I'm really sorry. I
5  can't remember. I think it was --
6  well, actually, I can't remember.
7  Q.  Let me refresh your -- would it have
8  been Outpost or Outpost TBR?
9  A.  Yes, Outpost.
10  Q.  And did he say why that product would
11  be disqualified in this bid -- and I
12  mean Mr. Kervin.
13  A.  Yes. I believe it was because it was
14  saying Sentricon and Outpost were not
15  similar.
16  Q.  Now, the C & J Associates name, which
17  carries your first name, y'all haven't
18  incorporated; is that correct?
19  A.  That's correct.
20  Q.  Have y'all -- do y'all have a partner
21  agreement?
22  A.  No.
23  Q.  Okay. So, basically, the C & J

128

1  Associates name is a name drawn out of
2  the air that y'all put on a
3  letterhead?
4  A.  It sounded good. It rhymes with
5  E & J, but it's Curtis and Janice,
6  C & J.
7  Q.  But when you file tax returns, it
8  doesn't say C & J Associates, does it?
9  A.  It says Curtis Duncan.
10  Q.  Okay. And y'all have an Employer ID
11  Number; is that not correct?
12  A.  We a Federal ID Number.
13  Q.  Okay. And that Federal ID Number
14  carries what name next to it?
15  A.  Curtis Duncan or C & J Associates --
16  yeah, C & J Associates.
17  Q.  Does it say Curtis Duncan DBA C & J
18  Associates, or does it say just Curtis
19  Duncan?
20  A.  It says Curtis Duncan, and then it
21  says C & J Associates.
22  Q.  Okay. And this may have been asked,
23  if I'm repeating a question. Did you

32 (Pages 125 to 128)

JANICE DUNCAN - 4/11/2006

129

1     actually type the complaint in this
2     case, the original pleading, the
3     lawsuit?
4 A.   No.
5 Q.   One thing I want to clarify, what part
6     of DOT do you work in?
7 A.   Finance and Audits Bureau.
8 Q.   Finance and Audits Bureau. What, just
9     in general terms, is the function of
10    that part of DOT?
11 A.   Accounting.
12 Q.   Okay.
13 A.   Auditing.
14 Q.   And, now, what part -- is there some
15    sub in that part of DOT you work for?
16 A.   Yes.
17 Q.   What is that section?
18 A.   Cost section -- Cost, C-O-S-T.
19 Q.   I am a little bit hard of hearing.
20    That's why I do that. Now, what is
21    your exact role as an employee of DOT?
22    What do you do day to day?
23 A.   I supervise the cost section, and that

130

1     would include several duties of the
2     cost -- of accounting of the cost of
3     the payment documents.
4 Q.   So if something comes in for payment,
5     what is your role?
6 A.   To verify the accounting distribution.
7 Q.   And that's the terms I've heard over
8     and over, and I've never understood.
9     So what -- exactly what are you
10    verifying in layman's terms?
11 A.   I'm verifying that if this person is
12    paying for pest control services, that
13    the code is actually for pest control
14    services. If they're buying office
15    supplies, then the code -- accounting
16    code is office supplies.
17 Q.   I'm going to come down a little bit
18    closer. By the way, something I
19    always say, anytime you need to take a
20    break, we'll take a break. I never
21    consider these a bladder contest by
22    any means.
23 A.   Okay. All right.

131

1 Q.   I'm looking at document -- Exhibit 9.
2     If you would, tell me which pages are
3     the ones that you deal with when
4     you're looking at whether something
5     should be paid.
6 A.   Okay. The first page, it says pest
7     control.
8 Q.   Okay. That's the second page of the
9     document.
10 A.   Oh, I don't look at this page unless
11    there's questions.
12 Q.   Okay. So you look at -- in Exhibit 9,
13    you look at Page 2. They're not
14    numbered, but the second page. And
15    what other page do you look at?
16 A.   Okay. This page is titled, Pest
17    Control. Pest control is an easy
18    object code. There's no question
19    about pest control. So the next page
20    I would look at would be the
21    accounting distribution page, which is
22    Page 3.
23 Q.   Okay.

132

1 A.   And they're charging it to Account
2     8010, which is -- they're charging it
3     to an overhead account, which is a
4     good thing for pest control. They're
5     using Object 653. Object 653 is for
6     pest control, no question about it.
7     So there's no need to
8     look at any other page, and I would
9     just go back to the first page and put
10    my initials.
11 Q.   Okay. So all these computer codes are
12    so that later certain reports can be
13    generated out of the computer; is that
14    correct?
15 A.   That's one reason, yes.
16 Q.   And to make certain the payment is for
17    a legitimate service; is that correct?
18 A.   No. It's to make sure that the
19    document is properly coded. If it's
20    pest control, then it's coded properly
21    for pest control.
22 Q.   Okay. So if you saw a legal expense
23    coded pest control, what would happen?

