# C & J ASSOCIATES PEST CONTROL

## v.

# RAYBURN HORNSBY, et al.

# CURTIS DUNCAN

### April 11, 2006



DEFENDANT'S
EXHIBIT
ALDOT 13

Reagan Reporters, LLC
Phone: 334.262.7556
Fax: 334.262.4437
www.ReaganReporters.com

**Page 1**

```
IN THE UNITED STATES DISTRICT COURT
   FOR THE MIDDLE DISTRICT OF ALABAMA

C & J ASSOCIATES
PEST CONTROL,
   Plaintiff,
                        CIVIL ACTION NO.
vs.                     2:05-CV-557-WHA-
                        DRB
RAYBURN HORNSBY,
et al.,
   Defendants.


        *    *    *    *    *    *

        DEPOSITION OF
        CURTIS DUNCAN,
taken pursuant to notice and
stipulation on behalf of the
Defendants, in the Jury Room of
Courtroom 4A of the United States
Federal Courthouse, One Church Street,
Montgomery, Alabama, before Mishan
Williamson, Certified Shorthand
Reporter and Notary Public in and for
the State of Alabama at Large, on
April 11, 2006, commencing at
approximately 11:36 a.m.
```

**Page 2**

```
          APPEARANCES

FOR THE PLAINTIFF:
     CURTIS DUNCAN, pro se

FOR THE DEFENDANTS:
     HARRY LYLES, ESQ.
       Assistant Counsel
       Alabama Department of
       Transportation
       1409 Coliseum Blvd.
       Montgomery, Alabama 36110

     JEFFREY H. LONG, ESQ.
       General Civil and
       Administrative Law Division
       Office of the Attorney
       General
       Alabama State House
       11 South Union Street
       Montgomery, Alabama 36130

ALSO PRESENT:
     PAT ANTLE
     ISAAC KERVIN
     STAN CARLTON
```

**Page 3**

```
1    STIPULATIONS
2
3        It is stipulated and agreed
4    by and between counsel representing
5    the parties that the deposition of
6    CURTIS DUNCAN may be taken before
7    Mishan Williamson, Certified Shorthand
8    Reporter and Notary Public in and for
9    the State of Alabama at Large, without
10   the formality of a commission; and all
11   formality with respect to other
12   procedural requirements is waived;
13   that objections to questions, other
14   than objections as to the form of the
15   questions need not be made at this
16   time, but may be reserved for a ruling
17   at such time as the deposition may be
18   offered in evidence or used for any
19   other purpose by either party as
20   provided by the Federal Rules of Civil
21   Procedure.
22       It is further stipulated and
23   agreed by and between the parties
```

**Page 4**

```
1    hereto and the witness, that the
2    signature of the witness to this
3    deposition is hereby not waived.
4
5    *  *  *  *  *  *  *  *
6           INDEX
7    EXAMINATION            PAGE
8    MR. LYLES....................  5
9    MR. LONG..................... 99
10
11
12   DEFENDANT'S EXHIBITS        PAGE
13   10   (Bid No. 0153)        123
     11   (Bid No. 2146)        145
14   12   (Bid No. 2146)        149
     13   (Document: Winning Bid  154
15        for Bid No. 2146)
     14   (Invitation to Bid     161
16        Document by C & J
          Associates)
17
     (The following exhibits were
18   previously marked in this case and
     referred to at the following pages:)
19
     1 - 9 ...................... 98
20
21   (The following questions and/or
     answers were certified at the
22   following pages: 186 through 187
23   Line 8.......................... 185
```

5

1    CURTIS DUNCAN, of lawful
2    age, having first been duly sworn
3    testified as follows:
4
5    EXAMINATION
6    BY MR. LYLES:
7    Q.    Just for the record, Mr. Duncan, can
8    you go ahead and state your full name,
9    please, sir?
10   A.    Curtis Duncan.
11   Q.    And you are the Curtis Duncan that has
12   filed the lawsuit we're here about
13   today; is that right?
14   A.    Yes, sir.
15   MR. DUNCAN: I just want to
16   get one thing on the
17   record.
18   MR. LYLES: All right.
19   MR. DUNCAN: That I -- you
20   know, being that my wife
21   has to leave, you know,
22   if y'all could get to me
23   the federal rule --

6

1    whenever you can get it
2    to me, I'd appreciate
3    it -- that invoked that
4    she had to leave.
5    MR. LYLES: Okay.
6    Q.    Other than the deposition that you
7    just sat through with your wife, have
8    you ever been in a deposition before?
9    A.    No. This is the first.
10   Q.    Okay. Just like Mr. Long was telling
11   your wife, if you don't understand
12   something I ask you, stop me and tell
13   me you don't understand. If you can't
14   hear me -- I tend to drop my voice
15   sometimes. If you can't hear me, stop
16   me and tell me; I'll try to speak up.
17   If you answer me, I'm going to assume
18   that you understood what I asked you,
19   and that your response was in response
20   to my question.
21   Now, Mr. Long asked your
22   wife about relatives in a number of
23   counties, and we're going to need to

7

1    ask you the same question. So as far
2    as Autauga County, do you have any
3    relatives in Autauga County?
4    A.    Not that I know of.
5    Q.    What about Barbour?
6    A.    No.
7    Q.    Bullock?
8    A.    No.
9    Q.    Butler?
10   A.    No.
11   Q.    Chilton?
12   A.    No.
13   Q.    Coosa?
14   A.    No.
15   Q.    Covington?
16   A.    No.
17   Q.    Crenshaw?
18   A.    No.
19   Q.    Elmore County?
20   A.    No.
21   Q.    Lowndes County?
22   A.    Possibly one; Tom Gardner.
23   Q.    Gardner?

8

1    A.    Yeah.
2    Q.    Okay.
3    A.    He's married to my cousin, Estelle
4    Gardner.
5    Q.    All right.
6    THE COURT REPORTER: What was
7    her name?
8    THE WITNESS: Tom Gardner.
9    THE COURT REPORTER: The wife.
10   THE WITNESS: Estelle.
11   Q.    And what about Montgomery County?
12   A.    I would really have to get a list to
13   y'all. It could come up to about a
14   hundred, easily.
15   Q.    Okay.
16   A.    That's the direct and also wives
17   or whatever.
18   Q.    Uh-huh.
19   A.    It could easily get to a hundred.
20   MR. LYLES: Mr. Long, is that
21   all right with you if he
22   just gets a list to us?
23   MR. LONG: That will be fine.

2 (Pages 5 to 8)

CURTIS DUNCAN - 4/11/2006

9

Q. Okay. Pike County?
A. No.
Q. Now, how long have you been in the pest control business?
A. 25, 26 years now.
Q. Okay. So prior to the creation of C & J, what companies or entities did you perform services for?
A. I worked with C Con Pest Control.
Q. Okay.
A. That was the one company --
Q. Okay.
A. -- I worked with before.
Q. And with regard to this type of business, what type of training do you have to have to do that kind of work?
A. Basically, they train you on the job.
Q. Okay.
A. And after a year -- maybe two years -- I think it's a year after the proper training, taking courses or whatever, that you take the state certification test with the Agricultural Department.

10

Q. Okay. Is there any kind of professional association or society that you can join in that business?
A. Yes. They have associations you can join, yes.
Q. Are you a member of any?
A. No. Time won't permit me to join the associations. But they have what they call re-certification points --
Q. Uh-huh.
A. That after three years -- every three years, you have to get your re-certification. You got to take a correspondence class or whatever to keep your certification up.
Q. To the best of your knowledge, have you kept up with that?
A. Yes, sir.
Q. Okay. One of the questions Mr. Long asked your wife, and I wanted to follow up on with you, regarding the different brands of material or poison, whatever it is, how do you

11

determine brands or companies' products C & J Associates will use in the work?
A. It depends on the bid specifications.
Q. Okay. So do you have access then or opportunity that you could -- you could use different kinds depending on the bid specifications?
A. Yes.
Q. It's just a matter of you knowing who the supplier was and getting in touch with him and saying, I want to use this?
A. Yes.
Q. Okay. All right. Now, with regard to the entity, C & J Associates, how many employees does that company have?
A. At what time?
Q. How about today? How many does it have today?
A. Just myself.
Q. Okay. And then your wife on whatever duties that you ask her to do?

12

A. Yes. Uh-huh. She wears several hats.
Q. All right. The order that brought us all here today said that you should bring certain documents to the deposition with you. Have you got those with you here today?
A. Yes. I brought all I have in my possession.
Q. Okay. Let me just call them out and see what you got in each category, if we could. The first one was tax returns for the past five years.
A. Okay. I have 2000; that's the federal and state.
Q. Is that the only one you got here with you today?
A. I got 2001 --
Q. Okay.
A. -- federal and state. I also have 2002, federal and state.
Q. Okay.
A. I also -- well, I'll let you -- I'll let you look at that.

3 (Pages 9 to 12)

CURTIS DUNCAN - 4/11/2006

13

1  Q.   All right.  What about the state and
2       partnership authority, do you have any
3       such document?
4  A.   Being a sole proprietor, I don't --
5       you know, you don't have to file with
6       the probate or whatever.
7  Q.   All right.
8  A.   But what I do have, in addition to my
9       taxes, is my city -- city license.
10 Q.   Okay.
11 A.   My city license here.  This goes back
12      to 2000.
13 Q.   Uh-huh.
14 A.   And this is showing -- this shows
15      where I got it for this -- this year.
16 Q.   Okay.
17 A.   And this also -- I went to the city,
18      and I got a copy back to 2000, showing
19      that I'm the one owner --
20 Q.   Okay.
21 A.   -- of the business.
22 Q.   All right.  Go ahead.
23 A.   I also went to my insurance agent, and

14

1       he went back and pulled my insurance
2       --
3  Q.   Uh-huh.
4  A.   -- that's required -- that you have to
5       have for the state.
6  Q.   Right.
7  A.   And it also shows --
8  Q.   Individual.  Okay.
9  A.   -- individual.  And then some of them
10      have partner -- I mean -- not
11      partnership.  It has individual or
12      sole proprietor --
13 Q.   All right.
14 A.   -- identified on it or whatever.
15 Q.   All right.
16 A.   Well, that's 2000 up to 2005 there.
17      And that's the business insurance.
18 Q.   All right.
19 A.   Now, the 2003, 2004, and 2005, I don't
20      have those federal tax forms.  I've
21      got a copy of the fire report.  A lot
22      of my documents was destroyed in the
23      fire.

15

1  Q.   Uh-huh.
2  A.   I think that was December '04.
3  Q.   Okay.
4  A.   You want me to just keep it in the
5       folder?
6  Q.   Yeah.
7  A.   That's the reason why I don't have --
8       you know, I informed you the tax --
9       tax people -- and I'm trying to gather
10      that information in.
11 Q.   What about Form W-9, request for the
12      ID Number?
13 A.   I put the request on this State of
14      Alabama Transportation.
15 Q.   All right.
16 A.   It has the EIN and also my social
17      security number.
18 Q.   Okay.  The document that I was asking
19      your wife about, that computer screen
20      that shows that it's a minority-owned
21      business, as I understood her
22      testimony -- that was Defendant's
23      Exhibit 1 --

16

1  A.   Uh-huh.
2  Q.   As I understood her testimony, y'all
3       don't have any idea how that
4       information got in there; is that
5       right?
6  A.   No.  I don't know.  I -- you know --
7       what year was that?
8  Q.   Let me see, this is dated July 8th of
9       '93.
10 A.   July 8, '93 --
11 Q.   Uh-huh.
12 A.   Yeah.  That's -- I didn't really --
13      don't know why that would reflect
14      that.
15 Q.   Okay.  All right.  Now, the complaint
16      that we got in this lawsuit, and we
17      asked your wife some questions about
18      her participation.  And from what I
19      understood, she looked some things up
20      at your request and did some
21      proofreading.
22          Did anybody else assist
23      you in the drafting of this complaint

4 (Pages 13 to 16)

CURTIS DUNCAN - 4/11/2006

17

1  besides your wife?
2  A.  No.
3  Q.  No lawyers helped you with it or
4      anything?
5  A.  No.
6  Q.  Okay. Did you just get a book and
7      look at it or look up something on the
8      internet?
9  A.  I went down to the state law library,
10     and I did research: AUM Law Library,
11     Faulkner --
12 Q.  Okay.
13 A.  -- University of Alabama.
14 Q.  All right. I'm going to ask you some
15     of the same questions that we talked
16     about with your wife. We're going to
17     go through this complaint and see
18     about some of the things that you
19     state in there.
20     One thing I did want to
21     ask you, though, was your wife
22     mentioned a conversation where
23     Mr. Kervin asked you not to bid or

18

1  enter a bid. Do you remember that
2  conversation?
3  A.  Yes.
4  Q.  Tell me what happened.
5  A.  It was pre -- it was during the
6      pre-bid of the solicitation in
7      question.
8  Q.  Uh-huh.
9  A.  And we were discussing -- I had wrote
10     several letters, and we were
11     discussing why I wasn't awarded the
12     contract.
13 Q.  Uh-huh.
14 A.  He stated that they wanted one
15     specific product, which was Sentricon.
16     The bid specification called -- said
17     that you could actually turn in a
18     comparable product. According to all
19     the various pesticide that distribute
20     the product, people in the industry,
21     the Agricultural Department,
22     entomologists, or whatever --
23 Q.  Uh-huh.

19

1  A.  They said that the product was
2      comparable.
3  Q.  Okay. Well --
4  A.  I was eventually disqualified. I
5      didn't understand why.
6  Q.  Okay.
7  A.  Because I -- when I submitted the bid,
8      I did all the research that I -- you
9      know that a responsible bidder would
10     do. And I didn't -- I never
11     understood why my product was
12     rejected.
13 Q.  Okay. Now, your product is Outpost;
14     is that right?
15 A.  Yes, sir.
16 Q.  But Sentricon, from what you told me a
17     while ago, you could have used that
18     product if you so desired; is that
19     right?
20 A.  Well, I discussed this with
21     Mr. Kervin.
22 Q.  Uh-huh.
23 A.  That the particular company that

20

1  actually distributed that product,
2  they -- they have all rights to decide
3  who distributes that product.
4  Q.  Oh, I see.
5  A.  The product that I submitted was open
6      to anybody cert -- as long as you're
7      certified by the State of Alabama.
8  Q.  Okay.
9  A.  Everybody I have asked -- but the
10     Sentricon, in a sense, is restricted
11     because they determine who they want
12     to franchise out to. I discussed it
13     in, you know, great detail with
14     Mr. Kervin.
15 Q.  All right.
16 A.  He said, Well, you know, this is the
17     product that we want.
18 Q.  Uh-huh.
19 A.  And this was for the first bid. And
20     he was talking about bidding it out
21     again, and he told me not to turn in
22     the -- you know, not to submit it
23     because they already had disqualified

5 (Pages 17 to 20)

CURTIS DUNCAN - 4/11/2006

21

1    me the first time. You know, it's
2    supposedly a comparable product.
3         The second time, when
4    they wrote specifications, it was
5    written that you only -- it was a
6    sole-source product.
7    Q.   Okay.
8    A.   You couldn't turn in a comparable
9    product.
10   Q.   Okay. Do you feel like Mr. Kervin's
11   discussion with you about those
12   products and his asking you not turn
13   in a bid, you feel like that was based
14   on your race?
15   A.   Well, you know, I've been doing it for
16   25 years.
17   Q.   Uh-huh.
18   A.   Never had a product that was -- never
19   had a bid that was rejected in that
20   way.  I -- you know, I -- you know, I
21   thought about it for a long time and
22   my product was comparable  and I just
23   didn't understand -- and to this day,

22

1    I still don't understand why I was
2    disqualified.  The only thing I could
3    logically deduct was that I wasn't the
4    right company.
5    Q.   The right company?
6    A.   The right company.  And as far as
7    being qualified, I had the same
8    credentials that the other company
9    had.
10   Q.   Okay.
11   A.   And the only thing I could deduct out
12   of that was because of my race.  I
13   mean, it wasn't no -- any other
14   logical reason why I was rejected for
15   it.
16   Q.   Okay. The things that you've just
17   told me about, the process -- your
18   thought process, is that the only
19   thing that led you to think that it
20   was because of your race?
21   A.   My thought process?
22   Q.   Yeah. What you just described to us.
23   A.   Yeah. Well, what I -- I took what he

23

1    told me to be sincere.
2    Q.   Uh-huh.
3    A.   And I tried to make sense of it.
4    Q.   Okay.
5    A.   And when you put all the cards on the
6    table, I was qualified.  According to
7    the bid specifications and the product
8    that I turned in, my product was
9    comparable.  I had the credentials,
10   the experience to provide the service.
11   Q.   Uh-huh.
12   A.   But that's the only logical reason
13   that it -- that it could be why.  It
14   had to be because of my race.
15   Q.   Did Mr. Kervin ever make reference to
16   your race?
17   A.   No, of course not.
18   Q.   What about Ms. Antle? Did you ever
19   talk to her before?
20   A.   No.  I mean, every -- every time I
21   meet them, they're still polite,
22   courteous to me.
23   Q.   What about Mr. Carlton?

24

1    A.   I met Mr. Carlton -- I think my wife
2    mentioned it.  I met Mr. Carlton one
3    time, and I discussed the same thing
4    as I discussed with Mr. Kervin.
5    Q.   Was that -- that was prior to the
6    lawsuit that you met him, when you
7    were going through the bid process?
8    A.   Yes.  That was prior to -- that was
9    prior to the award of the contract.
10   Q.   Okay.
11   A.   Because I was thinking all the way up
12   to that point that I was going to be
13   awarded the contract.  As a matter of
14   fact, I was awarded one contract, the
15   Corrections contract -- Corrections
16   specs -- I mean, solicitation.  But I
17   later found out that it was -- you
18   know, they had the award letter and
19   everything, but it was -- I learned
20   later it was torn up.
21   Q.   Okay.
22   A.   And that --
23   Q.   Who did you learn that from?

6 (Pages 21 to 24)

CURTIS DUNCAN - 4/11/2006

25

1  A.  This was maybe a week -- a couple of
2  weeks after they re-solicited the bid
3  solicitation, and they put it back
4  out.
5       The other two vendors had
6  turned in a non-responsive bid because
7  the prices -- the prices was in the
8  wrong column. It was non-responsive.
9  At that time, mine was the only one
10 that had the prices in the right
11 place, but they disqualified it
12 because they said I didn't turn in a
13 comparable product and re-solicited
14 the bid.
15      I didn't find out about
16 the Corrections award -- well, I don't
17 know if you can actually call it an
18 award, but it was -- it was filled out
19 on the sheet that they was going to
20 award it to me. But I didn't find
21 that out until two weeks after they
22 awarded the second bid.
23 Q.  Okay. All right. You -- during the

26

1  course of the case, you've had
2  occasion to read Mr. Kervin's
3  affidavit, have you not?
4  A.  Yes, sir.
5  Q.  In that affidavit, he indicates that
6  pursuant to a letter from you, that he
7  checked with two folks at the Alabama
8  Department of Agriculture, Mr. Block
9  -- Dr. Block and Mr. Debrow.
10      Did you ask him to check
11 with those -- with those people, in a
12 letter, and that he discuss the
13 equivalency of Outpost and Sentricon?
14 A.  Yes.
15 Q.  Okay. And did you read in his
16 affidavit what they told him, that
17 they have separate chemical
18 structures?
19 A.  Yeah. I didn't -- yeah. When I read
20 it in the affidavit, that's the first
21 time that I knew what they,
22 specifically, told him.
23 Q.  Okay. Do you know whether or not

27

1  that's true.
2  A.  What? The statement that they made?
3  Q.  Uh-huh.
4  A.  No. It's not true.
5  Q.  Okay.
6  A.  I mean, what they told Mr. Kervin is
7  not true. They told me the opposite
8  of what they --
9  Q.  What they told Mr. Kervin?
10 A.  Yes.
11 Q.  Why do you think they changed their
12 stories?
13 A.  That was puzzling because I've been
14 knowing Dr. Block for about 20 -- yep,
15 25 years. And what I found out, this
16 was -- even at that time, I did not
17 know. What I found out later was that
18 his son -- Dr. Block's son-- he was
19 over the regulatory agency -- his son
20 work for Cook's Pest Control. And I
21 only found out -- I found out way
22 after this bid that his son was
23 working with Cook's Pest Control.

28

1  Q.  You think that maybe that's why he
2  changed his story?
3  A.  Who, Mr. Kervin?
4  Q.  Dr. Block?
5  A.  Oh, Dr. Block. That's the only
6  logical thing. Because he never -- he
7  never brought it to my attention.
8  During the time his son was working
9  there, he never brought it to my
10 knowledge that his son was working for
11 Cook's Pest Control. As a matter of
12 fact, when I talked with Dr. Block, he
13 used some choice words in saying
14 there's not a blankety-blank
15 difference between the two products.
16 You know, so --
17 Q.  What kind of choice words did he use?
18 A.  I don't to want use them here.
19 Q.  Well, I understand that, but --
20 A.  I mean --
21 Q.  -- you're only doing it because I'm
22 asking you. We know that you don't
23 want to use them, but I need to know

7 (Pages 25 to 28)

CURTIS DUNCAN - 4/11/2006

29

1  exactly he told you, if you remember.
2  A.  He told me there wasn't a dime worth
3  of -- he said, It wasn't going to make
4  a dime -- a dime -- he said there
5  wasn't a D-A-M-N, damn -- there's not
6  a -- he used the word "damn."
7  Q.  Okay.
8  A.  A dime worth of difference between the
9  two products.
10 Q.  Okay. It also says that Dr. Block
11  said that his opinion was Outpost is
12  better for private homes, while
13  Sentricon is better for commercial
14  use.
15      And you don't feel like
16  that's true?
17 A.  That was the first time I heard it,
18  when I read it in the affidavit.
19 Q.  Well, let me ask you this: If it is
20  because of his son, then that would
21  not indicate that the decision was
22  based on your race, would it?
23 A.  Well, I had -- Mr. Kervin -- you know,

30

1  I wrote the letter that he talk to
2  Dr. Block before he made the decision
3  on the award.
4  Q.  Uh-huh.
5  A.  And he didn't inform me until after he
6  awarded it what Dr. Block said. He
7  didn't -- he didn't tell me before he
8  made the decision.
9  Q.  Uh-huh.
10 A.  And I -- you know, what it --
11 Q.  Do you think his failure to tell you
12  that is because of your race?
13 A.  Yes, sir. Because I told him what
14  Dr. Block told me. If Dr. Block -- If
15  I'm using Dr. Block as a reference, if
16  he told him something negative,
17  something contrary to what I said,
18  then the contracting officer, it would
19  be his duty to say, Mr. Duncan -- you
20  know, cause I'm questioning why I was
21  not awarded the contract -- Hey,
22  Mr. Duncan, Dr. Block told me this.
23 Q.  Where do I find that duty spelled out?