33 (Pages 129 to 132)

JANICE DUNCAN - 4/11/2006

133

1   A.   I would question that, and they would
2        have to -- well, I would read that
3        second page there and see how they
4        have it coded, and then I would change
5        the code to legal services if it's
6        legal services.
7   Q.   Okay. Can you change code yourself,
8        or do you have to send it back to
9        them?
10  A.   I can change the code myself as long
11       as I know what the requisition is
12       for -- this is pest control -- as long
13       as I know what it's for.
14            Some things, I can't
15       change -- well, I can change it, but I
16       always will make sure what the
17       requisition is for by contacting the
18       division or bureau.
19  Q.   Do you call them up and say, Look,
20       you're charging your legal services to
21       pest control -- this is just some --
22       what's going on here and ask them
23       questions?

134

1   A.   Well, that would be so obviously wrong
2        that -- you know, yeah, sometimes.
3             I wouldn't ask that type
4        question because, I mean, I would know
5        it's confusion, that they obviously
6        used the wrong code if it's legal
7        services.
8   Q.   But if it doesn't pass your
9        inspection, it can't be paid; is that
10       correct?
11  A.   Lamar McDavid actually has the final
12       decision on if it can be paid or not.
13  Q.   Okay. And are you the one who makes
14       recommendations to that gentleman?
15       What was his name?
16  A.   Lamar McDavid, yes.
17  Q.   Okay. So basically your role is
18       checking computer codes, making
19       certain they're proper?
20  A.   Properly coded, yes.
21  Q.   On Exhibit 9, where, actually, your
22       husband is being paid, when you
23       initialed it, were you aware that your

135

1        husband was the company getting paid?
2   A.   No.
3   Q.   Okay. Have you -- do you remember the
4        names of all the defendants in this
5        lawsuit?
6   A.   No.
7   Q.   You want me to give them to you?
8        Rayburn Hornsby, Johnny Harris, Stan
9        Carlton. Those three, have you had
10       any conversations with them concerning
11       -- let me rephrase that.
12            Do see those folks
13       regularly: Rayburn Hornsby --
14  A.   No.
15  Q.   -- Johnny Harris, Stan Carlton?
16  A.   I see Stan regularly. I don't see
17       Johnny Harris and Rayburn Hornsby
18       regularly.
19  Q.   Okay. Have you ever heard any of
20       those, Hornsby, Harris, and Carlton,
21       make any racially insensitive remarks?
22  A.   I can't remember that I did.
23  Q.   I'm sorry?

136

1   A.   I can't remember.
2   Q.   Okay. If you do remember, please
3        remember to supplement.
4             Let me ask you this:
5        Have you understood each question that
6        you've been asked today?
7   A.   Some questions were difficult to
8        understand, and I answered as best as
9        I could.
10  Q.   At this point, do you have any answers
11       you've previously made you wish to
12       change?
13  A.   I don't --
14            MR. DUNCAN: See the
15       transcript.
16  A.   Yeah. I would have to see the
17       transcript.
18            MR. LONG: I don't believe I
19       have any further
20       questions.
21            MR. LYLES: Mrs. Duncan, those
22       are our questions. I
23       know you're disappointed

34 (Pages 133 to 136)

JANICE DUNCAN - 4/11/2006

137

2  that we're through. Your
3  deposition is concluded,
4  and you're free to go.
5       Just for the record
6  we'll go ahead and
7  introduce the exhibits
8  that I'll hand you. It's
9  1 through 9.
10  (The referred-to documents were
11  marked for identification as
12  Defendants' Exhibit
13  Nos. 4 and 6.)
14
15  (The deposition of JANICE DUNCAN
16  concluded at approximately 11:21 a.m.
17  on April 11, 2006.)

139

1  the Middle District of Alabama; that
2  the foregoing 137 typewritten pages
3  contains a true and accurate
4  transcription of the examination of
5  said witness by counsel for the
6  parties set out herein; that the
7  reading and signing of said deposition
8  was not waived by witness and counsel
9  for the parties.
10
11       I further certify that I am
12  neither of kin nor of counsel to the
13  parties to said cause, nor in any
14  manner interested in the results
15  thereof.
16
17       This 28th day of April, 2006
18
19
20
21       Mishan Williamson, CSR
         Notary Public
22       State of Alabama at Large
23

138

1       * * * * * * * *
2       REPORTER'S CERTIFICATE
3       * * * * * * * *
4
5  STATE OF ALABAMA
6  COUNTY OF AUTAUGA
7
8       I, Mishan Williamson,
9  Certified Shorthand Reporter and
10  Notary Public in and for the State of
11  Alabama at Large, do hereby certify
12  that on April 11, 2006, pursuant to
13  notice and stipulation on behalf of
14  the Defendants, I reported the
15  deposition of JANICE DUNCAN, who was
16  first duly sworn by me to speak the
17  truth, the whole truth, and nothing
18  but the truth, in the matter of C & J
19  ASSOCIATES PEST CONTROL, Plaintiff,
20  versus RAYBURN HORNSBY, et al.,
21  Defendants, Civil Action Number
22  2:05-CV-557-WHA-DRB, now pending in
`3  the United States District Court for

35 (Pages 137 to 139)