31

1  A.  That would fall -- that would fall
2  within the guide of the Administrative
3  Procedures.
4  Q.  Okay.
5  A.  Under the evaluation of the bids.
6  Q.  Where would that be in the
7  Administrative Procedures?
8  A.  Where would it be? I would have to --
9  I don't have that in front of me.
10 Q.  Okay.
11 A.  But that would go into the evaluation
12  process.
13 Q.  Why --
14 A.  And I can't quote the -- the exact
15  number, but it's the competitive bid
16  or whatever.
17 Q.  Okay. What about the part where
18  there's an indication that Mr. Walt
19  Weinwurm was consulted?
20      He represented Bayer ES,
21  manufacturer of Outpost, the product
22  bid by C & J Associates? Do you
23  remember that part of the affidavit?

32

1  A.  Yeah.
2  Q.  That affidavit is what we've marked as
3  Defendants' Exhibit No. 4. And it
4  says that a gentleman had already
5  informed -- had discussed the bid with
6  you, and he told you that you should
7  withdraw your bid because Outpost is
8  not equivalent to Sentricon.
9      Are you saying that
10  Mr. Weinwurm did not tell you that?
11 A.  No. He didn't tell me that.
12 Q.  Why do you think he told them that?
13 A.  I don't know.
14 Q.  So you think he's just mistaken, that
15  he never told you that?
16 A.  He never told me that, no. And from
17  my memory, my conversation with
18  Mr. Weinwurm, he -- he talked to
19  Mr. Kervin. And his words to me was
20  that -- well, he said, the State
21  appears to be -- have favoritism
22  toward Sentricon. And he advised --
23  he made this -- he said, no matter

8 (Pages 29 to 32)

CURTIS DUNCAN - 4/11/2006

33

1     what you do, it's not going to satisfy
2     them.
3  Q.   And that's what he told you?
4  A.   Right.
5  Q.   Okay.
6  A.   Yeah. That was his version to me, you
7     know, saying that, hey, after talking
8     with State Purchasing, Mr. Kervin, he
9     said, that they already had in mind
10    who they want to have this contract.
11    And he said, no matter what you do,
12    even if you get it, you're not
13    anything to be able to satisfy them.
14  Q.   Do you remember when you had that
15    discussion with Mr. Weinwurm?
16  A.   It was -- it was pre-award. It was
17    pre-award.
18  Q.   All right.
19  A.   And I was surprised to see that in the
20    affidavit, you know, because I had a
21    different -- I want to say -- a
22    different perspective of it when I
23    talked to him.

34

1     MR. LYLES: Just for the
2       record, that last name
3       we've been discussing is
4       W-E-I-N-W-U-R-M.
5  Q.   So are you telling me that you don't
6    think Mr. Kervin really had that
7    conversation with Mr. Weinwurm, or you
8    don't think Mr. Weinwurm said that to
9    him?
10  A.   I believe he had a conversation with
11    him. But the version of what took
12    place in that conversation, I couldn't
13    say what, you know, Mr. Kervin and
14    Mr. Weinwurm discussed. But when I
15    talked to Mr. Weinwurm, when I
16    discussed it with him, he said, yeah,
17    our products are comparable. But, he
18    said, you're fighting a losing battle
19    because the already have in mind who
20    they want to have -- have the bid.
21  Q.   How many contracts have you ever been
22    awarded with the Department of
23    Transportation.

35

1  A.   None. I've been doing a lot with the
2    State, but I've never had one --
3  Q.   How many have you ever had with the
4    State?
5  A.   Several. Mental Health for maybe --
6    over a eight-to-ten year period; state
7    troopers, somewhere between eight to
8    ten years. I do work with -- through
9    Retirement Systems for several years.
10    And others -- the others are smaller
11    ones. But those are the -- those are
12    the major ones.
13  Q.   And of those departments you've
14    listed, have you ever had occasion to
15    file suit against any of them?
16  A.   This is first time I ever filed suit
17    against the State. Unluckily, I had
18    to file one this time. I really
19    didn't want to file a lawsuit.
20  Q.   All right.
21  A.   Never been in a deposition before.
22  Q.   Based on your complaint, it appears
23    that you feel like Cook's Pest Control

36

1     was getting favorable treatment; is
2    that right?
3  A.   Yeah -- well -- yeah, Cook and also
4    Terminix because they both just – you
5    know, they both had a franchise
6    agreement to distribute the product,
7    Sentricon.
8  Q.   Okay. Was it because of the product
9    they distributed or because of your
10    race that they got the favorable
11    treatment?
12  A.   Race. My product was comparable. In
13    so many words, it was almost
14    identical.
15  Q.   Okay. Tell me what things happened
16    that you feel like were based on your
17    race rather than just a different
18    product or somebody's son working for
19    Cook's Pest Control.
20  A.   The evaluation process of the bid. I
21    turned in, you know -- not only did I
22    make reference to those different
23    people, I also turned in documentation

9 (Pages 33 to 36)

CURTIS DUNCAN - 4/11/2006

37

1     about each -- both -- well, I turned
2     in what my product offered and
3     compared them.
4   Q.   Okay.
5   A.   Like, put it up on the chart and
6     showing, you know, the pros and cons
7     of both products.
8   Q.   All right. What you're telling me
9     then -- is it based on what happened,
10    that you feel like it was because of
11    your race?
12  A.   Yeah. The reason why I feel that it
13    was my race was because, you know, I
14    don't think -- I didn't -- well, I
15    know I didn't get a fair evaluation of
16    my product. I know I had the
17    experience of 25, 26 years in the
18    business. And I turned in a product
19    that if you go to Auburn University
20    and get an entomologist or if you go
21    outside this state -- outside this
22    agricultural department we have here
23    in Alabama, they'll tell you. As a

38

1     matter of fact, a seminar they just
2     had not long ago stated there's no
3     difference between the products.
4   Q.   What seminar was that?
5   A.   It was up in Birmingham.
6   Q.   Do you remember when it was?
7   A.   I didn't go to this one. But the
8     company I used to work for, they
9     actually went to the seminar.
10  Q.   And they told you what they said?
11    Someone told you?
12  A.   Yeah. Yeah. From C Con, they told
13    me. If I'm not mistaken the guy works
14    at the University of Georgia. And the
15    question came up during the seminar of
16    the comparison -- is there a
17    difference between the two products.
18  Q.   Do you remember who at C Con told you
19    that?
20  A.   Lou Childrey.
21  Q.   Children?
22  A.   Like child, C-H-I-L-D-R-E-Y.
23  Q.   Okay.

39

1   A.   And I -- well, I want to say, you
2     know, doing my re-certification points
3     that I've been getting over the years,
4     it's just common knowledge that it's
5     -- you know, the product -- there's no
6     difference in the product.
7   Q.   All right. Did any of these
8     defendants make any kind of racial
9     slur to you?
10  A.   Of course not.
11  Q.   Okay. I think you -- I don't want to
12    put words in your mouth, but earlier,
13    I think you said that Ms. Antle and
14    Mr. Kervin treated you with respect,
15    or they were polite to you.
16  A.   Always polite, courteous. But the
17    actions of the -- the results of the
18    evaluations --
19  Q.   Uh-huh.
20  A.   -- don't add up. You know, you sit
21    down -- when you put my product --
22    when you compare the two and my
23    qualifications, there was no logical

40

1     reason for why I wasn't awarded the
2     contract. And that's all -- all I was
3     -- I was talking to Mr. Kervin
4     pre-bid, but it appeared to me that I
5     wasn't even taken seriously, you know.
6   Q.   What about Mr. Carlton down here, has
7     he ever said anything to you that
8     would indicate that he was racially
9     biased towards you?
10  A.   No. No, of course not.
11  Q.   What about -- do you know Mr. Hornsby?
12  A.   No.
13  Q.   You never discussed it with him?
14  A.   No. I never had any direct
15    conversation with him.
16  Q.   What about Mr. Harris?
17  A.   No. I never met him personally, but I
18    went up and did a site visit, got a
19    signature, did the inspection, you
20    know, but never had a personal, direct
21    con -- you know, conversation.
22  Q.   All right. Do you know what the race
23    of either of those gentlemen is,

10 (Pages 37 to 40)

CURTIS DUNCAN - 4/11/2006

41

Mr. Hornsby or Mr. Harris?
2   A.   Yes.
3   Q.   What are they, please, sir?
4   A.   Mr. Hornsby is -- is white.
5   Q.   What about Mr. Harris?
6   A.   I haven't seen him. I couldn't say.
7   Q.   All right. Your lawsuit talks about
8        several different statutes; one those
9        is 1985. Okay? That's what you got
10       listed on Defendant's Exhibit 8.
11       You've got several things listed up
12       there. Do you know what 1985 is; what
13       that statute covers?
14  A.   It's dealing with conspiracy.
15  Q.   Okay. That's right; it's a conspiracy
16       statute. So what I need to know is
17       what -- number one, who was in this
18       conspiracy, and, number two, what did
19       they conspire to do to you.
20            Let's take the first,
21       number one. Who was in a conspiracy
22       against you because of your race?
23  A.   Well, I would -- the name of the

42

1        aforementioned defendants.
2   Q.   Okay. So Mr Hornsby, Mr. Harris, Stan
3        Carlton, Mr. Kervin, Ms. Antle were in
4        a conspiracy against you; is that
5        right?
6   A.   Right.
7   Q.   Well, let me ask you --
8   A.   Now --
9   Q.   Okay. Go ahead.
10  A.   Too, like I stated earlier, it was
11       maybe a week, maybe two weeks after
12       the bid opening --
13  Q.   Uh-huh.
14  A.   I requested to see the bid files and
15       things like you mentioned, about
16       Dr. Block and Mr. Debrow and
17       Mr. Weinwurm. I had no knowledge of
18       it. And we're going through an
19       evaluation phase you know, it was
20       -- why wasn't that shared with me
21       during the --
22  Q.   Okay.
`3  A.   -- evaluation?

43

1   Q.   You think that was because of your
2        race?
3   A.   That's the -- that's the only reason
4        that I could come up with. Because
5        when I got an opportunity to read --
6        read the bid files, especially when
7        one of the other things was that
8        Corrections had awarded me the
9        contract; it was torn up.
10  Q.   Okay.
11  A.   And nobody mentioned that to me
12       before, that it was -- that I actually
13       was awarded the contract. And why it
14       was -- you know, I didn't find all
15       this out until after the fact. When I
16       got an opportunity to read the entire
17       bid -- you know, bid file, it occurred
18       to me that there's a lot of things I
19       should have known during the
20       evaluation of the bid. If there was
21       good intention from the state agency,
22       I should have known. I shouldn't have
23       to find out after.

44

1   Q.   But you think that the lack of good
2        intentions was because of your race?
3   A.   The lack of good intentions?
4   Q.   You said if there was good intentions
5        on the part of the state, you should
6        have known. I'm saying, the lack of
7        good intentions, the failure to tell
8        you those things, was because of your
9        race?
10  A.   Yeah. I interpret that to be a
11       violation of the competitive bid law.
12       It's supposed to be open to the
13       public.
14  Q.   All right. What about -- right now,
15       we're talking about your race.
16  A.   My race?
17  Q.   Uh-huh.
18  A.   Yes. That's the only reason that --
19       that any logical person could deduct.
20  Q.   Did you see anything in that bid file
21       notating your race?
22  A.   Of course not. Of course not. I
23       mean, the courts have ruled that, you

11 (Pages 41 to 44)

CURTIS DUNCAN - 4/11/2006

45

1    know, when a person discriminates,
2    they not just going to be overt with
3    it.
4    Q.   Okay.
5    A.   That it would be under the cover.
6    Q.   My question to you is: Did you see
7    anything in the file that would
8    indicate, other than what you have
9    surmised from --
10   A.   Oh, after the award?
11   Q.   Right.
12   A.   Yes, sir. When you read the bid file
13   in its entirety --
14   Q.   Does it make reference to your race?
15   A.   Of course not.
16   Q.   Does it say, "let's do this," because
17   of your race?
18   A.   No. It's not going to.
19   Q.   One of the things in a conspiracy --
20   what I'd like to ask you is, is what
21   each one these people did to further
22   the conspiracy. What -- what -- tell
23   me everything you think Mr. Hornsby

46

1    did.
2    A.   Mr. Hornsby?
3    Q.   Uh-huh.
4    A.   Well, when I read the bid specs, I
5    found out that he actually did the
6    research on determining that Sentricon
7    was the product that the state use.
8    Didn't know that going through -- you
9    know, didn't know that throughout the
10   entire bid process.
11   Q.   Okay.
12   A.   And when I read that, the
13   documentation that they have in the
14   file, they actually made the
15   recommendation that -- that they
16   should bid it out as a sole-source
17   product.
18   Q.   Who did he make that recommendation
19   to?
20   A.   Huh?
21   Q.   Who did he make that recommendation
22   to?
23   A.   No. No. I'm saying that Mr. Hornsby

47

1    -- Mr. Hornsby did.
2    Q.   He recommended that to?
3    A.   To State Purchasing, Mr. Kervin and
4    Ms. Antle.
5    Q.   Uh-huh.
6    A.   They corrected him and said that you
7    should accept comparable products.
8    Q.   Uh-huh.
9    A.   That's on the record. They went ahead
10   and wrote the bid specs, that it would
11   accept comparable product. But when
12   it actually -- when they solicited the
13   bid and put it out, somewhere during
14   the evaluation process, we discovered
15   that the two companies that submitted
16   Sentricon was nonresponsive, and I was
17   the only person that had turned in a
18   comparable product and a responsible
19   product. I was disqualified for
20   reasons -- to this day, I don't
21   understand why I was disqualified.
22   Q.   Okay.
23   A.   And you know, the thing that the court

48

1    has set up, that if you are -- you
2    know, if you have the
3    qualifications -- you're qualified and
4    if you are not awarded the contract or
5    the job or whatever, that you -- you
6    go through these steps to determine
7    discrimination.
8    Q.   Okay.
9    A.   You know, even though you may not have
10   on record that you -- you know,
11   somebody said, well, I didn't do this
12   -- I didn't award the contract because
13   of race.
14   Q.   Okay. You used the term (as read:)
15   "That a letter fraudulently stated
16   that Defendant Hornsby spearheaded the
17   evaluation of the most prevalent
18   subterranean termite control program."
19   You remember making that
20   statement?
21   A.   Yes, sir.
22   Q.   Who committed fraud?
23   A.   Well, when I looked at the bid file,

12 (Pages 45 to 48)

CURTIS DUNCAN - 4/11/2006

49

```
      he had a chart where he -- where he
 2    had the pros and cons of Sentricon.
 3    And he, basically, put down the good
 4    things about Sentricon.  He didn't
 5    compare it to another bait.  He just
 6    compared it to liquids.
 7            And when he made the
 8    recommendation to Mr. Kervin, it was,
 9    Well, this is the best product on
10    market.  But he didn't have any
11    documentation supporting that it was
12    better than the bait -- the other
13    comparable baits out there.  He
14    compared it to a liquid, which would
15    be comparing an apple to an orange.
16 Q. Okay.  So you're saying he didn't have
17    a fraudulent intent; he knew it was --
18    he knew it was incorrect, and did it
19    anyway?
20 A. Yes, sir.
21 Q. What do you base that on?
22 A. Well --
23 Q. Don't you say that he used a page and
```

50

```
 1    a half of information about Sentricon
 2    off the Sentricon website?
 3 A. No.  No.  This was something that he
 4    typed up himself.
 5 Q. But you got the statement, the only
 6    information offered by the Defendants
 7    Hornsby, Harris, Carlton, for
 8    declaring Sentricon a sole-source
 9    product is a page and a half comparing
10    Sentricon, plus a page and a half of
11    information by Sentricon off the
12    Sentricon website.
13 A. Right.  Right.
14 Q. Did that page and half come from the
15    Sentricon website?
16 A. The page and a half, he typed it up
17    himself.
18 Q. Did that information come from the
19    website?
20 A. No.  What I'm saying, he gave his
21    personal --
22 Q. Okay.  Then why have you got "plus a
23    page and a half of information"?
```

51

```
 1 A. He gave -- he gave -- he got some off
 2    of the website from Sentricon --
 3 Q. So that --
 4 A. But at the same time -- not just -- if
 5    he would have just submitted that, but
 6    he put -- he actually just wrote his
 7    personal --
 8 Q. So his fraud and their fraud is in
 9    commenting on that page and a half of
10    information?  Is that when they --
11 A. He was mis --
12 Q. -- committed fraud?
13 A. He was misrepresenting the product as
14    being superior to all other products
15    without proper documentation.
16 Q. Did this information from Sentricon
17    say it was superior?
18 A. Huh?
19 Q. The information from the Sentricon
20    website, did it say it was superior?
21 A. No.  I'm saying the part that he typed
22    himself --
23 Q. I understand that --
```

52

```
 1 A. -- outside of that.
 2 Q. Was the part he typed, was it
 3    different from the information from
 4    the Sentricon website?
 5 A. The information that he typed?
 6 Q. Yes.
 7 A. When you have somebody intentionally
 8    just selectively type down the pros
 9    and not the good and the bad of the
10    product, and then at the same time,
11    you don't mention to the central
12    office that, hey, there's another
13    product out there that's comparable to
14    this product.
15 Q. Well, could it have been his opinion
16    that it just was not comparable?
17 A. Well, before we get to that part, they
18    had --
19 Q. No.  No.  My question is:  Could that
20    have been his opinion?
21 A. I'm trying to give you how he
22    formulated his opinion.  Because Cook
23    was going the previous -- it was built
```

13 (Pages 49 to 52)

CURTIS DUNCAN - 4/11/2006

53

1    on the regular pest control up there.
2    They -- it's in their file -- stated
3    that they had Cook to come out and
4    submit a price of how much it would
5    cost to install Sentricon.  He had a
6    relationship with Cook's Pest Control.
7  Q.  How did these Defendants Hornsby,
8    Harris, and Carlton, how did they
9    commit fraud by doing what you
10   describe here?  Tell me what they did
11   that is fraud.
12 A.  If you will produce the letter that he
13   wrote, I could read it word for word.
14   I'm giving you a general description
15   of what he wrote.  And what he
16   generally wrote was, that this product
17   was most prevalent, if I'm not -- or
18   the best out there on the market.
19   That's not true.
20 Q.  Okay.
21 A.  You know, he basically -- well, to be
22   honest with you, it got to the point
23   where he made recommendations to

54

1    Mr. Kervin to make it a sole-source
2    product from the very beginning.
3  Q.  So they committed -- they were lying
4    when they did that?  This man was
5    lying when he did it?
6 A.  Stan?
7 Q.  Uh-huh.
8 A.  Oh --
9 Q.  Mr. Carlton.  Is there any other --
10 A.  No.
11 Q.  Is Mr. Carlton lying when that letter
12   was submitted?  Are you calling that
13   man a liar?
14 A.  No. No. No. The letter I'm
15   referring to --
16 Q.  You say Defendants Hornsby, Harris,
17   and Carlton submit a letter on January
18   16, 2003, to Defendant Antle, this
19   lady over here, to be the only product
20   accepted for treatment.
21 A.  Uh-huh.
22 Q.  The letter fraudulently states that
23   Hornsby spearheaded the evaluation.

55

1 A.  Uh-huh.
2 Q.  All right.  When they sent the letter,
3   they're lying, is that what you're
4   saying?  This man sitting right here
5   lied; is that what you're saying, the
6   man sitting right over here?
7 A.  If you could produce that letter --
8 Q.  No, sir.  I'm asking you.  You're the
9   one who refers to the letter.
10 A.  Yeah.  I know I made reference, but
11   what I'm saying --
12 Q.  Are you saying that man right there
13   lied when they submitted that letter;
14   that's what I'm asking you?
15 A.  Well, what I'm saying -- I'm going to
16   have to have that letter, that letter
17   that he wrote.
18 Q.  You're the one that refers to the
19   letter.
20 A.  Now, I'm referring to it.  Now --
21 Q.  Did he lie when they submitted that
22   letter?  That's all I want you to
23   answer.

56

1 A.  You're talking several --
2 Q.  I'm asking about what -- we're talking
3   about what you said, that they
4   submitted a letter --
5 A.  Yeah.
6 Q.  The letter fraudulently states -- the
7   letter that they submitted.
8      So are you saying that
9   Mr. Hornsby, Mr. Harris, Mr. Carlton,
10   that man right there, lied in the
11   letter; that's what I'm asking you?
12   Yes or no?
13 A.  The complaint -- I stand by what I
14   stated in the complaint.
15 Q.  It states, "they fraudulently stated."
16   That man right there lied; is that
17   what you're saying?
18 A.  Sir, what I'm saying is --
19 Q.  No, sir.  I'm asking you what you
20   said --
21 A.  I can't -- I can't --
22 Q.  -- in this complaint.
23 A.  What I'm saying is I can't --

14 (Pages 53 to 56)

CURTIS DUNCAN - 4/11/2006

57

THE COURT REPORTER: Y'all are
2   going to have to do this
3   one at a time.
4   THE WITNESS: Okay. I'm
5   sorry.
6   Q.   Go ahead.
7   A.   What I'm saying, I can't say what his
8   state of mind was at that time --
9   Q.   That's my point.
10  A.   In the complaint, I only can make --
11  allege -- I can only allege, and
12  through discovery, that will prove
13  that he lied. I can't sit up here and
14  say he lied.
15  Q.   Okay. Tell me what discovery you
16  have, as of today, as we sit here --
17  right here, that says Mr. Carlton lied
18  to Ms. Antle?
19  A.   By that letter.
20  Q.   And that's all you got?
21  A.   That's all I can have until we go
22  through discovery.
23  Q.   What discovery?

58

1   A.   Depositions -- I mean, we are going to
2   have depositions.
3   Q.   Outside of that letter, do you have
4   any evidence, as we sit here today,
5   that he lied to Ms. Antle?
6   A.   Yeah. Why the contract was awarded to
7   somebody other than myself. I was
8   disqualified.
9   Q.   That makes him a liar?
10  A.   I guess it would. It has to.
11  Q.   Then you say that Ms. Antle and
12  Mr. Kervin rejected the fraudulent
13  actions of Mr. Hornsby and Mr. Harris.
14  Are you saying that they
15  knew that Mr. Carlton and these other
16  gentlemen were lying when they turned
17  that in?
18  A.   Well, their records reflect that they
19  rejected them saying that this should
20  be a sole-source product.
21  Q.   But your complaint says they rejected
22  the fraudulent actions.
23  Are you saying that when

59

1   she rejected that letter, she knew
2   Mr. Carlton over here committed fraud?
3   A.   That she knew?
4   Q.   Uh-huh. She rejected the
5   fraudulent --
6   A.   That only can come --
7   Q.   -- actions.
8   A.   -- out of discovery. I can't -- I
9   can't --
10  Q.   So you just made it up and hoped you'd
11  find something to back it up?
12  A.   No. I didn't make it up. I based it
13  on their actions, Mr. Lyles. Their
14  actions showed that.
15  Q.   All right. Ms. Antle -- what actions
16  showed that?
17  A.   Their awarding the contract to
18  somebody other than the lowest
19  comparable bid.
20  Q.   And that, in your mind, constitutes
21  fraud?
22  A.   Sir?
23  Q.   In your mind, that constitutes fraud?

60

1   A.   Constitutes fraud?
2   Q.   Uh-huh.
3   A.   They knew. Mr. Kervin and Ms. Antle,
4   they did the right thing in saying
5   that, hey, y'all can't make this a
6   sole-source product. It's a policy
7   within the Transportation. I can't
8   quote it now, but when you try to make
9   a product a sole-source product, you
10  got to have scientific backup. You
11  got to have some documentation
12  strongly supporting it. They didn't
13  have that documentation, so it had to
14  be fraudulent.
15  Q.   I see.
16  A.   If you don't have documentation
17  supporting making the products a sole
18  source --
19  Q.   Uh-huh.
20  A.   -- what else could it be?
21  Q.   Let's go to next the paragraph. You
22  talk of your protesting the
23  restrictive bid specifications, and

15 (Pages 57 to 60)

CURTIS DUNCAN - 4/11/2006

61

1    you wrote a letter on March 24, 2003,
2    concerning this matter to Defendants
3    Kervin and Antle. (As read:) "They
4    willfully and knowingly ignored your
5    protest because of your race."
6        Tell me everything that
7    makes you think that Pat Antle and
8    Mr. Kervin deliberately ignored your
9    letter because of your race.
10  A.   Because I submitted scientific
11       documentation, not based on what
12       somebody else said, but what a
13       layperson can read themselves to know
14       that my product was a comparable
15       product.
16  Q.   And the only possible reason for them
17       not accepting that was because of your
18       race?
19  A.   Right.
20  Q.   It couldn't be that they disagreed
21       with you?
22  A.   Disagreed with scientific facts?
23  Q.   I'm just asking you. You're telling

62

1    me that the only possible reason they
2    could have not done what you wanted
3    them to do is because of your race.
4    A.   Yes, sir. Because when I sub -- I
5         submitted the label. The label is
6         federal law.
7    Q.   Uh-huh.
8    A.   You know, when I submitted the law
9         showing that my product was comparable
10        to the other product, and I wasn't
11        awarded the contract -- I met the
12        qualifications of the bid specs, and I
13        was denied award simply because of my
14        race.
15   Q.   Okay.
16   A.   I mean, they haven't gave me a reason
17        for not -- a legitimate reason for not
18        awarding me the contract. And that's
19        the process that the courts use to
20        determine whether you've been
21        discriminated against.
22   Q.   Okay. The next paragraph says that in
23        March 2003, you performed required

63

1    site visits and collected signatures
2    for Corrections and Transportation.
3    During that time Mr. Hornsby,
4    Mr. Harris, and Mr. Carlton became
5    aware of your race.
6        Now, tell me how that
7    happened. How did that make them
8    aware of your race?
9    A.   Because I went on site and did the
10        inspection.
11   Q.   But you told me, Mr. Harris, you never
12        met him.
13   A.   No, I never met him. But I went on
14        site and I did the -- I could have met
15        him without even knowing I met him,
16        because I went throughout the whole
17        building.
18   Q.   Okay.
19   A.   I identified myself as I went through
20        it, you know.
21   Q.   But you're saying that Mr. Harris, at
22        that time, found out that you were a
23        black man, and he decided to

64

1    discriminate against you and the same
2    as with Mr. Hornsby and Mr. Carlton?
3    A.   Right. My race was identified during
4         the bid process, yes.
5    Q.   And that automatically made them
6         discriminate against you?
7    A.   It didn't automatically make them
8         discriminate, but the only thing --
9         when you go through the process of how
10        you award, according to the bid laws
11        and their own administrative
12        procedures and administerial duties --
13   Q.   Okay.
14   A.   When you go through that process, I
15        was disqualified for reasons outside
16        of the specifications.
17   Q.   And that made it based on your race;
18        is that right?
19   A.   Yes, sir.
20   Q.   Okay. And then you said that
21        Mr. Kervin and Ms. Antle went ahead
22        with bid specs recommending Sentricon
23        and had the bid open on March 27,

16 (Pages 61 to 64)

65

2003.
Did they do anything
wrong there?
4  A.   Is that the first bid or second bid?
5  Q.   I'm reading your complaint,
6        Paragraph 16.
7  A.   Yeah.  That's the first bid.
8  Q.   Okay.  Did Mr. Kervin or Ms. Antle do
9        anything wrong there?
10 A.   They did the right thing there.
11 Q.   Okay.  When did those two turn on you
12       because of your race?
13 A.   Based on the information in the files
14       --
15 Q.   Uh-huh.
16 A.   Due to the fact that they had awarded
17       me the Corrections, somewhere during
18       the evaluation period.
19 Q.   Okay.  Somewhere during the evaluation
20       period, these two joined up with
21       Mr. Carlton over here and committed
22       fraud and became racists; is that what
23       you're saying?

66

1  A.   I'm on record to say that they did the
2        right thing when they first was
3        confronted with the specifications
4        that Mr. -- I think Mr. Hornsby in
5        North Alabama.  They corrected it.
6  Q.   Okay.  But somewhere along the line
7        they left the path and got into the
8        conspiracy with Mr. Carlton over here;
9        is that right?
10 A.   Somewhere in there.
11 Q.   In Paragraph 18, you say that you
12       submitted your information on April
13       7th -- the information label by
14       Outpost -- by fax to Mr. Antle -- to
15       Ms. Antle and Mr. Hornsby, and they
16       willingly and knowingly chose to
17       fraudulently ignore it because of
18       their racial bias.  There's two or
19       three things in there I want to ask
20       you about.
21            First, how do you know
22       that they deliberately chose to ignore
`3       what you sent them?

67

1  A.   Because all the documentation they had
2        before -- before them.
3  Q.   Couldn't they have just disagreed with
4        it?
5  A.   Disagreed with -- with --
6  Q.   With what you sent them.
7  A.   -- facts?
8  Q.   Couldn't they have disagreed with what
9        you sent them?
10 A.   No.
11 Q.   Didn't have a right to disagree with
12       it?
13 A.   No.  Not disagree.  I'm saying they
14       didn't follow the procedures.
15 Q.   I see.  And which procedure tells them
16       that they -- when you submit this
17       stuff, that they have to agree with
18       it?
19 A.   When I submit it?
20 Q.   Uh-huh.  When you fax them things that
21       they have to --
22 A.   I'm not saying that everything that I
23       submit to them, they have to agree to

68

1        it.  What I'm saying is, is that when
2        I submit a label, which is made by the
3        company, and then -- it's federal law.
4  Q.   What's federal law?
5  A.   The label.
6  Q.   They have to agree the label is
7        federal law?
8  A.   No.  What I'm saying is, the label,
9        which tells you -- that instructs you
10       on the product, how to use it, what it
11       -- what's its pros and what's its
12       cons, and then when you -- when they
13       compare it to Sentricon it's
14       comparable.
15 Q.   What if they're basing what they do on
16       this thing because people at
17       Agricultural and Mr. Weinwurm told
18       them?  What if they're basing what
19       they're doing based on what they told
20       them?  Even if those people were wrong
21       --
22 A.   Right.
23 Q.   Ms. Antle --

17 (Pages 65 to 68)

CURTIS DUNCAN - 4/11/2006

---

69

1  A.  I understand.
2  Q.  If all these people believe what those
3      people told them, how is that fraud or
4      racial?
5  A.  How is it fraud or racial?
6  Q.  Uh-huh.
7  A.  By not letting me know.
8  Q.  Oh, okay.
9  A.  You're going through the evaluations
10     period. I'm submitting evidence --
11     I'm submitting documentation that,
12     hey, my product is comparable and --
13 Q.  Okay.
14 A.  -- if I give you a reference, and that
15     reference gives you something contrary
16     to what the labels says and what I'm
17     saying --
18 Q.  Well, they've got conflicting
19     information; right?
20 A.  Well, that's what they told -- that's
21     what he have in his affidavit.
22 Q.  Okay.
23 A.  But like I say, why did I become

---

70

1      knowledgeable of this after the second
2      bid, that's the question.
3  Q.  Uh-huh.
4  A.  And I was communicating with
5      Mr. Kervin. We talked, you know, a
6      couple -- two or three different times
7      in great detail, and I just don't know
8      why I wasn't informed of it.
9  Q.  All right. Limestone Correctional
10     Facility. You dealt with Mr. Rhodes
11     over at Corrections, right, Director
12     of Procurement?
13 A.  Yes. His name was on the document. I
14     don't think I met him.
15 Q.  Okay.
16 A.  Just other than --
17 Q.  All right.
18 A.  But he had awarded the contract, and
19     Ms. Antle had typed up an award
20     letter. And to this day, I don't
21     understand why that award letter was
22     torn up.
23 Q.  Okay.

---

71

1  A.  And nobody mentioned and said, Hey,
2      Mr. Duncan, we were going to award it
3      to you, but --
4  Q.  But you think they had a duty to do
5      that?
6  A.  Yes, sir. I mean, you're in the
7      evaluation phase of the bid, and the
8      agency done made the decision that I
9      was qualified for it. What was so
10     compelling that State Purchasing would
11     overrule them? I don't have anything
12     documenting that.
13 Q.  Okay. But you're saying that under
14     the regs and everything, they had a
15     duty to tell you; is that what you're
16     telling us?
17 A.  Yes. In the evaluation phase.
18 Q.  Okay. And If I go look at the
19     administrative regulations, I'm going
20     to find that, where it says they had a
21     duty to do these things; is that what
22     you're telling me?
23 A.  Yeah.

---

72

1  Q.  Okay. Now -- and then you say
2      Mr. Harris, on April 17th, wrote a
3      fraudulent letter to Mr. Carlton over
4      there, disqualifying you because of
5      his preference for a white vendor for
6      Cook's Pest Control.
7  A.  Who wrote the letter you say?
8  Q.  No. You said, "Defendant Harris, on
9      April 17th, wrote a fraudulent letter
10     to Defendant Carlton to disqualify the
11     plaintiff because of his preference
12     for a white vendor."
13 A.  Right.
14 Q.  How do you identify Cook's Pest
15     Control as a white vendor?
16 A.  Identify?
17 Q.  Uh-huh. How do you determine who are
18     white vendors and who are black
19     vendors?
20 A.  It's common knowledge that Mr. Cook is
21     a white owner of the company.
22 Q.  So since he's a partner, that's a
23     white vendor?

---

18 (Pages 69 to 72)

CURTIS DUNCAN - 4/11/2006

73

1    A.   Is a partner?
2    Q.   That's what you said. You said he's a
3         white partner in the company. That's
4         what you just said, I thought, just
5         now.
6    A.   No. I said Mr. Cook is the owner of
7         the company.
8    Q.   Okay. Is that why you call him a -- a
9         preference for a white vendor?
10   A.   They're not black.
11   Q.   Are you saying that because he's white
12        --
13   A.   They're not minority.
14   Q.   Okay. But are you saying, since they
15        wanted Cook, that it was because they
16        were white --
17   A.   Based on their actions, yes.
18   Q.   Okay. "And has racial bias for the
19        plaintiff." So you're saying that
20        Mr. Harris here has a racial bias
21        against you?
22   A.   Right. Because --
23   Q.   I'm sorry?

74

1    A.   I was just -- you know, if a person
2         meets all the qualifications for a
3         job, and he also -- in a state bid,
4         you're supposed to award to the lowest
5         responsible bidder. What is that
6         person supposed to think when he's not
7         awarded the contract?
8    Q.   All I can answer is what you
9         apparently felt.
10   A.   Okay.
11   Q.   I can't say I think that's the reason,
12        but I'm well aware of what you think.
13        Then you say that he fraudulently
14        writes in his letter that the
15        plaintiff's low bid is unacceptable.
16        So he lied again when he
17        said that your bid was unacceptance;
18        is that right?
19   A.   Right.
20   Q.   Does your product have a guarantee of
21        elimination of subterranean termites?
22   A.   Does my what?
23   Q.   Does your product have a guarantee of

75

1         elimination of subterranean termites?
2    A.   Does --
3    Q.   Does your product -- in this paragraph
4         you say that the reason he said it
5         wasn't equal was there was no
6         guarantee.
7    A.   They said I didn't submit a guarantee
8         with the bid specs, and the bid specs
9         didn't require me to turn one in.
10   Q.   That's not what I asked you. I said,
11        "due to the no guarantee of
12        elimination." Is that or is that not
13        true? Does your product have a
14        guarantee of elimination of
15        subterranean termites?
16   A.   Yes, on the label.
17   Q.   Your product does?
18   A.   Right. If you read the language on
19        the -- on the label, yes.
20   Q.   Okay. What about the replacement
21        guarantee?
22   A.   Okay --
23   Q.   It says that you did not include a

76

1         replacement guarantee for termite
2         damage.
3    A.   The bid specification didn't ask me to
4         turn one in.
5    Q.   No, sir. It says that you did not --
6         it says, (as read:) "Falsely states
7         that you did not include."
8              Did you or did you not
9         include a replacement guarantee for
10        termite damage?
11   A.   The bid specifications --
12   Q.   No, sir.
13   A.   You're misreading that.
14   Q.   No, sir. I'm reading what you wrote.
15        (As read:) "It falsely stated that you
16        did not include."
17             So it's an easy question,
18        Mr. Duncan. Did you or did you not
19        include a replacement guarantee for
20        termite damage in your bid? Did you
21        or did you not?
22   A.   I did not include the terminate --
23   Q.   So that was not a false statement

19 (Pages 73 to 76)

CURTIS DUNCAN - 4/11/2006

77

1    then, was it?
2  A.  It is a false statement, because
3    they're misstating the facts.
4  Q.  Mr. Duncan, you made a statement that
5    he lied. Was Mr. Harris lying again
6    because of your race?
7  A.  Why would I turn in a warranty that I
8    didn't know to turn in? That's -- I
9    mean, that's the facts of this.
10 Q.  Mr. Duncan, I know that's what you
11   want to talk about. I'm asking you
12   what you wrote. You said that he lied
13   when he said you didn't turn it in.
14   And you're sitting here saying --
15 A.  To cover.
16 Q.  So he didn't lie, did he?
17 A.  Well, I'm telling you -- what I'm
18   saying to you is, the reason why I
19   didn't turn one is because I didn't
20   know, and he knew I didn't know to
21   turn it in.
22 Q.  Oh, so he knew that you didn't know?
23 A.  Right. It's not in the bid

78

1    specification, sir.
2  Q.  Next you say that Mr. Carlton over
3    here on April 21, he writes this
4    letter lying to Ms. Antle --
5  A.  Uh-huh.
6  Q.  -- that Outpost does not meet the
7    specs --
8  A.  Right.
9  Q.  -- that it does not offer total colony
10   elimination. Is that true or not?
11   Does it or doesn't it?
12 A.  It's on the label.
13 Q.  I'm asking you. Does it or does it
14   not?
15 A.  What?
16 Q.  Is that statement true? You said that
17   he falsely stated that your product
18   does not offer total colony
19   elimination as Sentricon does.
20 A.  Right. That's on the label that it
21   does.
22 Q.  So he lied -- so that's not true right
23   there?

79

1  A.  He had the information stating that it
2    was true.
3  Q.  Okay. So he deliberately lied about
4    that?
5  A.  That will come out in discovery
6    whether he deliberately lied about it.
7  Q.  No. You're the one who says -- you
8    already said he deliberately lied.
9    I'm asking you now what --
10 A.  No --
11 Q.  You just stick that in there so you
12   could make the complaint better?
13 A.  I didn't stick that in there. When
14   you file a complaint, you allege what
15   a party does. Being that it's due --
16   involving discrimination, you ask me
17   did they make any racial connotations
18   towards me. No, they didn't. When a
19   person is conspiring and doing things
20   behind the scenes, sir, I can't get
21   into what his mind -- state of mind.
22   That would be for a jury to make.
23 Q.  So it's your position that you can say

80

1    anything you want to about these
2    people down here --
3  A.  No. I base it on --
4  Q.  -- and hope that you can find
5    something to base it on; is that what
6    you're saying?
7  A.  No, sir. What I'm saying is based on
8    their --
9  Q.  Let's go to Paragraph No. 24.
10 A.  Based on their letters --
11 Q.  We're going to -- the question is
12   over. We're going to the next
13   question.
14 A.  I'm just saying, based on the
15   letters --
16 Q.  We're going to the next question now,
17   Mr. Duncan.
18 A.  I understand. But why are you getting
19   frustrated with me, sir?
20 Q.  I'm not getting frustrated with you.
21   We're going to take a break, and
22   you're going to come back in here and
23   answer the questions.

20 (Pages 77 to 80)

81

A.    I'm answering the questions.
            MR. LYLES: Take a two-minute
        break.
            MR. DUNCAN: I'm free. I'm
        ready to go.
            MR. LYLES: I'm not. It's my
        deposition.
            MR. DUNCAN: Okay. You want
        to take a break? Okay.
            MR. LONG: We're going to take
        a ten-minute break,
        Mr. Duncan.
            MR. DUNCAN: Okay.
        (Brief recess was taken at
        12:39 p.m., and deposition
        testimony reconvened at
        1:21 p.m.)
Q.    (By Mr. Lyles:) Let's cut part of
    this short, Mr. Duncan, and let me ask
    the question to you in this way. We
    discussed some of the reasons for the
    various parts of your complaint as far
    as your feelings that they were

82

    improper and fraudulent and based on
    your race, have we not?
A.    Yes, sir.
Q.    I mean, that's what we've been talking
    about, is it not?
A.    Yes.
Q.    Okay. And my question to you: Other
    than the documents that you cite in
    here, and the inclusions that you told
    me about, do you have any evidence at
    this point in time that will support
    the allegations in your complaint,
    outside of what's cited in here and
    the thought processes you've told me
    about?
A.    I base that on what I saw in the bid
    file a week or two after that.
Q.    So it would be the bid file and the
    documents you cite in here --
A.    Yes, sir.
Q.    -- are pretty much --
A.    Yeah. That's all I have to base it
    on.

83

Q.    Okay. And from what I understood your
    wife to say, her knowledge of this
    lawsuit is based on reading the
    complaint and discussing aspects of it
    with you. As far as personal
    knowledge, she wouldn't have any in
    this lawsuit from what I understood
    her to say. Is that -- do you agree
    with that assessment?
A.    She made reference to, before the bid,
    about when we met with Mr. Kervin --
Q.    Right.
A.    -- and the discussion we had with him.
    But, basically, her -- what she could
    produce would be, why she signed the
    bid --
Q.    Okay.
A.    -- and the ownership of the company.
Q.    Okay. Now, if I understood her
    correctly, and she, of course, said
    that you would be the -- had to answer
    this. Your company doesn't keep cost
    and profit records on each account

84

    that you service; is that right?
A.    No. Not on each one, no.
Q.    Okay. How do you determine the income
    to report it to the IRS if you don't
    do that on each one?
A.    Say it again?
Q.    How do you determine the income that
    you report to the IRS if you don't do
    that on each one?
A.    If I don't do it on each one?
Q.    Uh-huh.
A.    Well, you know, the pricing of the job
    is based on what the market price is.
Q.    Uh-huh.
A.    And whatever my profit is after the
    labor and expense, that's what's
    taxable. That's how --
Q.    But you do it -- you don't go through
    a operation like that on each job; you
    do it like the total -- total revenue,
    minus your total expenses, and then
    that's what your profit is?
A.    Right.

21 (Pages 81 to 84)

CURTIS DUNCAN - 4/11/2006

85

1    Q.    Okay. And one thing I was confused
2          about, did you testify that there was
3          some certification that you had with
4          ag industries, or somebody, about your
5          pest control business or something you
6          had to repeat to keep your
7          certification?
8    A.    Oh, yeah. You know, it's law -- it's
9          regulatory law that you get your
10         re-certification points over a
11         three-year period.
12   Q.    Uh-huh.
13   A.    And you submit the documentation, and
14         then they'll renew your permit.
15   Q.    I thought your wife testified that
16         there was no license required. Did I
17         misunderstand that?
18   A.    She was saying that she -- it wasn't
19         required for her to have a license,
20         that, you know --
21   Q.    As long as she's under the umbrella of
22         C & J?
23   A.    Right. As long as, you know, she was

86

1          under my license.
2    Q.    Okay. Now, the Sentricon -- if I
3          understood you correctly, you told me
4          that Sentricon had a -- had a group of
5          people that they had franchised their
6          product with.
7    A.    Right.
8    Q.    And you couldn't obtain it like you
9          could, perhaps, Outpost or something
10         else?
11   A.    Well, you know, when the bid
12         specification came out, and they said
13         that you could turn in a comparable
14         product, the product that I had assess
15         to was cheaper, as far as overhead,
16         because you had to pay a franchise
17         fee. And I talked in detail with
18         Mr. Kervin, that in order to get
19         Sentricon the company automatically --
20         it would be more cost for the state
21         because you have pay a franchise fee
22         to distribute the product for
23         Sentricon.

87

1    Q.    That's --
2    A.    I was saying the reason that my
3          product would be automatically lower
4          was because by overhead would be
5          lower.
6    Q.    Okay.
7    A.    And I thought that was what the State
8          was looking for.
9    Q.    Okay. But you're not saying that
10         Sentricon uses some kind of racial
11         criteria to decide who to let use
12         their product, or that they know --
13   A.    No. I never had the -- the -- what do
14         I want to say -- as long as I had free
15         access to go out to Lesco or Oldham,
16         you got your state certification
17         showing you licensed to do termite
18         work. I go get the -- I try to get
19         the most efficient product that's on
20         the market where I can offer my
21         customers the best price. And
22         everybody in the market -- it's common
23         knowledge that Sentricon is the most

88

1          expensive thing that you can give to
2          your customers, not necessarily it's
3          the most efficient one or most -- what
4          I want to say -- not necessarily that
5          it's going to work better.
6    Q.    Okay. Now, some of the solicitations
7          were no-bid by some of the vendors; is
8          that right?
9    A.    Yeah, I believe so.
10   Q.    Do you know the racial makeup of the
11         vendors that no-bid? Have any idea?
12   A.    I can't remember specific -- you know,
13         specific company names.
14   Q.    Would that all be in that bid package
15         that you were talking about or the bid
16         file?
17   A.    The ones that didn't turn their bid
18         in?
19   Q.    (Nods head.)
20   A.    I would assume so.
21   Q.    Okay.
22   A.    I assume that would be in the bid
23         package.

22 (Pages 85 to 88)

CURTIS DUNCAN - 4/11/2006

89

Q.   All right. What about those that were
rejected due to their failure -- or do
you know if anybody was rejected for
their failure to be Sentricon dealers
or not to use Sentricon, other than
you?
A.   I was the only one that submitted a
bid that was disqualified. The one
other two was the ones that were
distributors of Sentricon. I was the
only one, you know, that was offering
a comparable product.
Q.   So some Sentricon bidders were
rejected?
A.   No. No. Well --
Q.   I didn't understand what you said.
First, you said you were the only one,
then you said other than.
A.   Okay. Of the ones that actually bid
--
Q.   Uh-huh.
A.   -- for the -- that she actually read
the prices, I was the only one that

90

submitted a comparable product. There
were only two other ones, Terminix and
Cook's, and they submitted Sentricon.
There was no other bidders.
Q.   All right. Now, your complaint, if I
understand it correctly, is against
these various defendants in their
individual capacities; is that right?
A.   Say that?
Q.   What do you understand to be the
difference between an official and an
individual capacity?
A.   Official capacity would be when the
State established procedures -- a job
stressing on what the requirement --
in this case, what the State
Purchasing Director, the criteria,
what parameters that he will work
within, within the competitive bid
laws, and administrative procedures.
     And when I said,
"individual capacity," is when -- what
I -- you know, in my complaint, is

91

that they went beyond the competitive
laws and their job description in
awarding this contract.
Q.   Your lawsuit says they're liable for
damages because they chose not to
perform their administerial duties
within the scope of their official
capacity. Do you remember saying
that?
A.   Yes.
Q.   What do you understand to be
administerial duty?
A.   Putting me on notice of why I wasn't
awarded the contract --
Q.   Okay.
A.   Before you re-solicit it, and then
before you award it.
Q.   Is that what you're talking about when
you, "chose not to perform
administerial duties"?
A.   Yes, sir. All I was asking for, you
know, was a letter back telling me why
I was disqualified before they

92

re-solicited it and bidded it out;
that's all I was asking.
Q.   Okay. Make sure I understand
correctly, the folks that are being
sued are Mr. Hornsby, Johnny Harris,
Mr. Carlton, Mr. Kervin, and
Ms. Antle?
A.   Yes.
Q.   And the reason that you think that
they acted fraudulently and were
motivated by your race, were the
things that you say in the complaint
and the document you cite there, plus
what was in the bid file that you
looked at, plus the conclusions you
drew that we talked about today?
A.   Yes, sir.
Q.   Outside of that, there aren't any
other considerations that you've
looked at?
A.   Other than our conversations, you
know, that we've had.
Q.   That we've talked about?

23 (Pages 89 to 92)

CURTIS DUNCAN - 4/11/2006

93

1  A.  Right. What we've talked about.
2  Q.  And on to damages, you say that you
3      want the defendants to pay your costs
4      in this action. What are your costs
5      in this action?
6  A.  Preparation for the case.
7  Q.  What would that be at this point?
8  A.  I would -- I would I have to go back
9      and -- I mean, I really -- I really
10     lost track of keeping up with the
11     costs of it so far.
12 Q.  Okay. What would it entail, things
13     like money you spent for copies and --
14 A.  Copies of the lawsuit.
15 Q.  Okay.
16 A.  You know, preparation.
17 Q.  Filing fees?
18 A.  Mailings, filing fees --
19 Q.  Okay.
20 A.  But, you know, in my complaint -- you
21     know, I was -- well, I'll let you go
22     ahead. I'm just talking.
23 Q.  You also say the relief to which you

94

1      think -- which you may show to be that
2      you're justified -- justifiably
3      entitled or which the Court may
4      consider appropriate.
5          And that calculation
6      would be based on the things we just
7      talked about: the bid package, the
8      documents you signed, the
9      conversations, and the thought
10     processes that you've talked about?
11 A.  Yeah. Just the actual damages that --
12     compensatory damages that I incurred.
13 Q.  All right. Now, as far as the
14     pleadings that we cited that you
15     filed, where you named you and your
16     wife as the people with knowledge of
17     the suit, as we sit here today, can
18     you think of any other people that you
19     feel like you should have put on that
20     list outside of the defendants and the
21     people mentioned in your complaint?
22 A.  No. No. Not outside those two names
23     I mean, I really put my wife's name on

95

1      there because she had to sign the
2      document. And basically, like I say,
3      everything else would be myself;
4      there's nobody else.
5  Q.  As far as her role in the company, do
6      you pretty much agree with her
7      testimony that she helped out as you
8      asked her to do over this period of
9      time?
10 A.  Yeah. I mean, she performed various
11     roles, from typing up letters -- like
12     she did that, when she turned in the
13     bid. I was in -- as a matter of fact,
14     I was returning from Huntsville for
15     Corrections and Transportation after
16     performing those inspections, and she
17     signed them because I was out of town.
18         Other than that, 99
19     percent of time, I would sign the
20     documents.
21 Q.  Whatever functions in the operation of
22     the business that you couldn't get to
23     or needed help with, then you would

96

1      ask her to help, and she would do as
2      you asked?
3  A.  Right. Right. And one thing --
4  Q.  And you're willing explain that
5      process to my wife -- strike that.
6      I'm sorry.
7          But, basically, that is
8      her involvement in the business; is
9      that right?
10 A.  Yes, sir. I mean -- you know, we're
11     married and, you know, we just -- it's
12     just a natural -- you know, that's one
13     of the benefits of being a sole
14     proprietor, that your wife, you know,
15     she can work with you. And like I say
16     -- and when we checked into -- you
17     know, with the ethics commission --
18 Q.  Uh-huh.
19 A.  I talked to an attorney down there
20     before we -- before I started -- you
21     know, started my company. I checked
22     with them so many years -- as a matter
23     of fact, I talked with him not too

24 (Pages 93 to 96)

CURTIS DUNCAN - 4/11/2006

97

```
     long ago.  He stated to me that it
 2   being a sole proprietorship, even if
 3   your wife work with the State, that it
 4   is fine.
 5   Q.   Okay.
 6   A.   He even gave the scenario that even if
 7        she was a part owner of the company,
 8        as long as she's not making -- she's
 9        not the one -- she's not making the
10       decision -- you know, it would have to
11       be the person in the contracting
12       office for it to be a conflict.
13   Q.   Okay.
14   A.   You know, we got -- like, I talked to
15        -- I think his name is -- I'm pretty
16        sure it's Hugh Evans.
17   Q.   Okay.
18   A.   I talked to him, you know, several
19        times.
20   Q.   Okay.
21   A.   You know, we always try to do things
22        by the book.  You know, I asked him
23        had anything changed, and he told me
```

98

```
 1   he got several opinions that support
 2   that stance.
 3        MR. LYLES:  Okay.  All right.
 4        I think Mr. Long has
 5        some questions for you,
 6        and we're going to play
 7        musical chairs for a
 8        minute.
 9        Just for the record,
10       before Mr. Long starts,
11       the exhibits that I used
12       in Mrs. Duncan's case,
13       I'm also adding to the
14       record in Mr. Duncan's
15       deposition.  I think
16       that's Exhibit Nos. 1
17       through 9.
18   (The referred-to document was
19       previously marked for
20       identification in this case as
21       Defendant's Exhibit
22       Nos. 1 through 9.)
23
```

99

```
 1        EXAMINATION
 2   BY MR. LONG:
 3   Q.   Basically, the same rules as this
 4        morning.  I'm not trying to trick you
 5        with any questions.  If you don't
 6        understand my question, please ask me
 7        to explain it.  Unless you tell me you
 8        don't understand my question, I will
 9        assume that you understand the
10       question, and your answer is
11       responsive to that.
12   A.   Okay.
13   Q.   What education do you have beyond high
14        school?
15   A.   I graduated from Alabama State in
16        1985.  I double majored in political
17        science and history.  Also, I started
18        working in pest control in 1980 with C
19        Con Pest Control, working my way
20        through school doing pest control.
21        Once, I graduated, I took my
22        certification test in pest control.  I
23        have a household license and a termite
```

100

```
 1   license and --
 2        THE COURT REPORTER:  What?
 3        THE WITNESS:  Oh, I'm sorry.
 4        I have my termite license
 5        -- my state certification
 6        termite license.
 7   A.   Lawns and ornamentals.  Also I have a
 8        household license, which is just
 9        general spraying.
10   Q.   When --
11   A.   I'm sorry.  I took my certification --
12        teacher certification.  I passed that.
13        Later on, it was a lawsuit that was
14        saying that it was not -- you know,
15        they couldn't use that test, but I
16        passed it.  But like I say, that's my
17        -- my educational background.
18   Q.   You're also a licensed teacher in the
19        State of Alabama?
20   A.   Yes.
21   Q.   Okay.  And what are you qualified to
22        teach?
23   A.   Political science, history.
```

25 (Pages 97 to 100)

CURTIS DUNCAN - 4/11/2006

101

1　Q.　Have you ever filed any previous civil
2　　　suits prior to this one?
3　A.　No. I haven't any suit against the
4　　　State of Alabama.
5　Q.　I'm asking if have you filed a civil
6　　　suit against anybody.
7　A.　Well, I got -- let's see, I got one
8　　　lawsuit that's in Birmingham. I'm
9　　　trying to see what's the name of the
10　　　agency -- a lawsuit against Birmingham
11　　　City Schools.
12　Q.　What are you suing them about?
13　A.　It was dealing with the bidding
14　　　process; coincidental. It was the
15　　　year 2003.
16　Q.　Who was the defendant again?
17　A.　Jefferson -- Jefferson -- Birmingham
18　　　City Schools.
19　Q.　Okay. Would that be a board of
20　　　education?
21　A.　Board of education, yes.
22　Q.　Okay. Now, has that lawsuit
23　　　concluded?

102

1　A.　No. It's still pending.
2　Q.　And what are your allegations in that
3　　　lawsuit?
4　A.　Same thing, basically. It's dealing
5　　　with the -- dealing with the bidding
6　　　process. You want me to go into the
7　　　details about that?
8　Q.　I'm going to be asking you details
9　　　about it.
10　A.　All right. That's all right. That
11　　　lawsuit I turned in a bid
12　　　solicitation. And when I read the bid
13　　　specifications, the job required you
14　　　to have a lawns and ornamental
15　　　license.
16　　　　And I wrote a letter to
17　　　the Purchasing Director before the bid
18　　　opening that -- I put him on notice
19　　　that, once reading the bid, I noticed
20　　　that you have to have a household
21　　　license, but also a lawns and
22　　　ornamental license to perform this
23　　　service.

103

1　　　　When they had the bid
2　　　opening, the company that they had
3　　　doing it for previous years, it came
4　　　out that he didn't have the required
5　　　license. They didn't have the
6　　　required license, and the Purchasing
7　　　Director gave that company 60-plus
8　　　days to take the state certification
9　　　test after the bid opening. And when
10　　　the 60 days went by, he sent me -- he
11　　　sent the bid bond back to me.
12　　　　At that time I
13　　　questioned, you know, did he pass the
14　　　certification test. He informed me,
15　　　at that time, that they hadn't passed
16　　　it, and that he would give them, you
17　　　know, a couple more -- he said he
18　　　would give them a couple more weeks to
19　　　pass it. He gave them a couple more
20　　　weeks, and that never -- he never told
21　　　me whether or not he passed it or
22　　　whatever. But all I know is they gave
23　　　it to Orkin Pest Control at that time,

104

1　　　you know. They performed the service.
2　　　　And two years later, they
3　　　put the solicitation out again. I
4　　　wrote a letter inquiring about the
5　　　specifications, how they were written
6　　　and whatever. The Purchasing Director
7　　　never wrote a letter back, you know,
8　　　stating why he went beyond the 60 days
9　　　or whatever, and I filed a lawsuit.
10　　　　When -- actually, when
11　　　they were going through the process of
12　　　re-bidding that contract out again, I
13　　　wrote a letter concerning what
14　　　happened -- you know, we're still
15　　　within the two years -- what happened?
16　　　　He never -- he never -- unlike
17　　　Mr. Kervin, he never wrote me a letter
18　　　even after he awarded it. So that's
19　　　where we are now.
20　Q.　Do you have any other civil lawsuits
21　　　or ever been involved in any besides
22　　　that?
23　A.　I got one in Jefferson County -- you

26 (Pages 101 to 104)

105

know, Federal Court. Fairfield
Housing. Had two -- well, the bid
specs were calling for a specific
bond, and I couldn't make sense out of
what the Purchasing Director wanted,
so I turned it over to my insurance
agent, who is Chattler (phonetic) --
Russ Chattler. He talked with the
purchasing -- well, the Director of
Housing, and he couldn't make sense
out of it. So, you know, he wrote a
letter inquiring, you know, what --
what was required for the bid bond.
        She never gave a
legitimate reason for it. I went to
the bid opening. She postponed it,
and then she had it, I believe, a
month later. And when we actually --
when we actually went to the bid
opening, she never gave any
documentation for the bid bonds. My
insurance guy was trying to -- he went
to the 11th hour, trying find out what

106

1  bid bond she wanted, and I got a
2  letter from him stating it also.
3          But to make a long story
4  short, they were requiring a bid bond
5  that was -- that she couldn't even
6  give a copy of or describe how she
7  wanted my insurance guy to write it.
8          In so many she words, she
9  went ahead and she awarded the
10  contract to Cook's Pest Control and
11  never gave me justification. My price
12  was lower than the other bidder. She
13  never put anything in writing saying
14  why I was disqualified or whatever.
15  Q.  Are both of these lawsuits racial
16      discrimination lawsuits?
17  A.  They're based -- well, they're based
18      on the bid process.
19  Q.  Okay.
20  A.  And they'll be -- they would fall
21      under the umbrella as far as
22      discrimination, yes.
23  Q.  Okay. And other causes of action, but

107

1      they both have a discrimination
2      element?
3  A.  Right. Yes. Cause this -- this was
4      an incident where I never got the
5      contract. And as I mentioned earlier,
6      like in Birmingham -- in the
7      Birmingham lawsuit, I found out that
8      somehow Dr. Block was involved in
9      writing those bid specs.
10  Q.  You say Dr. Block, who is -- where's
11      he located at?
12  A.  He's at Agricultural, Pesticide
13      Division Director.
14  Q.  You're saying that he wrote the bid
15      specs for the Jefferson County -- or
16      City Board of Education?
17  A.  Well, when I spoke to the purchasing
18      agent, he informed me that when he --
19      when he was writing the bid specs,
20      that he sent it down to Montgomery,
21      and he had it approved by Dr. Block --
22  Q.  Okay.
23  A.  -- in his office.

108

1  Q.  You don't know that Dr. Block actually
2      wrote the specs, but that's what
3      you've been told.
4  A.  Well, that's where we are now, we're
5      in the middle of discovery of that.
6  Q.  Now, we've got two lawsuits: One
7      against a Jefferson County Board of
8      Education, whether it be the county or
9      the city --
10  A.  Birmingham.
11  Q.  Okay. And we got one against
12      Fairfield Housing. Is there any other
13      lawsuit out there that you're in?
14  A.  2003, Jefferson County.
15  Q.  Another one in Jefferson County?
16  A.  No. One. You got the City Schools of
17      Birmingham against Jefferson County
18      Board of Education.
19  Q.  Okay. So you got one against
20      Jefferson County Board of Education?
21  A.  Right.
22  Q.  And does that have a discrimination
23      element in it?

27 (Pages 105 to 108)

CURTIS DUNCAN - 4/11/2006

109

1   A.   Yes. It's dealing with the bidding
2        process again. When I -- he bid the
3        contract out with --
4   Q.   I'm going to cut you short. Some of
5        the details are a little bit more than
6        I want to know.
7   A.   Yeah. Yeah.
8   Q.   Right now, I've got three lawsuits
9        that you've got. Do you have a fourth
10       besides this one?
11  A.   No.
12  Q.   Have any of those lawsuits come to
13       trial?
14  A.   No. We're still in the discovery --
15  Q.   Discovery phase.
16  A.   Phase, yes.
17  Q.   Now, prior -- besides this lawsuit and
18       those three lawsuits, you're not
19       involved in any other lawsuit and have
20       never been involved in any other civil
21       lawsuit?
22  A.   No.
23  Q.   Do you have a lawyer in any of those

110

1        three lawsuits?
2   A.   No, I don't. Not at the moment. I've
3        been interviewing with different ones.
4   Q.   Have you ever had a criminal charge
5        against you?
6   A.   No.
7   Q.   Have you ever been accused of a crime?
8   A.   No.
9   Q.   Okay.
10  A.   No record. I've got some speeding
11       tickets now.
12  Q.   Okay. I'm not interested in speeding
13       tickets, but I guess I would be .
14       interested in DUIs. Have you ever
15       been accused of a DUI?
16  A.   Oh, no. I don't drink, don't smoke.
17  Q.   Have you received contracts for pest
18       control with the State of Alabama?
19  A.   Yes.
20  Q.   If you would, list what -- well, first
21       of all, let's get this straight. You
22       have to bid on certain contracts;
23       right?

111

1   A.   Right.
2   Q.   Sometimes it's more informal; is that
3        correct?
4   A.   More informal? What you mean by
5        informal?
6   Q.   Sometimes they just send out a Request
7        for Proposal; would that be correct?
8   A.   Very rarely. Most of them are like
9        Ms. Antle and Mr. Kervin, they're
10       solicitations, and they mail them out.
11  Q.   Okay. Do all of them involve Isaac
12       Kervin and Ms. Antle, all these
13       contracts? Do they all go through
14       them?
15  A.   Very -- I say like Risk Management,
16       you know, if you're less than 7,500,
17       they would -- you know, they would get
18       maybe three or four people, and they
19       get them to submit.
20  Q.   And that's the agency that does that;
21       correct?
22  A.   Right. Risk Management.
23  Q.   It's the individual state agency that

112

1        sends out proposals if it's under
2        7,500; is that correct?
3   A.   Yeah.
4   Q.   Okay. Now, if it's over 7,500, you
5        have to submit a formal bid. Do you
6        agree with that statement?
7   A.   Huh?
8   Q.   If a contract is 7,500 or over, you
9        have to submit a formal bill -- bid
10       through State Purchasing?
11  A.   Right.
12  Q.   And that's when you deal with
13       Ms. Antle and Isaac Kervin or whatever
14       previous people held those positions?
15  A.   Right.
16  Q.   Okay. Going through State Purchasing,
17       how many pest control contracts would
18       you have with the State of Alabama?
19  A.   Are you talking about now or from
20       '92 or --
21  Q.   Let's do right now.
22  A.   Right now with the state?
23  Q.   Uh-huh.

28 (Pages 109 to 112)

CURTIS DUNCAN - 4/11/2006

113

1  A.  Public Safety and Retirement Systems.
2  Q.  Any other contracts that went through
3      State Purchasing that you have for
4      pest control?
5  A.  At this time, now?
6  Q.  In the last five years.
7  A.  No, not with the state. I had some
8      with Mental Health. I'm doing one
9      facility at Mental Health.
10 Q.  Do they have their own purchasing
11     department? Do you know?
12 A.  Mental Health has their own purchasing
13     department.
14 Q.  And they don't go through --
15 A.  Right. They have a -- yeah. They
16     have their own little -- they have
17     their own state purchasing office --
18     not State Purchasing -- but Mental
19     Health Purchasing. I'm sorry.
20 Q.  What's the most recent state contract
21     you've been awarded?
22 A.  I hadn't -- I guess -- Mental Health
23     is the one I'm doing now.

114

1  Q.  Other than Mental Health, what's the
2      most recent?
3  A.  I've been working with Retirement
4      Systems.
5  Q.  And that one went through State
6      Purchasing; is that correct?
7  A.  Yeah. They have -- yeah. They have
8      their purchasing.
9  Q.  Okay. When you receive these
10     contracts through State Purchasing,
11     explain the process as you understand
12     it.
13 A.  Okay. When I first started my own
14     company, I got on the state bidding
15     list. They will mail you a
16     solicitation out each time a pest
17     control contract would go out, you
18     know, for bid.
19 Q.  Okay. So you -- first of all, as I
20     said, you put yourself on the list so
21     they have to mail it to you; is that
22     correct?
23 A.  Right. As long as you, you know, you

115

1      respond and keep it up to date,
2      they'll continue to send you one.
3  Q.  So from State Purchasing, you
4      regularly receive Invitations to Bid
5      for state pest control contracts; is
6      that correct?
7  A.  Correct.
8  Q.  Now, do you bid on them all?
9  A.  Majority of the time.
10 Q.  How do you bid on one?
11 A.  How do I bid them?
12 Q.  Uh-huh.
13 A.  By reading the specifications, seeing
14     what the job entails. When you read a
15     job specification to see what -- what
16     license is going to be required, how
17     much labor cost, whatever.
18 Q.  Let me -- you read the specs first; is
19     that correct?
20 A.  Well, that's the first thing you do.
21     You got to find out what the job will
22     require you --
23 Q.  Then you determine whether you can

116

1      meet the specs. Will that be another
2      step you take?
3  A.  Right. If you determine whether
4      you're -- you know, you're certified
5      or licensed to do the job.
6  Q.  Make sure you have the proper license
7      or the proper products, and it's just
8      something that you want to do; is that
9      correct?
10 A.  Right.
11 Q.  Now, is there any official paperwork
12     that you have to fill out to enter a
13     bid?
14 A.  What they provide you. You know, you
15     fill out the cost, turn in your
16     license as required. Basically,
17     that's, generally, what --
18 Q.  It's safe to say, you submit a bid
19     package that shows that you meet --
20 A.  The criteria --
21 Q.  -- all the requirements of the bid; is
22     that correct?
23 A.  Right.

29 (Pages 113 to 116)

CURTIS DUNCAN - 4/11/2006

117

1   Q.   And that's called submitting a bid --
2        a competitive bid.
3   A.   Right.
4   Q.   And often you take the Invitation to
5        Bid, and then mail it in.  And isn't
6        there something you're supposed to do
7        with the envelope?
8   A.   Oh, you talking about how you fill it
9        out?
10  Q.   Isn't there a requirement about the
11       envelope?
12  A.   Oh, you have to identify your company
13       name on the outside of the envelope,
14       put down the bid number -- what else
15       -- that's generally what -- you know,
16       it's pretty general.
17  Q.   You seal the bid, too, don't you?
18  A.   Huh?
19  Q.   You seal it?
20  A.   Yes.  Yeah.  You always seal it, or
21       they'll have a right to disqualify --
22  Q.   If it's not sealed?
23  A.   Right.  If it comes in opened, they'll

118

1        contact the person who sent it and let
2        them know that they'll have to
3        re-solicit -- I mean, re-submit it.
4   Q.   I'll get back to sealing the bids, but
5        I forget something.  I want to show
6        you your 2000 tax return that you
7        provided us today.
8   A.   Uh-huh.
9   Q.   This is your state tax return.  And on
10       an un-numbered page, you show income
11       from gambling winnings and money you
12       made in a lawsuit.  Where did you
13       derive that money from?
14  A.   Where did I derive it?
15  Q.   Where did it come from?
16  A.   What you mean?
17  Q.   You're showing income in the year 2000
18       gambling winnings -- this is
19       miscellaneous income -- and you're
20       showing a lawsuit income.
21  A.   You mean, where did I earn it?
22  Q.   Yeah.  Where did you get the money
23       from?  What did somebody pay you money

119

1        for out of a lawsuit?
2   A.   Oh, on, no.  That should be like a
3        expense, where I consulted with a
4        attorney.  Yeah.
5   Q.   Actually, you're showing it as income,
6        along with gambling winnings.  If that
7        was an expense, it would be -- it
8        would be gambling alone.
9   A.   I know it wasn't a lawsuit.  That had
10       to be reflecting -- that had to be
11       reflecting a payment to an attorney.
12       And that's 2000, you say?
13  Q.   Yes.
14  A.   Okay.  No.  That's not from a lawsuit.
15  Q.   Okay.  And now we're back.  You sealed
16       the bid, and you put the required
17       information on an envelope; correct?
18  A.   Uh-huh.
19  Q.   Now, what's the next step you do or
20       somebody from your company does
21       concerning that bid?
22  A.   Go to the bid opening.
23  Q.   What happens at the bid opening?

120

1   A.   The buyer will open up the bid
2        packages, and from my knowledge --
3   Q.   Do they call out what the bid is?
4   A.   Right.  They check to make sure that
5        the person who submitted the bid have
6        submitted all the required, you know,
7        insurance, license --
8   Q.   Okay.  Is there just one person, or is
9        there a team of people going through
10       the bids to see if they got everything
11       in there?
12  A.   You talking about the company or --
13  Q.   No.  From the state's point of view.
14  A.   No.  Ms. Antle will have somebody, one
15       of her co-workers, to sit in on the
16       bid and witness it.
17  Q.   Okay.  I'm just asking, are you aware
18       that Ms. Antle is the buyer for the
19       pest control area?
20  A.   Right.
21  Q.   Okay.  And all the bids in question in
22       this lawsuit that you bid, what was
23       the product that you bid with?

30 (Pages 117 to 120)

121

A. You talking about the bid in question?
2  Q. The ones in the lawsuit. We may go
3     through each bid in detail later, but
4     --
5  A. Which bid you talking about?
6  Q. You list three bid numbers in your
7     lawsuit.
8  A. Oh, okay.
9  Q. What's the product that you bid with
10    in those three bid numbers?
11 A. Outpost.
12 Q. Okay. Is your product a stand-alone
13    product?
14 A. According to the -- according to the
15    label and the supporting documents
16    that was submitted, yes, it can be.
17    It's optional. You can use it as a
18    stand-alone, and it also had mentioned
19    that you can use other things to
20    supplement it. But it's left up to
21    the discretion of the -- of the pest
22    control operator whether he would use
23    it as a stand-alone or, you know,

122

1     supplement it with something else.
2  Q. Okay. That's a fair answer. Now,
3     let's in some way separate these
4     contracts for how we're going to
5     discuss them.
6         How many are we talking
7     about in your lawsuit?
8  A. We're talking about the one for
9     Corrections and then also the one for
10    Mr. Hornsby. I can't think of the
11    name of the division up there.
12 Q. Okay.
13 A. The office that he works at.
14 Q. So there's only two agencies involved
15    in the contracts, that's
16    Transportation and Corrections; is
17    that correct?
18 A. Correct.
19 Q. Okay. Now, I'm going to mark, and I'm
20    going to keep these exhibits
21    consecutive. We were at 9, so I'm
22    going to mark what I'm going to show
23    you as Defendants' Exhibit 10.

123

1  A. Okay.
2         (The referred-to document was
3         marked for identification as
4         Defendants' Exhibit No. 10.)
5  Q. Now, if you would tell me, on the
6     Invitation to Bid number, the last
7     four digits? If you want me to help
8     you find anything --
9  A. Talking about this?
10 Q. Yes.
11 A. 0153.
12 Q. I'm going to call this the 0153 Bid.
13    This is the one we're going to be
14    talking about now.
15 A. Okay.
16 Q. Now, do you recognize that as the bid
17    that you submitted for this contract?
18    Take all the time need to review it.
19 A. Uh-huh.
20 Q. Is that the entire bid you submitted?
21 A. Yes. Uh-huh.
22 Q. Okay.
23 A. That's it.

124

1  Q. Okay. And that is your wife's
2     signature down at the bottom; is that
3     correct?
4  A. Yes.
5  Q. Now, go to the -- okay. This is a bid
6     for work for what department, this
7     0153?
8  A. This was for Transportation.
9  Q. Okay. You're probably better at
10    reading these things than me. You've
11    probably seen them a lot more. Now,
12    on the 4th page, do you see a
13    requirement that there be a site
14    visit?
15 A. Yes.
16 Q. Is this, right here, (indicating) is
17    this Mr. Hornsby's signature?
18 A. If I remember correctly, I think that
19    might be his receptionist.
20 Q. Okay. There's an initial by it. Is
21    this the part that certifies that you
22    made a site visit?
23 A. Right.

CURTIS DUNCAN - 4/11/2006

125

1    Q.    They signed it and that proves that
2          you met that requirement of this bid;
3          is that correct?
4    A.    Right.
5    Q.    We're still in Exhibit 10 for all this
6          line of questioning. On the 6th page,
7          this is your pricing for years two and
8          three; is that correct?
9    A.    Right.
10   Q.    On 7th page, or the next page, is your
11         pricing for the first year of --
12         you've got 9,500; is that correct?
13   A.    Right.
14   Q.    It's apparent that someone has done
15         the math of that 791.66 figure and
16         come up with 9,499.92; is that
17         correct?
18   A.    Yes. I would guess that's Pat Antle.
19   Q.    I'm betting you're right there, too.
20         But somebody did it, is all you could
21         know, probably.
22   A.    Right. Right.
23   Q.    They're checking your math.

126

1    A.    Huh?
2    Q.    They're checking your math.
3    A.    Oh, yeah. Yeah.
4    Q.    And, substantially, your math is
5          correct.
6    A.    Correct.
7    Q.    You're 8 cents off.
8    A.    Huh?
9    Q.    You're 8 cents off, but substantially;
10         that's correct.
11   A.    Oh, yes. Yeah. We rounded it up to
12         the --
13   Q.    Maybe that's what you did; I don't
14         know.
15   A.    Yeah.
16   Q.    Now, let me turn it where I can read
17         it. Would you start reading right
18         here on this page, where it has the
19         9,500 after installation?
20   A.    "After installation"?
21   Q.    Yes.
22   A.    (As read:) "After installation, any --
23         if any stations are -- let me pull it

127

1          closer.
2    Q.    Okay. Do you need reading glasses?
3    A.    No. I just had it too far away from
4          me.
5    Q.    Okay.
6    A.    Let's see, where are we here? I lost
7          my track. If any -- where was that
8          at? Show it to me again.
9    Q.    After installation (indicating) --
10   A.    (As read:) "After the installation,
11         if any stations are destroyed or
12         damaged, vendor will replace at no
13         extra cost to ALDOT. Vendor will
14         repair any new damages -- new damage
15         caused by native subterranean
16         termites. Protection is covered in
17         the warranty with vendor."
18   Q.    Now, that's a requirement of a
19         replacement warranty, is that not?
20   A.    Huh.
21   Q.    The damage replacement warranty?
22   A.    Protection is covered in the warranty,
23         yes.

128

1    Q.    Okay. So if the termites -- native
2          termites do damage, you have to fix
3          whatever they damage; is that correct?
4    A.    Correct.
5    Q.    I'm just curious, and this is a
6          curious question, is that sort of a
7          way to exclude Formosan termites when
8          they say native termites?
9    A.    Well, you're talking about
10         subterranean, which they going to come
11         from the ground up. The Formosan can
12         survive if any moisture is in the
13         structure.
14   Q.    Okay.
15   A.    So they don't have to have a
16         continuous cycle to go to the soil.
17   Q.    Okay.
18   A.    So this, technically, wouldn't cover
19         Formosans --
20   Q.    Okay.
21   A.    -- not as -- not as written, which is
22         subterranean because, you know, it's
23         the most common in the Southeast.

32 (Pages 125 to 128)

CURTIS DUNCAN - 4/11/2006

129

1　Q.　Okay. Now, below that paragraph there
2　　　is -- what does that read, the next
3　　　line?
4　A.　Add Hexaflumuron?
5　Q.　Yes.
6　A.　"Or an approved equal to all stations
7　　　having termite activity."
8　Q.　Okay. Now, what's the common name of
9　　　that chemical, Hexaflumuron?
10　A.　That's Sentricon.
11　Q.　Okay. So this is a bid for Sentricon
12　　　or an approved equal; is that correct?
13　A.　Right.
14　Q.　Now, this is your bid, and this is
15　　　where you show you're qualified and
16　　　all that.
17　A.　Yes, sir.
18　Q.　Where is your protection coverage
19　　　warranty form?
20　A.　They didn't -- they didn't ask you to
21　　　turn a protection warranty form in.
22　Q.　Okay.
23　A.　I mean, the Agricultural Department,

130

1　　　it's standard that you have a warranty
2　　　to even do business.
3　Q.　Well -- I mean, if they want -- let me
4　　　rephrase it this way: I contend that
5　　　you have to put a form that shows
6　　　you're guaranteed, that you will fix
7　　　the damage any subterranean termites
8　　　-- native subterranean termites do.
9　　　　So where is your
10　　　guarantee that your company is going
11　　　to fix that damage done by the
12　　　termites?
13　A.　Where is my guarantee?
14　Q.　In this bid.
15　A.　In this bid? It didn't ask for it to
16　　　be turned in with the bid.
17　Q.　Okay.
18　A.　It states that protection is covered
19　　　in the warranty with the vendor.
20　　　That's if -- if you are -- if you're
21　　　awarded the contract, you're required
22　　　to have a warranty to be able, you
23　　　know, to perform the contract.

131

1　　　　And during all my
2　　　correspondence, nobody asked me to
3　　　turn one in. I would have turned one
4　　　into them if they asked for it.
5　Q.　Have you read Mr. Isaac Kervin's
6　　　affidavit, which was Exhibit 4, in
7　　　these depositions?
8　A.　Uh-huh.
9　Q.　Now, Mr. Isaac Kervin says, "The bid
10　　　was also rejected because C & J
11　　　Associates failed to provide
12　　　documentation of the required damage
13　　　protection warranty."
14　　　　So you disagree with that
15　　　statement?
16　A.　Yes.
17　Q.　You don't think this bid requires that
18　　　to be --
19　A.　They -- they didn't ask you to turn it
20　　　in with the bid. It's right here. I
21　　　made a note. A copy of your license
22　　　should be submitted with the bid. I
23　　　submitted everything that they asked

132

1　　　me to submit with the bid. "Failure
2　　　to do so will delay." Even with that
3　　　statement, he said it would delay the
4　　　evaluation period. If they interpret
5　　　that statement -- that statement that
6　　　they wanted to have the warranty, all
7　　　they had to do was submit a letter or
8　　　call and say, Mr. Duncan, turn your
9　　　warranty in.
10　Q.　On the top of Exhibit 4 --
11　A.　Uh-huh.
12　Q.　In this corner right over this number,
13　　　(indicating) do you see the buyer's
14　　　name?
15　A.　You talking about Pat Antle?
16　Q.　Yeah. The buyer --
17　A.　Oh, it's right here, yes.
18　Q.　And who is the buyer?
19　A.　Pat Antle.
20　Q.　And do you have any idea why they give
21　　　you the buyer's name in these
22　　　Invitations to Bid?
23　A.　Why?

33 (Pages 129 to 132)

CURTIS DUNCAN - 4/11/2006

133

1    Q.   Yes.
2    A.   Contact person.
3    Q.   Okay. So in case you have any
4         questions about the bid, that's who
5         you're supposed to call; is that
6         correct?
7    A.   Yeah. If you have a question about
8         them, yes.
9    Q.   And this bid, No. 0153, who won this
10        bid?
11   A.   I think Terminix eventually was
12        awarded the contract.
13   Q.   Under this bid number or under a
14        another bid number?
15   A.   Under another bid number.
16   Q.   Okay. Did anybody win under this bid
17        number? Are you aware?
18   A.   Well, according to the bid package,
19        Mr. Carlton made the recommendation
20        that Cook's should be awarded the
21        contract. But Ms. Antle said that
22        they couldn't award it to them because
23        it was nonresponsive. And if my

134

1         memory serves me correct, they put the
2         bid figures in the wrong column.
3    Q.   Okay.
4    A.   You know, the figures wasn't correct.
5    Q.   Would you agree with me that it's a
6         fair statement if I say Bib No. 0153
7         was never awarded under this number?
8    A.   I'm -- it's a record in there where it
9         never was awarded.
10   Q.   But you were disqualified according to
11        Exhibit 4, because you didn't provide
12        the required damage protection
13        warranty, and they were disqualified,
14        as you just told me, because they had
15        wrong pricing information; is that a
16        fair statement?
17   A.   No.
18   Q.   Okay. What's wrong with that
19        statement?
20   A.   You have here where they instruct you
21        with what they want you to submit with
22        the bid.
23   Q.   Uh-huh.

135

1    A.   It -- it's got emphasis on it.
2    Q.   I've understood that you and I may
3         disagree on what this bid requires,
4         but that wasn't the question.
5    A.   What was the question?
6    Q.   Was it a fair statement that your bid
7         was rejected, as Mr. Kervin said in
8         his affidavit, because you failed to
9         provide the documentation of the
10        required damage protection warranty
11        and that the other two bidders were --
12   A.   That would be a fair statement about
13        the other two vendors, but that
14        wouldn't be fair in my case.
15   Q.   Okay. But you've reviewed the file --
16   A.   Huh?
17   Q.   And you know what they say their
18        grounds for rejecting your bid is;
19        correct?
20   A.   Yes.
21   Q.   And what is that ground?
22   A.   What is their ground?
23   Q.   Yes.

136

1    A.   That's the statement he made in his
2         affidavit -- that affidavit, which was
3         failure to provide documentation of
4         the -- that's not what the contract
5         reads --
6    Q.   I'm not arguing that.
7    A.   I mean, what the specifications.
8    Q.   Let's answer just the question.
9    A.   I said it's not a fair --
10   Q.   I didn't ask you whether it was a fair
11        statement this time.
12   A.   What was the question? I'm sorry.
13   Q.   Is it the position of the State of
14        Alabama Department of Purchasing that
15        they rejected your bid on 0153 for
16        failure to provide the required damage
17        protection warranty.
18   A.   Okay. Yeah. That's his statement,
19        yes.
20   Q.   And the other two, you agree, were
21        rejected because they had faulty
22        pricing information; is that correct?
23   A.   Correct, yes.

34 (Pages 133 to 136)

CURTIS DUNCAN - 4/11/2006

137

Q. And then we agree that nobody was
awarded a bid under 0153, that number?
A. No.
Q. Then who was awarded the bid?
A. Who was awarded the bid?
Q. Under that bid?
A. Nobody was awarded that bid.
Q. Okay. So you agree with me.
A. Well, what I agree to is, I was
rejected --
Q. We've passed that.
A. I was going --
Q. We've moved on.
A. Well, that's --
Q. We agree that nobody was awarded a
contract under the No. 0153; correct?
A. Correct.
Q. Okay. That's where we're at. We're
going to get on to the next bid.
A. All right. Mr. Long, you have a copy?
You're going to get to the second bid?
Q. Uh-huh.
A. Okay. All right.

138

Q. Now, when you bid on this, what
product did you bid with?
A. Outpost.
Q. Which is -- is that Hexaflumuron,
however you say that name?
A. It would fall under -- into this
category of "approved equal."
Q. Or approved equal?
A. Uh-huh.
Q. Meaning somebody has got to decide if
that's an approved equal?
A. Right.
Q. So another reason that Isaac Kervin
gave in the affidavit, No. 4, is that
your bid was rejected because you did
not have the approved product,
essentially; is that correct?
A. Right. That's his statement.
Q. You had Outpost instead of Sentricon
or what he considered equal?
A. Right.
Q. All right. Do you recall that
previous part of the court record, and

139

I don't know if I'm going to introduce
this as an exhibit, that we had
previously filed a summary judgment
motion?
A. Right.
Q. And we attached certain exhibits to
that?
A. Correct.
Q. Now, on May 22, Exhibit B to Antle's
and Kervin's motion for summary
judgment, you protested the failure to
be awarded the bid, No. 0153; is that
correct?
A. Correct.
Q. Okay. It's been your contention, as I
understood it, that my client had a
duty to respond to that letter,
Exhibit B, the May 22nd, 2003, letter,
which you wrote, which was attached to
my client's motion for summary
judgment?
A. Yes.
Q. And, now, let me ask you this: To be

140

a duty, it's got to arise under a
statute, a regulation, or something;
so where does duty arise from under
state law that they have to write back
to your May 22, 2003, correspondence?
A. Words from the statute?
Q. Where do you --
A. That would fall under due process.
Q. You're saying --
A. Equal protection of the
Fourteenth Amendment.
Q. You're saying you have a
constitutional right to have this
letter, Exhibit B to the motion for
summary judgment, replied to by
Defendants Antle and Kervin?
A. No. This is part of the evaluation
process. And in the evaluation
process, you got to have some type of
due process.
Q. Okay. So is that one of your claims
in this lawsuit, you were denied due
process because they did not respond

35 (Pages 137 to 140)

141

```
1     to this May 22, 2003, Exhibit B to
2     motion for summary judgment?
3   A.  Well, under the Equal Protection
4     Clause.
5   Q.  Okay. So you're claiming that --
6   A.  I'm saying that another vendor, being
7     that he was a white contractor, if he
8     writes a response back to that before they bid
9     response back to that before they bid
10    the contract out. And this is the
11    first, in all my years of bidding with
12    the State, that I incurred this, in
13    2003; that when I write a letter back,
14    nobody responds back to it. I mean,
15    the process was fair before.
16  Q.  Okay. They did eventually respond,
17    but they did not respond until after
18    the bid process; is that --
19  A.  The damage was done then.
20  Q.  Okay. So you're claim -- claiming
21    that you have a constitutional right,
22    whether it be under due process or
23    equal protection, to get a response to
```

142

```
1     Exhibit B, May 22, 2003, letter,
2     before the bids mentioned are awarded?
3   A.  Right. That's the part --
4   Q.  You've answered.
5   A.  I was just saying the process, you
6     know, up until that date, that's --
7   Q.  I have no question now.
8   A.  Okay. I'm sorry. I'm sorry.
9   Q.  Now, you also wrote, which is
10    Exhibit C to my defendants' motion for
11    summary judgment, a letter dated,
12    May 30, 2003, to Isaac Kervin.
13  A.  Uh-huh.
14  Q.  Are you claiming the same
15    constitutional rights with "C" that
16    you've previously asserted you had
17    with "B"?
18  A.  Right.
19  Q.  And that's one of the violations
20    you're alleging in that lawsuit; is
21    that correct?
22  A.  Well, my whole lawsuit is premised on
23    the process of the -- before they --
```

143

```
1     during the bidding process.
2   Q.  Okay. I can't help but notice one
3     letter, Exhibit 3, is to Ms. Antle,
4     and then the next one is to
5     Mr. Kervin; isn't that correct?
6   A.  Yes. After I didn't get a response,
7     then I wrote a letter on Mr. Kervin,
8     yes.
9   Q.  Again, with Defendants' -- I mean,
10    Contract 0153 and this one, 0174, you
11    file another letter on June 4, 2003;
12    is that correct?
13  A.  Yes.
14  Q.  And this one goes to Mr. Isaac Kervin?
15  A.  Yes.
16  Q.  And is the same true here you allege
17    their failure to respond to this prior
18    to the bid process is violation of
19    your due process and equal protection?
20  A.  Yes, sir.
21  Q.  Okay.
22  A.  Mr. Long -- go ahead -- I mean, it is
23    with the understanding that when I
```

144

```
1     write a letter that, you know, you
2     will get a response back to it. I was
3     -- that was the purpose of writing.
4   Q.  Now, they did -- you were written
5     back, Exhibit F to my defendants'
6     motion for summary judgment,
7     concerning all these letters on
8     June 13, 2003; is that correct?
9   A.  Yes, sir.
10  Q.  And this letter is signed by Isaac
11    Kervin -- well, the other one was.
12  A.  Yeah -- he -- yeah.
13  Q.  This probably came off the computer.
14    The version you got is probably
15    signed.
16  A.  I gotcha. I gotcha. Yeah. It was
17    signed by Mr. Kervin.
18  Q.  But you say the lateness of this
19    response is what made these previous
20    letters I've gone through -- I believe
21    it's "B," "C," and "D." -- it's the
22    lateness of "F" that made those a
23    constitutional violation of your equal
```

36 (Pages 141 to 144)

CURTIS DUNCAN - 4/11/2006

145

protection and due process?
2  A.  Yes, sir.
3  Q.  Okay. I'm going mark this as
4      Defendants' 11, and I'm going to ask
5      you, please, sir, to identify what
6      that document is.
7          (The referred-to document was
8          marked for identification as
9          Defendants' Exhibit No. 11.)
10 A.  Bid No. 2146, for the Transportation
11     Invitation to Bid for the First
12     Division, termite.
13 Q.  Okay.
14         MR. LONG: Where's Exhibit 10?
15         I want to show him
16         something real quick.
17 Q.  I just want to explain something to
18     you, why I keep referring to these by
19     the last four digits. You will notice
20     that these numbers in the corners, all
21     the numbers are the same, and it's
22     going to be true of even the third
23     document except for the last four

146

1      digits. Would you agree with that?
2  A.  Yeah. It's in sequence.
3  Q.  Okay. Now, if you just answered, I'm
4      sorry; sometimes I'm slow. What did
5      you tell me this was?
6  A.  Oh, this was the Invitation to Bid for
7      the First Division for termite
8      control.
9  Q.  This is the DOT Invitation to Bid;
10     correct?
11 A.  Yes, sir.
12 Q.  Would you agree that, basically, this
13     is a re-bid of Exhibit 10?
14 A.  No. From my memory of the bid, it was
15     a sole-source product. They changed
16     -- I'm sorry --
17 Q.  Okay. Sometimes -- I've confused you.
18     That's a good legitimate way to bring
19     it to my attention. Would you agree
20     that this is bidding the same facility
21     for termite control as Exhibit 10?
22 A.  Yes. This is a re-bid.
23 Q.  Okay.

147

1  A.  A re-bid of the first.
2  Q.  I understand there's some differences
3      in the bid, but, essentially, it's a
4      re-bid of Exhibit 10 with some
5      differences.
6  A.  Right.
7  Q.  And this bid number, I've got it --
8      sort of memorized it here -- is 2146.
9      And when did this Invitation to Bid go
10     out, if you can tell from the
11     document?
12 A.  It was send out on 5/19/03.
13 Q.  And if you -- you know how to read
14     these. When do you have to respond
15     by?
16 A.  It's supposed to be turned in by five
17     o'clock on 6/4/03.
18 Q.  Okay.
19 A.  Bid opening at 6/5/03 at ten
20     o'clock -- the bid opening.
21 Q.  Teach me how to read these things.
22 A.  Starting here or over here?
23 Q.  Well, show me where it has to be

148

1      submitted by.
2  A.  Oh, right here. That's the -- that's
3      the date. You have to turn it in by
4      five o'clock the day preceding the bid
5      opening, and that's the bid opening
6      date.
7  Q.  Okay. Now, I'm looking at -- this is
8      front and back, and I count front, one
9      page; back, two page, third page, four
10     page, five page, and six page. So
11     that it looks like this. Okay.
12         Now, this up here,
13     basically, requires bait stations,
14     three buildings; is that correct?
15 A.  Correct.
16 Q.  And down below, it requires a certain
17     chemical; is that correct?
18 A.  Hexaflumuron, yes.
19 Q.  Which is --
20 A.  Sentricon.
21 Q.  Which is not your product. Your
22     product is Outpost; correct?
23 A.  Right. This is a sole source.

37 (Pages 145 to 148)

CURTIS DUNCAN - 4/11/2006

149

1  Q.  Okay. And then down here where it
2      says, "If termite activity is found at
3      one or more stations monitoring,"
4      would you read starting right here
5      from your copy?
6  A.  Okay. You want me to start where it
7      where it says "A"?
8  Q.  "A damage," yes.
9  A.  (As read:) "A damage replacement
10     guarantee, which provides for the
11     re-treatment of the structures and the
12     repair of damage caused by
13     subterranean termites must be
14     submitted before an award could be."
15         (Off-the-record discussion.)
16 Q.  Now, I'm going to show you -- and I
17     want you to keep 11 -- Defendants'
18     Exhibit 12. And, if you would,
19     please, sir, identify that document.
20         (The referred-to document was
21          marked for identification as
22          Defendants' Exhibit No. 12.)
23 A.  Solicitation 2146, termite treatment

150

1      for the First Division.
2  Q.  In essence, what that means -- is for
3      the Invitation to Bid 11 and 12, you
4      no-bid on it; is that correct?
5  A.  I protested and also entered no-bid.
6  Q.  You protested and no-bid it. I have
7      no problem with that answer. If you
8      want to add anything, I'll let you.
9  A.  It's just those -- those -- the reason
10     I protested is because I hadn't got
11     any -- any response back to my protest
12     letters.
13 Q.  Okay. But this protest doesn't tell
14     us, on this Document 12, why you
15     protested, does it?
16 A.  Huh?
17 Q.  On 12 -- on Document 12, it doesn't
18     tell us why you protested, does it?
19 A.  It doesn't tell why --
20 Q.  Yes.
21 A.  -- I protested?
22 Q.  Yes, the document.
23 A.  It's obvious that I was protesting

151

1      because had not responded to my
2      letters. What, was I supposed to
3      write another letter that they're
4      going to ignore?
5  Q.  Let me ask you this: And I'm limiting
6      my question to Document 12 --
7  A.  Okay. I see. I understand.
8  Q.  Document 12 only shows "protest" and
9      doesn't tell why, does it?
10 A.  I understand.
11 Q.  Do you agree with that?
12 A.  No. It doesn't say why. And --
13 Q.  Okay. That's all.
14 A.  -- the reason why I put "no bid" on
15     there was because, in order to stay
16     active on the -- on the qualified list
17     to get to -- to continue getting bids
18     -- to be eligible for bids, if I
19     didn't put "no bid" on there, that
20     would have been one -- one strike
21     against me. Once you get three
22     strikes, they don't send you no more
23     solicitations.

152

1  Q.  Or you just have to go put your name
2      back on there again; wouldn't that be
3      correct?
4  A.  Well, the only way I could keep it
5      active -- without going through all
6      that trouble -- on the qualified list,
7      I had to put "no bid" on there.
8  Q.  But I'm beginning to wonder, if you
9      bring that up, how much trouble is it
10     to get you back on the qualified list?
11 A.  Oh, man. You know, why -- why get a
12     strike against you, when you can --
13     can just follow the procedure that
14     they -- they have. The procedure is
15     to stay active and not get struck off
16     the bid list.
17 Q.  I'm going withdraw my question and
18     re-ask it this way.
19 A.  Okay.
20 Q.  When you first got on the qualified
21     bid list, what all did you have do, as
22     best you can remember?
23 A.  You had to fill a form out and tell

38 (Pages 149 to 152)

153

```
      the State that you are -- that you
 2    want to receive future documents --
 3    not -- I mean, future solicitations.
 4 Q. So if you miss three, you have to fill
 5    out another form?
 6 A. Right.
 7 Q. And you have to, I guess, attach some
 8    documents?
 9 A. No. Just general information.
10 Q. Okay.
11 A. I guess, you know, what you had on
12    this form.
13 Q. You said it like it's a difficult
14    process. It doesn't really sound that
15    difficult to me.
16 A. Being a businessman, my time is very,
17    very, you know, valuable to me. So
18    it's simpler for me to put "no bid,"
19    rather than being --
20 Q. But would you agree it's not that big
21    of a process to re-qualify?
22 A. For me it is.
23 Q. Okay. I suppose you'd have to go down
```

154

```
 1    there and put it in; right?
 2 A. Yeah. You got to take the time and re
 3    -- reapply.
 4 Q. I'm not that interested in those -- in
 5    those facts.
 6 A. I know but that's the facts of the --
 7    that's the reason why I put "no bid"
 8    on there.
 9 Q. Now, on this bid, No. 2146 --
10 A. Yes.
11 Q. Do you know who got --
12 A. Terminix.
13 Q. Okay. I'm going to show you
14    Exhibit 13. Would you agree with me
15    that is the winning bid for with 2146?
16 A. Yes.
17    (The referred-to document was
18     marked for identification as
19     Defendants' Exhibit No. 13.)
20    MR. DUNCAN: Mr. Long?
21    MR. LONG: Yes?
22    MR. DUNCAN: Do you know that
23    document -- you still on
```

155

```
 1    that same document?
 2    MR. LONG: Uh-huh.
 3    MR. DUNCAN: Oh, okay.
 4 Q. I'm going to show you Exhibit 14, and
 5    I apologize for these pauses, but I'm
 6    not an expert on reading these
 7    documents like Ms. Antle is.
 8    And in this little box on
 9    the left page of Exhibit 13, would you
10    read this box?
11 A. (As read:) "This contract provides
12    for re-treatment of the structure and
13    the repair of damages caused by
14    subterranean termites only within the
15    limits from the repair effective date
16    stated in this plan."
17 Q. Okay. So that's if -- if termites
18    damage the structure, they agree to
19    repair the damage caused by the
20    termites; correct?
21 A. That's correct.
22 Q. Okay.
23 A. The same language that requires that,
```

156

```
 1    that you have that warranty in there,
 2    you spell it out that you submit it.
 3    On the first document, that I was
 4    disqualified, it doesn't specify that.
 5 Q. I get to ask my questions my way.
 6 A. I'm sorry.
 7 Q. I won't argue with you. We'll be here
 8    forever if you want to argue, and
 9    that's not my purpose.
10 A. I was just trying -- you know, it
11    seems like we're not getting to the
12    meat of this, so I'm just --
13 Q. So Terminix got this contract?
14 A. Yes. After I was illegally
15    disqualified for the first one, yes.
16 Q. Okay. I note that you decided you
17    were illegally disqualified, and I
18    think that's for the jury and the
19    Court. But is this Terminix in
20    Montgomery? Terminix in Birmingham?
21    You got any idea who got this one?
22 A. It's someone near -- someone near the
23    facility. I remember reading in the
```

39 (Pages 153 to 156)

CURTIS DUNCAN - 4/11/2006

157

1    file --
2    Q.  Okay.
3    A.  They're in that area.
4    Q.  It looks like they're from Huntsville.
5    A.  Yeah. Huntsville, Yes.
6    Q.  And this facility is located where?
7    A.  It's near the First Division.
8    Q.  What's the first -- is First Division
9        in Montgomery?
10   A.  No. It's -- I want to say
11       Guntersville. But is it Guntersville
12       or Huntsville? That's my
13       understanding of it; it's in the area;
14       North Alabama.
15   Q.  Okay. I think it tells.
16   A.  I think the only thing it says is
17       First Division.
18   Q.  Okay. You're correct.
19   A.  Okay.
20   Q.  It's the facility in Guntersville --
21   A.  Guntersville, all right. Correct.
22   Q.  Now, what do you know about the
23       organization called Terminix

158

1        International located in Huntsville,
2        Alabama?
3    A.  What do I know about them?
4    Q.  Yes.
5    A.  That they was awarded the contract.
6    Q.  Okay. Are they a stock company?
7    A.  Say what?
8    Q.  Are they a stock company?
9    A.  I don't have any -- I don't know. I
10       don't know their makeup. I don't know
11       whether they're a L.L.C., or --
12   Q.  You don't know what type business
13       entity it is?
14   A.  No, I don't.
15   Q.  Then let me ask this question --
16   A.  Okay.
17   Q.  If you don't know if it's
18       stockholders, partners, or whoever
19       they are, how do you know what the
20       race of that company is?
21   A.  I know what the race of the company?
22   Q.  (Nods head.)
23   A.  Well, you know, I've been in the

159

1        business for 25 years. I pretty much
2        can count the black-owned companies in
3        the state.
4    Q.  What evidence do you have that it is a
5        white-owned organization?
6    A.  What evidence do I have?
7    Q.  Uh-huh.
8    A.  That will come out in discovery.
9    Q.  Okay.
10   A.  I mean, I couldn't --
11   Q.  So at this time, you don't have any
12       evidence that that is a white-owned
13       organization; is that correct?
14   A.  No.
15   Q.  Entity?
16   A.  No. I would have to --
17   Q.  Thank you.
18   A.  Right. But there is a --
19   Q.  I'm finished with my question.
20   A.  I haven't met a black-owned Terminix
21       company.
22   Q.  Let's see. We've agreed that there's
23       a DOC -- DOT, Department of

160

1        Transportation, contract as part of
2        your lawsuit. It traveled under two
3        numbers, and nobody got the first
4        number -- and I can repeat these
5        numbers if you need me to.
6    A.  No. No.
7    Q.  And then the second number, you
8        no-bid, and Terminix got the contract;
9        is that correct?
10   A.  Right. But for the record -- I want
11       the record to be clear. When you say
12       no-bid, that I wrote "no bid" in order
13       to stay active on the state bidding
14       list.
15   Q.  That's fine; for the record --
16   A.  Also Mr. Kervin informed me that --
17   Q.  I didn't ask you anything that
18       Mr. Kervin told you, but I'm going get
19       to that question. I like to make my
20       depositions flow the way I have it
21       planned.
22   A.  That's fine.
23   Q.  I'm going to show you Exhibit 14,

40 (Pages 157 to 160)

CURTIS DUNCAN - 4/11/2006

161

please, sir, and tell me, if you
2 would, what that exhibit is?
3 A.   (No response.)
4 Q.   See if you can answer. I'm still
5      looking --
6 A.   Okay. Yeah. I see the Limestone.
7 Q.   That's an Invitation to Bid; is that
8      correct?
9         (The referred-to document was
10        marked for identification as
11        Defendants' Exhibit No. 14.)
12 A.   That's correct.
13 Q.   And what type of contract is it?
14 A.   It's a termite treatment for Limestone
15      Corrections. The bid solicitation
16      number is -- the last four digits, is
17      0174.
18 Q.   Okay. Now, this is one of the
19      allegations in he complaint that you
20      were racially discriminated against
21      and your constitutional rights were
22      violated because you weren't awarded
23      this contract; is that correct?

162

1 A.   Correct.
2 Q.   Again, your wife signed on this one as
3      the bidding person.
4 A.   Yes. It was on the same day. It was
5      in the same bid package, I believe.
6      Well, it was the same date. It was
7      bid on, on the same day.
8         (Off-the-record discussion.)
9 Q.   Okay. I'm going to just show you the
10      page -- in your copy, the page I'm
11      looking at. Look at 6,900 at the
12      bottom.
13 A.   Okay.
14 Q.   Now, where is this termite treatment
15      supposed to be rendered?
16 A.   At Limestone Correctional Facility.
17 Q.   But I even led you to the page where
18      it gave the --
19 A.   Okay. Does it have the -- I know they
20      got the vendors on there, but it
21      doesn't --
22 Q.   Let's -- let's -- I'll go on to this
23      part. It's several buildings at

163

1      Limestone that's reflected on that
2      page; is that correct?
3 A.   Correct.
4 Q.   And, now, on that same page, what
5      chemical compound is required?
6 A.   Hexaflumuron or an approved equal.
7 Q.   Okay. And that is what chemical name?
8 A.   Hexa --
9 Q.   Yes.
10 A.   -- flumuron?
11 Q.   Yes. I mean the --
12 A.   Oh, Sentricon. I'm sorry.
13 Q.   Okay. And, again, it has a clause
14      that says, "Vendor will repair any new
15      damage caused by native subterranean
16      termites."
17 A.   Right. That's -- that's the
18      specification.
19 Q.   As covered in the warranty --
20 A.   Right. That's telling you what the
21      job will entail.
22 Q.   So if it's the position of the
23      Department that the vendor will

164

1      replace at no extra cost to
2      Corrections -- vendor will repair any
3      new damage caused by native
4      subterranean termites, protection is
5      covered in the warranty with vendor,
6      if it's the Department's position that
7      requires you to submit a copy of the
8      replacement warranty, it's your
9      position that's not required?
10 A.   My interpretation of that part of the
11      specification was that, that was what
12      was required of the company to
13      perform, not to turn it in with your
14      bid.
15 Q.   Okay. I think you're making yourself
16      clear. They say you had to turn it in
17      with the bid, and you're saying, no, I
18      disagree with that interpretation;
19      correct?
20 A.   Yeah -- you know -- true.
21 Q.   Of course, if there is any
22      misinterpretation in this Exhibit
23      No. 14, it has a number you can call.

41 (Pages 161 to 164)

CURTIS DUNCAN - 4/11/2006

165

1    and ask; is that not correct?
2  A.  I didn't have any question about it
3    because the bid is quite specific and
4    --
5  Q.  The question was: There was a name
6    that you can call and ask if that is a
7    question in your mind.
8  A.  Right. But that question never
9    crossed my mind.
10  Q.  And if you know -- and, actually, 14
11    has a copy of your bid; correct?
12  A.  Yes.
13  Q.  For Limestone Correctional Facility?
14  A.  Right.
15  Q.  For No. 0174 --
16  A.  Correct.
17  Q.  Of those previous letters I've shown
18    in depositions, that's one you're also
19    protesting?
20  A.  Correct.
21  Q.  Okay. Do you need me to show them to
22    you or you just agree you were
23    protesting this contract, too, in your

166

1    writing?
2  A.  You're correct.
3  Q.  Okay. Now, who was awarded this
4    contract, if you know?
5  A.  Cook -- I'm not sure. I think Cook
6    was awarded this one -- yes. Okay.
7  Q.  Now, if you need to refer to your
8    complaint -- okay. I'm going to show
9    you --
10    (Off-the-record discussion.)
11  Q.  I'm showing you Exhibit 15 and
12    represent to you that this is the
13    winning bid for --
14  A.  For Cook's Pest Control.
15  Q.  Yes.
16  A.  That's true.
17  Q.  Now, on this page, what product did
18    they bid?
19  A.  Product, Sentricon; Recruit II Termite
20    Bait; active ingredient, Hexaflumuron.
21    MR. LONG: We need to take a
22    break. I have to ask my
23    client, because I haven't

167

1    learned how to read
2    these.
3    (Brief recess was taken at
4    2:47 p.m., and deposition
5    testimony reconvened at
6    3:06 p.m.)
7  Q.  I'm back to Exhibit 14, which was your
8    bid for the Department of Corrections
9    contract; correct?
10  A.  Uh-huh.
11  Q.  What's the total amount that you bid
12    in this Document 14?
13  A.  Okay. It was $575 per --
14  Q.  No. Total amount for the whole thing,
15    the whole shebang.
16  A.  $9,660.
17  Q.  Would all that figure be profit?
18  A.  Oh, no.
19  Q.  If you would, estimate what percentage
20    of that figure would be profit.
21  A.  Go back there and subtract the cost of
22    the Outpost, the bait, the stations,
23    and then the labor to install them and

168

1    whatever.
2  Q.  Okay. And I know you don't have these
3    exact figures here. That's why I
4    asked you to estimate what percentage
5    of that would be profit.
6  A.  Let's see, I would say the cost and
7    expense would run one-fourth --
8    one-fourth of that -- I'd say,
9    roughly, one-fourth.
10  Q.  Okay. That's the cost of the product.
11    How about the cost of your labor?
12  A.  For labor on this particular project,
13    I was going to work it myself. And I
14    would have to go back and -- I would
15    have to go back and really check --
16    check and see. You know, I had that
17    fire that damaged a lot of stuff I
18    had -- you know, information. But I
19    would say one-fourth of that would be
20    going towards labor expenses; maybe a
21    little bit more, but I could break
22    that down.
23  Q.  Okay. So you're saying you had,

42 (Pages 165 to 168)

169

roughly, a 75 percent profit margin in
that --
A.    Well, one-fourth -- you know, I had a
guy that lived in Huntsville --
Q.    This is Guntersville, remember?
A.    Yeah. Well, he lived within a hundred
miles of that. You know, on the
monthly service, it was debatable
whether I would have him to go out
every month. I was going to do the
initial service, and it was debatable
whether I was going to have him go and
do the monthly service. At that time,
I was travelling the state doing
Public Safety. And it was still a
tentative plan whether I would be
working it myself. On the front end,
I like to work those contracts myself
to make sure they get off to a good
start, and then, eventually, I may
have turned it over.
Q.    Okay. I'm picking up something. This
requires monthly inspections of the

170

bait; is that correct?
A.    It's been a long time since I read the
specs, but from my understanding, I
think it required you to do monthly
services until you get a hit. And you
would continue to check it on monthly
basis and then quarterly,
eventually -- you know, after you get
those initial hits or whatever.
That's off the top of my head. I
haven't read it.
Q.    You've got the document; take your
time. Periodic visits, how often do
you have to go check those bait
stations?
A.    Let's see, monitoring (as read:)
"Activity must be monitored 30 days
after installation. If terminate
activity is found in one or more
stations, monitoring will be continued
every 30 days."
Q.    Okay.
A.    "Or more often if necessary."

171

Q.    Okay.
A.    "When termites have been eliminated,
monitoring every quarter. If any
termite activity is discovered,
monitoring would revert to every 30
days or more often if necessary."
Q.    Okay. So based on the bid specs you
really can't say how often you had to
be up there. It depended on --
A.    On the --
Q.    -- the activity.
A.    On the activity, yes. That's true.
Q.    But, needless to say, there's labor
cost to drive from Montgomery to
Guntersville to go check those baits
every time; is that correct?
A.    True.
Q.    And there could be substantial labor
costs.
A.    Well, gas, wear and tear on a vehicle.
And that was -- like I say, that was
tentative because it all depends on
how many hits we get.

172

Q.    I understood that. You've explained
that well. Now, you mentioned
something about maybe somebody from
Huntsville servicing it, but my
previous memory of your testimony is
that you have no employees.
A.    At this time, I don't. I'm saying, at
that time, when I bidded on the
contract, I would have -- I bid to
where I would have an employee to work
this contract, to help me on it, you
know.
Q.    Okay. You can't assign the contract.
Was that not in the bid specs?
A.    Assign?
Q.    Yes.
A.    No. He would have been working for
me. He would have been working under
my license.
Q.    Okay. Did you have anybody in mind in
the Huntsville or Guntersville area
that could service this contract?
A.    Yes. As an option, if it came to

43 (Pages 169 to 172)

CURTIS DUNCAN - 4/11/2006

173

1    that, where -- it all depends on the
2    hits that you're dealing with. It's
3    unpredictable, not an exact science.
4    And baiting, when you really
5    understand it, it's not an exact
6    science. You don't know when the
7    termite will decide to --
8  Q.  I want to ask do you have somebody in
9    mind to service this contract from
10   that area. Sort of, that's a yes or
11   no question.
12 A.  Yes.
13 Q.  Could you name that individual?
14 A.  Darrell Caldwell.
15 Q.  And who is this individual?
16 A.  He's in Huntsville.
17 Q.  Is he a relative?
18 A.  No.
19 Q.  No. Is he licensed?
20 A.  No. No. He works under my license.
21 Q.  Has he ever worked for you before?
22 A.  Yes.
23 Q.  And when did he work for you before?

174

1  A.  He was working during that period when
2    I bid on the contract.
3  Q.  That's not my question. My question
4    was: Has he ever worked for you, and
5    you answered "yes."
6        My followup question was:
7    When did he work for you?
8  A.  I don't have those records before me.
9    During that time period, he did work
10   for me, yes.
11 Q.  I asked this of your wife, and I'll
12   ask this of you. How many times have
13   you met Isaac Kervin prior to today?
14 A.  I think, officially, I've met him
15   once.
16 Q.  Okay. I want official or unofficial.
17   I didn't put any official --
18 A.  The only time we had a conversation
19   was one time.
20 Q.  Okay. What was the substance of that
21   conversation?
22 A.  It was concerning the specifications,
23   the evaluation of the bids, the

175

1    products, the comparative ability of
2    the products.
3  Q.  Is this the conversation about all the
4    contract numbers we've previously been
5    over?
6  A.  I think when I spoke with Mr. Carlton
7    --
8  Q.  I asked about Isaac Kervin, my client.
9  A.  Oh, Isaac Kervin. I'm sorry. I'm
10   sorry. I met Mr. Carlton one time.
11   But Mr. Kervin, during that time, I
12   guess we probably met maybe four or
13   five -- maybe six times.
14 Q.  Yes. And where did these meetings
15   take place?
16 A.  In his office, the telephone.
17 Q.  Do you remember the substance of any
18   of these meetings or telephone
19   conversations?
20 A.  We just discussed everything that was
21   in those letters dealing with the
22   specifications, how they was written,
23   the evaluation of the bids; yeah, we

176

1    discussed all that.
2  Q.  Okay. What evidence do you have that
3    Mr. Kervin intended to discriminate
4    against you based on your race?
5  A.  Well, based on the record, based on
6    the bid files, my conversations. I
7    thought we had an open -- open door
8    where we discussed the bids and what
9    direction they was going in. I
10   thought he was fully informing me of
11   the facts of the evaluation. But like
12   I say, I found out after they awarded
13   the contract, there was things that I
14   didn't even know that was going on.
15 Q.  Okay. So your proof of his intent to
16   discriminate is all in these bids
17   files?
18 A.  Withholding of information that took
19   place during the evaluation of the bid
20   process.
21 Q.  All that information that's withheld
22   is in this -- these bill files; is
23   that correct?

44 (Pages 173 to 176)

CURTIS DUNCAN - 4/11/2006

177

A.   Documentation of the results of their
2       actions, which at the time I didn't
3       know the true extent at that time.
4   Q.   Okay.
5   A.   I only discovered it after I had the
6       opportunity to read the entire bid
7       specs.
8   Q.   I'm talking about today.  Is all your
9       evidence of Mr. Isaac Kervin's
10      discrimination against you based on
11      the conversations you had with him and
12      what's in the State of Alabama's bid
13      files?
14  A.   True.
15  Q.   Is that also true of Ms. Antle, the
16      conversations you had with her and all
17      of the information in those bid files?
18  A.   Yes.
19  Q.   I've learned that you've had some
20      employees.  What was the race of that
21      employee that you previously
22      mentioned?
23  A.   He was black.

178

1   Q.   Have you ever had a white employee?
2   A.   No.
3   Q.   Okay.  I'm going to ask you what's
4       kind of a hypothetical question.  If
5       Isaac Kervin believes that Sentricon
6       is a superior contract -- I mean,
7       superior product to Outpost, would you
8       agree that requiring a Sentricon, or
9       its equivalent only, in a pest control
10      contract would be a discrimination
11      based on the product rather than the
12      race?
13  A.   Being the product and myself is
14      inseparable.  You can't separate my
15      qualification, and the product would
16      be comparable.  I truly feel that if I
17      was a white contractor, and I
18      submitted that same product --
19  Q.   Okay.  But let's stick to my question.
20  A.   Okay.
21  Q.   If he believes -- if he really
22      believes that Sentricon is a superior
`3      product to Outpost, would that be a

179

1       legitimate, non-discriminatory reason
2       to require Sentricon?
3   A.   If I didn't submit the letter that I
4       did --
5   Q.   Let's only answer the question.
6           MR. LONG:  Would you read that
7           question back?
8       (Requested portion of record
9       read, Page 178, Line 17.)
10  Q.   If Mr. Isaac Kervin believes that
11      Sentricon is a serious -- is a
12      superior product over Outpost, would
13      you agree that would be a legitimate,
14      non-discriminatory reason to require,
15      in a pest control contract, Sentricon
16      only or it's equivalent; yes or no?
17  A.   Okay.  It's hypothetical?
18  Q.   Yes.
19  A.   And not based on the facts of --
20  Q.   It's a hypothetical.
21  A.   Yes.  If he had that belief -- I mean,
22      if.
23  Q.   The answer is yes, I think.

180

1   A.   The answer is yes, if he has that --
2       you know the facts to back it up.  I
3       can't just sit here -- hypothetical --
4   Q.   I'm finished with that question.
5   A.   Okay.  It's in the record that it's
6       hypothetical?
7   Q.   Yes.  Now, I'm going to ask the same
8       question.  If Pat Antle believes that
9       Sentricon is a superior product to
10      Outpost would you agree that that is a
11      legitimate, non-discriminatory reason
12      to require, in a contract for pest
13      control, Sentricon only or Sentricon
14      and it's equivalent; yes or no?  It's
15      a hypothetical again.
16  A.   I would -- I would say yes.  As I said
17      for Mr. Kervin --
18  Q.   Okay.  No.  I'm finished.
19  A.   You know, it's hard for me to say yes
20      when --
21  Q.   If I want --
22  A.   I'm sorry.
23  Q.   Do you have any -- and I'm talking

45 (Pages 177 to 180)

CURTIS DUNCAN - 4/11/2006

181

1  about the two contracts that were
2  actually awarded that we discussed
3  today, not the one that never was
4  awarded. Do you have any proof that
5  is Ms. Antle or Mr. Kervin had any
6  knowledge of the ethnicity of the
7  winners of those contracts?
8  A.  Say that again.
9  Q.  I'm talking about the two contracts
10  that were awarded, not the one that
11  was -- not that number that wasn't.
12      But on the two that we've
13  been over, that were awarded, today,
14  do you have any proof that my clients,
15  Isaac Kervin or Pat Antle, had any
16  knowledge of the ethnicity of the
17  winners of those two contracts?
18  A.  Do I have any proof?
19  Q.  Yes.
20  A.  I think that would be dictated by
21  discovery.
22  Q.  Okay. Currently, do you have any
23  proof? Same question.

182

1  A.  Is it -- are you asking me for my
2  perspective as far as --
3  Q.  I'll rephrase the question one more
4  time.
5  A.  You're confusing, yes. I'm trying to
6  --
7  Q.  I'm talking --
8  A.  Hypothetical again.
9  Q.  I'm talking about today, and this is
10  not hypothetical.
11  A.  This is not hypothetical, okay.
12  Q.  Do you have any proof that Isaac
13  Kervin and Pat Antle, my clients, had
14  any knowledge of the ethnicity of the
15  winners of the two contracts we've
16  previously discussed as I've asked you
17  questions today?
18  A.  I couldn't answer that question.
19  Q.  Is it yes -- is it yes or no? Do you
20  have any --
21  A.  I don't have -- I don't have the facts
22  to say yes or no on that, because --
23  you know, just to base it on my

183

1  experience, I was the -- I've been the
2  only black contractor bidding on those
3  contracts for 25 -- well --
4  Q.  What proof do you have that Isaac
5  Kervin or Pat Antle have any knowledge
6  of the ethnicity of the winners of the
7  two contracts we've discussed today
8  where contracts were awarded?
9  A.  I still can't answer that question. I
10  wouldn't --
11  Q.  What proof do you have; that's the
12  question?
13  A.  It would be speculative for me to --
14  to even try.
15  Q.  Is it fair to say, at the present
16  time, you have no proof that they had
17  knowledge of the ethnicity of the --
18  A.  No. Because it's a common fact that
19  you don't have any other black
20  contractors bidding on state
21  contracts. That's -- you know, you
22  can go back and check the record on
23  that.

184

1  Q.  Okay. Now, I want you to list what
2  proof you've got that --
3  A.  You've got a computer printout there.
4      THE COURT REPORTER: You are
5      talking at the same time.
6      THE WITNESS: I'm sorry.
7  Q.  What proof do you have that my clients
8  had knowledge of the ethnicity of the
9  winners of the two contracts that were
10  awarded that we discussed today?
11  A.  Okay. Well, when a company registers
12  with the State, you have a computer
13  printout supposedly, you know, telling
14  the ownership or whatever. So they
15  have access to that.
16  Q.  Do you have any proof that they've
17  looked up those computer printouts
18  that you discussed?
19  A.  I don't have any proof that they
20  didn't.
21  Q.  What other proof do you have that my
22  clients had any knowledge of the
23  ethnicity of the winners of the two

46 (Pages 181 to 184)

CURTIS DUNCAN - 4/11/2006

185

```
 1    contracts that were awarded that we
 2    discussed today?
 3  A.  Well, based on '92, I never bid
 4    against another black contractor with
 5    the State, so that's common knowledge.
 6  Q.  I don't know that. I'm just asking,
 7    when the jury is sitting over there,
 8    what proof are you going to offer them
 9    that my clients had any knowledge of
10    the ethnicity of winners of those
11    contracts?
12  A.  That will have to come through
13    discovery.
14        MR. LONG: I want to certify
15        that question.
16  A.  Certify? What's that --
17  Q.  It means I'm going to the Court to
18    make you answer, because you've
19    refused to answer it.
20  A.  You're asking to me speculate.
21  Q.  I'm asking you to list what proof you
22    have as of today.
23  A.  What proof do I have?
```

186

```
 1  Q.  Yes. That they had knowledge of the
 2    ethnicity of the winners of the
 3    contracts that were awarded that are
 4    made a basis of this complaint.
 5  A.  My complaint is, you know,
 6    allegations, alleged. I can't -- you
 7    don't prove your case on the front
 8    end. You do that through discovery.
 9  Q.  Is it fair to say that, at this date,
10    you have no proof that my clients had
11    --
12  A.  No. I'm not trying to say that,
13    because we haven't had discovery.
14        MR. LONG: I want to certify
15        this whole series of
16        questions.
17        MR. LYLES: I join the motion.
18        MR. DUNCAN: I do, too.
19  Q.  Have you had any conversations with
20    Isaac Kervin since these bids -- your
21    bids, that we've discussed today, have
22    been rejected?
23  A.  Other than just saying hi and hello.
```

187

```
 1    I don't think we've had a meeting
 2    since -- since went to the bid --
 3  Q.  Let me refresh your memory. Did you
 4    have any discussions with Isaac Kervin
 5    concerning the business you were
 6    conducting with Mental Health
 7    Department of the State of Alabama?
 8  A.  Oh, yeah. Okay. Yeah. Yeah. Sure
 9    did.
10  Q.  If you would, describe that
11    conversation to me.
12  A.  Can you refresh my memory? I'm
13    serious.
14  Q.  I don't --
15  A.  I know I talked to him, but --
16  Q.  Are you saying that you no memory of
17    that conversation?
18  A.  Oh, I have a -- I mean, I remember
19    talking to him about, you know -- it
20    was dealing with the -- well, dealing
21    with the bid -- the bid process. I
22    think the Finance Director directed me
23    to speak to Mr. Kervin -- Isaac
```

188

```
 1    Kervin. The associate -- the
 2    assistant, his name was Horn -- I
 3    think it was Hornsby. I'm not 100
 4    percent sure, but somebody from the
 5    Finance Director's office had directed
 6    me to speak to him --
 7  Q.  Okay.
 8  A.  -- concerning some bids.
 9  Q.  What was that conversation about?
10  A.  Let's see, it was dealing with -- I'm
11    trying --
12        MR. DUNCAN: Help me out,
13        Mr. Kervin, if you can.
14  Q.  He can't do that.
15  A.  I'm trying --
16  Q.  Only you get to answer questions
17    today.
18  A.  I'm trying to remember off the top of
19    my head. We discussed -- okay. Yeah.
20    The issue at that time with Mental
21    Health was that they decided to make
22    pest control a professional service.
23    And they wanted to change it from a
```

47 (Pages 185 to 188)

CURTIS DUNCAN - 4/11/2006

189

1    competitive bid to the professional
2    service, like a lawyer seeing a
3    doctor. Rather than bidding on
4    contracts, that the agency can make
5    evalue (sic) and decide which lawyer
6    they want to hire or what firm they
7    want to represent the State. They
8    wanted to do the same thing with pest
9    control.
10   Q.   Okay.
11   A.   When I discussed it with Mr. Kervin,
12       he was -- I really need to refresh my
13       memory -- he, basically, agreed that
14       pest control should be competitively
15       bidded out.
16   Q.   I'll represent this to you in
17       assistant attorney general language, I
18       agree with that statement.
19   A.   As a matter of fact --
20   Q.   Let me get -- this conversation was
21       after you lost these bids that you've
22       made a part of the lawsuit today;
23       right?

190

1    A.   I would have to -- this 2003. I'm
2        trying to remember. I want to say yes
3        -- I want to say this was after that.
4    Q.   So after you lost these bids by --
5        lost these bids, and you claim my
6        client, Isaac Kervin, discriminated
7        against you, you went and sought his
8        advice, in essence, concerning the
9        Mental Health contract?
10   A.   From the direction of the Finance
11       Director.
12   Q.   Okay. I didn't ask about the Finance
13       Director or Andy Hornsby or --
14   A.   Yes.
15   Q.   Now, after these contracts that you've
16       made a basis of this lawsuit are
17       denied, you went and sought my client,
18       Isaac Kervin 's advice about proposed
19       contracts you wanted with Mental
20       Health; is that not correct?
21   A.   Actually, it wasn't contracts that I
22       wanted. It was contracts that were
23       actually being taken away from me.

191

1    Q.   Okay.
2    A.   Yeah. I talked with him. Like I
3        said, Mr. Hornsby directed me to talk
4        with him.
5    Q.   Okay. Does Mr. Hornsby have any
6        authority over you?
7    A.   Mr. Hornsby?
8    Q.   Yes.
9    A.   No. I had wrote a letter to the
10       Finance Director.
11   Q.   That's not the question. Let's,
12       please, listen to my question. Does
13       Mr. Hornsby have any authority over
14       you?
15   A.   Does he have any authority?
16   Q.   Yes.
17   A.   He gave me -- I went to him concerning
18       the --
19   Q.   No. Let me rephrase it, if you don't
20       understand. Can Mr. Hornsby give you
21       instructions or directions and expect
22       you to keep them?
23   A.   I don't work for him. I don't take

192

1    orders from him. But he gave me
2    advice to talk to Mr. Kervin.
3    Q.   Okay. He suggested. He didn't direct
4        you. He suggested --
5    A.   He suggested -- directed, yeah.
6        During the discussion he mentioned
7        Mr. Kervin, and he said it would be
8        good for me to talk with him.
9    Q.   So you went and sought the advice of a
10       man that you had already formed the
11       belief had discriminated against you;
12       is that correct?
13   A.   I sought advice of -- from the advice
14       of the Finance Director.
15   Q.   Let's leave out the Finance
16       Director --
17   A.   I can't leave him out because he told
18       me to go. I wrote a letter to them,
19       and he told me --
20   Q.   I get to ask my questions my way.
21   A.   Oh, okay. I'm sorry.
22   Q.   Is it not fair to say that you went
23       and sought my client's, Isaac

48 (Pages 189 to 192)

193

Kervin's, advice about a Mental Health
2  contract after in your own mind you
3  had decided that he participated in
4  racial discrimination against you?
5  The answer to that is a yes or no.
6  A.   The answer to that would be, according
7  to the facts to that, yes.
8  Q.   I'm finished. Thank you for answering
9  the question. I'm finished with that
10  question.
11  A.   You got any more questions about the
12  conversation?
13  Q.   Yeah. If you remember any more of the
14  details, I do, yes.
15  A.   Well, Mr. Kervin, he said that Mental
16  Health -- first off, they shouldn't --
17  they shouldn't even try to change pest
18  control from a sealed bid. It should
19  not be a professional service.
20  Q.   Yeah.
21  A.   They said they shouldn't have never --
22  they shouldn't have opened up the bids
23  -- well, opened up the proposals

194

1  because at that time they exposed my
2  bid price to the competitors. And
3  then they turned around and bid that
4  contract out and the competitor knew
5  what the price was when they bid it
6  out again. But like I say --
7  Q.   I'm not defending Mental Health. We
8  can skip all that, and you're not
9  suing them today.
10  A.   No. No. No.
11  Q.   Okay.
12  A.   I appreciate the advice, though.
13  Q.   I think -- I know I've asked this of
14  Mr. Kervin. How many times have you
15  met Pat Antle?
16  A.   Several times.
17  Q.   Let me -- not just at the bid
18  openings, how many times have you had
19  conversations with Pat Antle?
20  A.   During what time period?
21  Q.   The time period when this bid process
22  started for these three contracts.
23  A.   I think all those letters, over 90

195

1  percent of them were addressed to her
2  and we talked on the phone several
3  times.
4  Q.   Yes.
5  A.   We talked at least five maybe nine or
6  ten.
7  Q.   Okay. And you previously -- no, I
8  don't think you have. You've never
9  heard her use any racial disparaging
10  language or anything like that? She's
11  always been respectful to you; is that
12  correct?
13  A.   She's always been polite, courteous,
14  professional.
15  Q.   Let me ask you this: Your product is
16  Outpost?
17  A.   Yes.
18  Q.   White vendors have Outpost, too, don't
19  they?
20  A.   It's accessible to everybody.
21  Q.   Okay. Do you have knowledge of any
22  white vendors in the Montgomery area
23  that use Outpost?

196

1  A.   In Montgomery? Just Montgomery or the
2  state as a whole?
3  Q.   I don't want to go through the whole
4  state. I just want to keep to the
5  localities of where these contracts
6  are.
7  A.   It was quite common during that time.
8  Q.   And these -- and these bids that are
9  the subject of this lawsuit, did you
10  look at all the other bids?
11  A.   The other bids?
12  Q.   Yes.
13  A.   What other bids? You talking about
14  the competitors' bids?
15  Q.   Yes. When you went and looked at the
16  bid files.
17  A.   Yeah. As a matter of fact, at the bid
18  opening, Ms. Antle --
19  Q.   You just told me you looked at the
20  bids. That's all I asked. If you'll
21  limit your -- we'll be out of here a
22  lot quicker if you'll limit your
23  answers to my questions.

49 (Pages 193 to 196)

CURTIS DUNCAN - 4/11/2006

197

1  A.  Okay. What was the question again?
2     I'm sorry.
3  Q.  Did you go look at the bids -- the
4     other competitors bids to these
5     contracts?
6  A.  Yes.
7  Q.  Did you pay attention to what product
8     the other bidders were bidding with?
9  A.  It was only two other bidders.
10 Q.  Which contract?
11 A.  The ones we discussed.
12 Q.  That's the DOT contract; right?
13 A.  DOT and Corrections, yeah.
14 Q.  Okay. And you're saying there's only
15    two bidders in the DOT and only two
16    other bidders in the DOC?
17 A.  I'm sorry. I'm sorry. Yeah. It was
18    only two bidders in both. Yeah.
19    That's correct.
20 Q.  And what products did they bid on, do
21    you know?
22 A.  They used Sentricon.
23 Q.  Did any of them bid Outpost besides

198

1     you?
2  A.  No. They didn't have -- well, there I
3     go again. They already had a
4     franchised agreement with Sentricon so
5     they didn't have no consent issue.
6  Q.  Let me go a little bit deeper in that
7     area that Harry went into. Sentricon,
8     you have to get license from the
9     company to use; is that correct?
10 A.  No. You have to sign a franchise
11    agreement.
12 Q.  Does that cost money?
13 A.  Does it cost money?
14 Q.  Yes.
15 A.  I don't know I've never been through
16    the process. I know to become -- you
17    know, it's just like you -- like
18    Hardee's. If somebody want to own
19    Hardee's or anyone who have a
20    franchise, I assume -- I'm assuming
21    there's an expense. I never -- I
22    never inquired.
23 Q.  Okay. So you don't know whether it is

199

1     a franchised product.
2  A.  Oh, I know it's a franchised product.
3     Because, Sentricon, they choose who
4     they want to do business with.
5  Q.  Okay. Have you ever tried to be a
6     Sentricon --
7  A.  No.
8  Q.  Do you know the process of becoming a
9     Sentricon -- the ability to use it?
10 A.  I never inquired.
11 Q.  Okay.
12 A.  And, you know, from the time of
13    receiving this bid, that would have
14    been too short a time to have even
15    tried to inquire to become a Sentricon
16    dealer -- a distributor of that
17    product.
18 Q.  If you would, per your understanding,
19    define what is sole-source contract.
20 A.  Sole source?
21 Q.  Yes.
22 A.  A sole-source product or a sole-source
23    contract?

200

1  Q.  A sole-source bid.
2  A.  Sole-source bid. It's where the
3     specifications are written
4     restrictively and tellingly around one
5     product. Where another product -- and
6     according to the State, you're
7     supposed to have supporting
8     documentation to prove that the
9     sole-source product is superior to the
10    other products. That's the definition
11    that I -- my understanding of the
12    sole-source product.
13       When I had a conversation
14    with Mr. Kervin, when I informed him
15    that the product that he -- that he
16    was choosing, that it was -- he said
17    it didn't make any difference as long
18    as he had competition among that
19    sole-source product. So as long as he
20    had Teminix or Cook or whoever was --
21    had a franchise agreement with them,
22    and as long as you have competition
23    among them. In other words, his whole

50 (Pages 197 to 200)

CURTIS DUNCAN - 4/11/2006

201

```
     -- his whole argument was that we can
2    -- the State don't care about the
3    other products as long as we have
4    competition with the sole-source
5    product.
6  Q.  And that's Mr. Kervin making those
7      statements?
8  A.  Yes.
9  Q.  Now, Cook's Pest Control won one of
10     these contracts, do you remember which
11     one?
12 A.  I think it was Corrections.
13 Q.  Okay.
14 A.  I think.  Yeah.  That's Cook doing the
15     Corrections.
16 Q.  That's the Guntersville contract?
17 A.  Yes, sir.
18 Q.  I think I've asked this one.  I'm
19     going to ask it again.  Do you know
20     white vendors who use Outpost; is that
21     correct?
22 A.  Yes, sir.  It's accessible to
23     everybody.
```

202

```
1  Q.  Do you think Ms. Antle and Mr. Kervin,
2      for that matter any defendant in this
3      lawsuit, has any duty to cure
4      deficiencies in a bid received?
5  A.  Cure deficiencies --
6  Q.  Yes.
7  A.  -- in a bid received?
8  Q.  Yeah.
9  A.  Once they're put on notice, yes.
10 Q.  Where do you think this duty for
11     Ms. Antle and these defendants to cure
12     deficiencies in the bid arises from?
13     What source of law are you basing that
14     duty upon?
15 A.  The competitive bid law, their own
16     administrative procedures.
17 Q.  Okay.
18 A.  We researched the administrative
19     procedures, it had the history of the
20     -- when a person file a protest, they
21     would have answered it within a
22     certain time period.
23 Q.  And you say that is in the
```

203

```
1      administrative procedures, that if you
2      write a letter, Alabama's
3      Administrative Procedures require them
4      to respond; is that correct?
5  A.  Well --
6  Q.  Was the answer right?
7  A.  Yes.
8  Q.  Thank you.  Thank you.
9  A.  As long as I've been in business, if
10     there's been a change, I haven't been
11     notified of it.
12 Q.  Do you have any evidence that any
13     defendant in this lawsuit doesn't
14     legitimately believe Sentricon is not
15     a superior product to Outpost?
16 A.  Say that once again.
17 Q.  Do you have any evidence that any
18     defendant in this lawsuit doesn't
19     sincerely believe that Sentricon is
20     not a superior product to Outpost?
21 A.  The evidence in their -- in their
22     files.
23 Q.  Okay.  Do you have any other evidence
```

204

```
1      outside the bid files?
2  A.  Outside the bid files?
3  Q.  Yes.
4  A.  No.
5  Q.  Now you asked in the complaint for
6      attorney's fees.  Are you aware that
7      only the prevailing party in this
8      lawsuit can ask for attorney's fees?
9  A.  Prevailing attorneys?
10 Q.  Yes -- no.  The prevailing parties can
11     ask for attorney's fees; that was my
12     question.  Are you aware that?
13 A.  You just made it aware to me.
14 Q.  Got it.
15 A.  Until now, I didn't have knowledge,
16     no.  What would be the grounds of
17     that?
18 Q.  I don't have to answer questions.
19 A.  I'm sorry.  I mean, you made me
20     inquisitive about that.
21 Q.  What are your reasons for not having
22     become qualified to use Sentricon as
23     one of your products?
```

51 (Pages 201 to 204)

CURTIS DUNCAN - 4/11/2006

205

1 A. Well, you know, in business, you have
2 the freedom of choice, free
3 enterprise. You choose the product of
4 what you have confidence in. That's
5 part of being in training as a pest
6 control and business man. I mean,
7 just because somebody say Sentricon is
8 the best product out there, doesn't
9 necessarily mean it's true.
10     I mean, they publicize
11 that, but when you look at the label,
12 look at all the scientific facts, when
13 you compare the product, why get an
14 expensive product and pass that cost
15 onto the customer when you can get a
16 more cost efficient one. Outpost is
17 one of the options. That was my
18 choice. That's all in your business
19 plan. That's about doing business.
20 Q. I want to remind you that if your
21 answer changes today -- a lot of
22 things, if you have any evidence of,
23 that you do have a duty to supplement

206

1 this deposition.
2 A. Okay.
3 Q. By letting us know. Because once you
4 uncover evidence we're entitled to
5 know relatively soon after you uncover
6 it.
7 A. Okay.
8 Q. I'm looking at the complaint, now, in
9 Paragraph 9. And I plan to go through
10 this as soon as possible. But in this
11 paragraph you state, (as read:) "This
12 action is brought by the plaintiff
13 because of defendants' alleged --
14 Hornsby, Harris, Stan Carlton --
15 permissible preference for a white
16 vendor, Cook's Pest Control."
17     (Off-the-record discussion.)
18 Q. If you don't mention my client, I'm
19 going to skip it. He asked that
20 question.
21 A. Okay.
22 Q. In Paragraph 14, you say you wrote a
23 letter on March 24, 2003, concerning

207

1 this matter. (As read:) "Defendants
2 Kervin and Antle willfully and
3 knowingly ignored plaintiff's protests
4 because of his race."
5     Now, is your evidence
6 that they willfully and knowingly
7 ignored your protest just because they
8 didn't respond to you after the bids
9 were awarded?
10 A. No. It was because they didn't --
11 they didn't contact me before the bids
12 were awarded.
13 Q. Okay. I'm going to go back to my
14 motion for summary judgment. And
15 you've seen our -- my defendants'
16 motion for summary judgment; correct?
17 A. Correct.
18 Q. I'm going to show you a selected page.
19 It is the first page beyond Exhibit 8,
20 and go two pages after that. Would
21 you read what I've got underlined in
22 this?
23 A. What's the color page for --

208

1 Sentricon, okay.
2 Q. You would agree this comes from a
3 Sentricon website; correct?
4 A. This right here?
5 Q. Yes.
6 A. Yes.
7 Q. And what's this statement right here,
8 if you would, read it for the court
9 reporter.
10 A. (As read:) "Conclusions of this
11 research is that the Sentricon system
12 has successfully eliminated colonies
13 of all economically important
14 subterranean species in the
15 Continental United States and Hawaii
16 and a wide variety of environments."
17 Q. Again, further down in this exhibit,
18 read this sentence that I'm pointing
19 now to.
20 A. "Sentricon one of the main differences
21 between Sentricon termite colony
22 elimination system and the basic
23 termite control, that uses a chemical

52 (Pages 205 to 208)

209

termiticide barrier, is colony
elimination."
3  Q.  Unfortunately, I got you to read the
4      wrong one. That's my fault. Read
5      this one.
6  A.  "The Sentricon system is the only
7      termite bait that has published peer
8      reviewed -- I mean -- review research
9      documenting colony elimination."
10            Hey, you know that's
11     propaganda, right?
12  Q.  I don't answer questions in my
13     deposition.
14  A.  Okay.
15  Q.  Earlier today, and I'm still looking
16     at the attachments, Exhibit H in the
17     motion for summary judgement. You
18     mentioned several labels.
19  A.  Right.
20  Q.  This is a federal label, is it not,
21     from Recruit II?
22  A.  Correct.
23  Q.  And Recruit II, again, is which of the

210

1      two, Outpost or Sentricon?
2  A.  Recruit II is the Hexaflumuron.
3  Q.  Which is, again?
4  A.  Sentricon.
5  Q.  Now, I'm going to show you this
6      Recruit II on this page and the final
7      two pages. Would you agree that is
8      the entire federal label that you were
9      referring to this morning?
10  A.  Yeah. This is the specimen label for
11     -- y'all said Recruit, but it's
12     Sentricon, yes.
13  Q.  Okay. That's what you mean, the
14     federal law label; correct?
15  A.  Right.
16  Q.  And beyond that is the federal law for
17     Outpost; is that correct?
18  A.  Correct.
19  Q.  I want you to look at it; be sure.
20     These three pages following Outpost
21     TBR, is that the federal label by law
22     you've referred to earlier today?
23  A.  Yes.

211

1  Q.  Okay. Just so -- on my copy of this
2      motion of summary judgment, would you
3      put your initials on these labels,
4      just your initials with my red pen.
5  A.  My initials on the labels?
6  Q.  On the bottom of the page, so --
7  A.  What would be the purpose of that?
8  Q.  When I show them to you at trial,
9      you'll be sure I'm showing you the
10     same document.
11  A.  Oh, okay.
12  Q.  That's the purpose.
13  A.  Okay. I thought that was the purpose
14     of the court reporter.
15  Q.  No. No.
16  A.  "C.D."?
17  Q.  Yeah. On each of those pages that
18     make up the labels.
19  A.  What's today's date?
20  Q.  It's the 11th. If you want to put the
21     date, that's fine. But I don't need
22     that.
23  A.  Just for my memory. You want me to do

212

1      the same thing for Outpost?
2  Q.  Yes. All right. Now, I'm going to do
3      the same thing with a different
4      portion of this document. Let me see
5      if it's somewhere else.
6          (Brief delay occurred at
7           3:53 p.m., and deposition
8           testimony reconvened at
9           4:01 p.m.)
10  Q.  Sorry for the delay. I'm going to
11     show you Exhibit 4.
12  A.  Okay.
13  Q.  Isaac Kervin's affidavit. And if you
14     would, tell me anything in there that
15     you contend is untrue.
16  A.  You want me to repeat what we stated
17     earlier? Okay. The statement that
18     Stan Carlton rejected the bid of C & J
19     Associates because Outpost system
20     offered by C & J Associates was not
21     the specified Sentricon system
22     required in the bid. Because the
23     primary active ingredient listed in

53 (Pages 209 to 212)

CURTIS DUNCAN - 4/11/2006

213

1    Outpost is listed by the EPA for
2    environmental toxicity.
3 Q.  So that's a statement you contend is
4    untrue?
5 A.  That's not -- yeah, that's not true.
6 Q.  Tell me anything else you say is
7    untrue in that affidavit.
8 A.  The bid was also rejected because
9    C & J failed to provide documentation
10    of the required damage protection
11    warranty. That's not true.
12 Q.  Well, we looked at them earlier. You
13    didn't contend that you provided it.
14    You contended that it wasn't required;
15    is that correct?
16 A.  The language of the specification did
17    specify that you submit that with the
18    bid.
19 Q.  Okay.
20 A.  I mean, y'all have a specification in
21    that specification saying that in
22    order for you -- for the State to
23    accept your bid, you have to turn your

214

1    license in. That was done.
2 Q.  Let's go through -- what else are you
3    claiming was untrue in that affidavit?
4 A.  That's not true.
5 Q.  What else?
6 A.  The statement in here when they say,
7    "On May 19, 2003, Ms. Alma (phonetic)
8    re-bid the contract and changed the
9    pricing structure to match industry
10    standards for pricing of this
11    commodity. At this time DOT changes
12    the specifications to Sentricon only."
13 Q.  You're staying that's an untrue
14    statement?
15 A.  Well -- "and add the specifications
16    requiring the damage repair --
17    replacement guarantee."
18        This is in reference to
19    the second bid. You just asked me the
20    question and the question was,
21    specifically, was that I -- the first
22    bid required me to turn in the
23    warranty.

215

1        Well, in the affidavit
2    here, they -- they have in here they
3    added a specification requiring the
4    damage repair guarantee. The
5    affidavit, specifically, says that
6    they added that in the second bid. It
7    wasn't in the first bid.
8 Q.  When it says they added it, it didn't
9    say it wasn't in the first, right?
10    The document is going to speak for
11    itself.
12 A.  The document as read, as written. The
13    first one doesn't require that. I
14    mean, when you -- well, it says it
15    here required -- the specification
16    requirement was added. It's a new
17    condition.
18        Why would you specify
19    that you're adding something that was
20    already in the original bid?
21 Q.  Now, you're saying -- Stan Carlton
22    rejected the bid by C & J Associates
23    because C & J would not specify the

216

1    Sentricon system. You said that part
2    was untrue; correct?
3 A.  That's the first bid?
4 Q.  Yes.
5 A.  And he said -- the statement said that
6    Stan Carlton rejected my bid because
7    Outpost being offered by C & J, that
8    was not specified as -- okay. When
9    you read that statement, it's saying
10    that if it's not Sentricon, we don't
11    take anything in consideration, that
12    it wasn't comparable.
13 Q.  All it says is Stan rejected the bid
14    because Outpost was not the specified
15    Sentricon system. Are you saying that
16    that's not what Stan Carlton --
17 A.  The bid was asking for a comparable
18    products.
19 Q.  I'm not asking about the bid. Are you
20    saying that Stan didn't do that --
21    Stan Carlton -- Mr. Carlton?
22 A.  Didn't do what?
23 Q.  Reject the bid by C & J Associates

54 (Pages 213 to 216)

217

because the Outpost system offered by
2  C & J was not the specified Sentricon
3  system. Are you saying that
4  Mr. Carlton didn't do that?
5  A.  Didn't do what?
6  Q.  I'll read it (as read:) "Stan Carlton
7  rejected the bid by C & J Associates
8  because the Outpost offered by C & J
9  Associates was not the specified
10  Sentricon system."
11  A.  I don't agree with that part.
12  Q.  Okay. Are you saying that Stan
13  Carlton didn't do that?
14  A.  He did that. But he was saying the
15  reason why he did it was because it
16  wasn't what the bid asked for.
17  Q.  Now, Mr. Carlton, in a letter of
18  April 21, 2003, in a memo said
19  (as read:) "And upon request during
20  the evaluation process this vendor
21  failed to provide the documentation of
22  the required damage protection
23  warranty; therefore, this bid is

218

1  rejected."
2        To me, that maybe sounds
3  like something Mr. Carlton would say
4  when he was evaluating this bid and
5  he's asked you for a copy of it and
6  you didn't give it to him.
7  A.  Where's the documentation that he
8  asked for it?
9  Q.  I don't know. I don't work for --
10  A.  It don't exist.
11  Q.  Okay. But you agree that's what the
12  this --
13  A.  I never received any --
14  Q.  You agree that's the gist of what's
15  written here?
16  A.  What's the gist?
17  Q.  That's what Mr. Carlton wrote to Pat
18  Antle?
19  A.  That's a -- that's a false statement
20  because he don't have any
21  documentation where he actually sent
22  me a letter or had any communication
23  with me.

219

1  Q.  Okay. If he made a telephone call,
2        would he have to have documentation?
3  A.  Say what?
4  Q.  If he made a telephone call to you, do
5        you think he'd have documentation?
6  A.  I'm quite sure he should have
7        documentation of it.
8  Q.  So you say something didn't happen if
9        there's not a document?
10  A.  Say what now?
11  Q.  You're saying that something doesn't
12        happen if there's not a document?
13  A.  Going through a bid process and the
14        communication we was having, he did
15        not send me a letter asking me for
16        that. It never was communicated to
17        me.
18  Q.  This doesn't say he sent a letter.
19        Are you saying that if Mr. Carlton
20        testified that --
21  A.  I never had a conversation with him
22        about this.
23  Q.  Let finish my question.

220

1  A.  Okay. Go ahead. I'm sorry.
2  Q.  Are you saying that if Mr. Carlton
3        testifies that in some form or manner
4        he asked, during the evaluation of
5        this bid, for you to provide
6        documentation of the required damage
7        protection warranty, are you saying
8        that would be untruthful testimony?
9  A.  That would be untruthful, because I
10        didn't discover that until I looked at
11        the bid file. I was surprised to see
12        that in there.
13  Q.  And are you basing that on -- because
14        he doesn't have a document
15        memorializing it?
16  A.  The whole process. The process don't
17        have a letter stating anything in
18        response to my letters that I
19        delivered to -- to y'all.
20  Q.  Okay. But let's get back to the
21        question. Are you saying that that's
22        a lie because he doesn't have a
23        document --

CURTIS DUNCAN - 4/11/2006

221

1    A.   Yes, it is.
2    Q.   -- memorializing it?
3    A.   Yes, it is. It's just the biggest lie
4         that you can tell. Because he never
5         communicated that to me. As a matter
6         of fact, we never had that
7         conversation --
8    Q.   You've already answered. For it to be
9         true, you claim he's got to have
10        documentation; is that correct?
11   A.   You're saying? Well, say the question
12        again.
13   Q.   Mr. Carlton, in his letter, stated
14        "And upon request, during the
15        evaluation process, this vendor --
16        which means he's talking about C & J
17        Associates up here -- failed to
18        provide documentation of required
19        damage protection warranty."
20   A.   That's not true. That's not true.
21   Q.   Now, would it be true that Raymond
22        Hornsby -- did Raymond Hornsby call
23        and make that request for the damage

222

1         protection --
2    A.   No. I had never had a conversation
3         with Raymond Hornsby.
4    Q.   So if Mr. Hornsby testifies to that,
5         you're saying that he's testifying
6         untruthful; is that correct?
7    A.   That's true. I wouldn't -- I wouldn't
8         know him if he walked in this room. I
9         wouldn't even know his voice. I've
10        never had a conversation with him.
11   Q.   So if somebody called you on
12        telephone, and it was Mr. Hornsby, and
13        asked you that, you wouldn't know who
14        it was; is that correct?
15   A.   Huh?
16   Q.   It was a bad question. If Mr. Hornsby
17        called you on the telephone and asked
18        for proof of the replacement warranty
19        protection, you wouldn't know whether
20        it was Mr. Hornsby or not because you
21        don't know his voice; is that correct?
22   A.   Well, I'm quite sure he would identify
23        himself. I spoke to Pat Antle on the

223

1    phone -- as a matter of fact, I faxed
2    her a copy of what they -- they asked
3    me for, a label and some supporting
4    documentation of the product. Nobody
5    asked me anything about a warranty.
6         MR. LONG: I want to bring up
7              something. We will, at
8              some point, be filing
9              more motions for summary
10             judgment, and I want to
11             ask you, are you aware
12             that you're supposed to
13             split your affidavit out
14             apart from the advocacy
15             portion of your response
16             to it?
17        MR. DUNCAN: The Court hasn't
18             brought that to my
19             attention, no.
20        MR. LONG: I want to bring it
21             to your attention now,
22             that when you oppose the
23             next motion for summary,

224

1              you've got to have an
2              affidavit that tells what
3              you state the facts are,
4              under oath.
5         MR. DUNCAN: Okay.
6         MR. LONG: Then attached to
7              it, a brief where you
8              advocate under the law.
9                   Because if you file
10             another response like you
11             did that last one, that
12             intermixes the two, and
13             notarizes the whole
14             thing, I want to put you
15             on notice that I'm going
16             to move to strike because
17             it doesn't comply with
18             the Federal Rules of
19             Civil Procedure.
20        MR. DUNCAN: Okay.
21        MR. LONG: The reason I'm
22             putting this on the
23             record here is, I believe

56 (Pages 221 to 224)

CURTIS DUNCAN - 4/11/2006

225

```
        Judge Boyd will
 2      appreciate me putting you
 3      on warning that you've
 4      got to separate your
 5      affidavit from your
 6      advocacy, it's called.
 7      Your affidavit and your
 8      brief where you're
 9      opposing our motion for
10      summary judgment.
11      MR. DUNCAN: You're going to
12      put that in writing,
13      right?
14      MR. LONG: No. I just put it
15      up on record.
16      MR. DUNCAN: Okay. Well, I'll
17      make a motion to the
18      judge to, you know, put
19      that in writing what you
20      just said.
21      MR. LONG: By all means.
22  Q.  Now, when we get to trial --
23      MR. DUNCAN: By the way, the
```

226

```
 1      rule that you mentioned
 2      earlier, you're going to
 3      get that to me also?
 4      MR. LONG: No. I never agreed
 5      to that. I'm not going
 6      to do your legal research
 7      for you.
 8      MR. DUNCAN: So you're going
 9      to give me some rule --
10      you're going to instruct
11      me how to respond to
12      something --
13      MR. LONG: I am not --
14      MR. DUNCAN: You're picking
15      and choosing what you
16      want to tell me.
17      MR. LONG: I'm not going to
18      purport to give any legal
19      advise. Do your
20      research.
21      MR. DUNCAN: Well, you
22      volunteered that
`3      information.
```

227

```
 1      MR. LONG: Yes. Because I
 2      plan on moving to strike
 3      any future pleading, and
 4      I'm giving you warning.
 5      MR. DUNCAN: True. I'll
 6      respond to that.
 7  Q.  Okay. When it comes time to present
 8      your case to the jury, what are you
 9      going to tell the jury your damages
10      are in this case?
11  A.  Well, my damages?
12  Q.  Uh-huh.
13  A.  Compensatory damages.
14  Q.  Okay. And how much are you planning
15      to claim in compensatory damages?
16  A.  I'll go back -- I'm going to have to
17      go back and pull my files together,
18      what I can salvage or whatever. But I
19      gave you a good ballpark figure
20      earlier.
21  Q.  If you would, repeat it for me. What
22      was that ballpark?
23  A.  Basically, one-fourth --
```

228

```
 1  Q.  One-fourth?
 2  A.  One-fourth of the -- the contract
 3      amount that we discussed earlier.
 4  Q.  Okay. You made a statement earlier
 5      today when Mr. Lyles was asking you
 6      questions. You said that it is common
 7      knowledge that there's no difference
 8      in the products, meaning the products,
 9      Sentricon and Outpost. Where would
10      one come across this common knowledge?
11  A.  You can talk to anybody in the
12      industry that's in pest control --
13      that has experience in the industry.
14      You can talk to entomologists across
15      -- across the country. I mean, it's
16      common knowledge.
17  Q.  Then I guess I need a definition of
18      what's common knowledge to you.
19  A.  Common knowledge in the industry.
20  Q.  Okay.
21  A.  Right. And based on all the
22      information that State Purchasing had
23      before them when they made a decision;
```

57 (Pages 225 to 228)

229

1    it's common knowledge.
2  Q.   Now, you're aware that my clients are
3    not entomologists; correct?
4  A.   I understand that.
5  Q.   And you're also aware my clients are
6    not chemists.
7  A.   I understand that.
8  Q.   Do you understand that my clients
9    aren't in any way trained in pest
10    control; is that --
11  A.   That's correct.
12  Q.   So when you say "common knowledge,"
13    you don't mean it would be common
14    knowledge to my clients, do you?
15  A.   No. I'm saying it's common knowledge
16    in the industry.
17  Q.   Okay.
18  A.   Once you're the Purchasing Director
19    who has -- supposed to have a
20    background as far as weighing
21    information that he has in front of
22    him, has scientific data showing that
23    the products are comparable.

230

1          The questions bears, how
2    can you make a decision to make
3    Sentricon the sole-source product?
4          It did not even follow in
5    compliance of what their policy of
6    Transportation. You got to have
7    documentation to back up a
8    sole-source. That documentation
9    doesn't exist outside of Mr. Hornsby.
10    And, basically, they based it on what
11    Mr. Hornsby referred to. I guess he's
12    an expert, but he's not an
13    entomologist.
14      MR. LONG: Let's take a
15        five-minute break.
16      (Brief recess was taken at
17        4:16 p.m., and deposition
18        testimony reconvened at
19        4:23 p.m.)
20  Q.   Do you agree that some people would
21    consider Sentricon a superior product
22    over Outpost? I'm not asking if you
23    do, I'm just saying some people would

231

1    consider --
2  A.   People associated with the product,
3    yeah.
4      MR. LONG: Okay. I have no
5        further questions.
6      (Off-the-record discussion.)
7
8      MR. LONG: We want to make
9        certain that the exhibits
10        10 through 14 are
11        introduced.
12      MR. DUNCAN: I'll get with her
13        to get the exhibits;
14        correct?
15      MR. LONG: Right. When you
16        get a copy of the
17        deposition from her,
18        she'll give you a copy of
19        the exhibits.
20
21    (The deposition of CURTIS DUNCAN
22    concluded at approximately 4:25 p.m.
23    on April 11, 2006.)

232

1      * * * * * * * *
2      REPORTER'S CERTIFICATE
3      * * * * * * * *
4
5    STATE OF ALABAMA
6    COUNTY OF AUTAUGA
7
8      I, Mishan Williamson,
9    Certified Shorthand Reporter and
10    Notary Public in and for the State of
11    Alabama at Large, do hereby
12  A.   Uh-huh.
13  Q.   Certify that on April 11, 2006,
14    pursuant to notice and stipulation on
15    behalf of the Defendants, I reported
16    the deposition of CURTIS DUNCAN, who
17    was first duly sworn by me to speak
18    the truth, the whole truth, and
19    nothing but the truth, in the matter
20    of C & J ASSOCIATES PEST CONTROL,
21    Plaintiff, versus RAYBURN HORNSBY, et
22    al., Defendant, Civil Action Number
23    2:05-CV-557-WHA-DRB, now pending in

CURTIS  DUNCAN - 4/11/2006

233

1      the United States District Court for
2      the Middle District of Alabama; that
3      the foregoing 231 typewritten pages
4      contains a true and accurate
5      transcription of the examination of
6      said witness by counsel for the
7      parties set out herein; that the
8      reading and signing of said deposition
9      was waived by witness and counsel for
10      the parties.
11
12         I further certify that I am
13      neither of kin nor of counsel to the
14      parties to said cause, nor in any
15      manner interested in the results
16      thereof.
17
18         This 28th day of April, 2006
19
20
21
22      Mishan Williamson, CSR
          and Notary Public
23      State of Alabama at Large