IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

C&J ASSOCIATES PEST CONTROL, *et al.*,    )
                                          )
    Plaintiffs,                           )
                                          )
v.                                        )
                                          )    CASE NO. 2:05-cv-557-WHA
RAYBURN HORNSBY, *et al.*,                )
                                          )
    Defendants.                           )

STATE OF ALABAMA            )
                            )
COUNTY OF MONTGOMERY        )

### AFFIDAVIT OF STAN CARLTON

Before me, the undersigned Notary Public, personally appeared **Stanford Duane Carlton**, who is

known to me, and who being first duly sworn by me, deposes and states as follows:

"My name is Stanford Duane "Stan" Carlton. I am a resident of Montgomery County, Alabama,

am over the age of 19 years, and am competent to testify as to the matters contained in this affidavit. I

have been employed by the State of Alabama since January 1994. I was first employed as a Personnel

Assistant I. I was appointed a Procurement Officer I in July 1994 and then promoted to Procurement

Officer II in July 1999. A description of my duties is attached hereto as 'Attachment A.' Attachment A

describes my duties since being promoted to Procurement Officer II in 1999.

"As noted in Attachment A, at paragraphs 1,3,4,5, I have certain responsibilities upon receiving

requisitions such as the one received from Mr. Hornsby and Mr. Harris. Upon receipt of such a request, I

am obligated to review the requisition, quotes, and specifications for accuracy and completeness.

Additionally, I answer requests for advice, assistance, and information. I also *write* and/or *revise*

(emphasis added) specifications to ensure that ALDOT receives the best quality product and/or service at

a reasonable price. Included in my duties are the review of the bid file and the *making of*

*recommendations.* I performed the above-described duties in this case particularly with regard to the bid

files relating to ITB ('Invitation to Bid') numbers 2130153 and 2132146. Contrary to the assertions of



DEFENDANT'S
EXHIBIT
ALDOT 14

Mr. Duncan, the specifications contained in the subject ITB were written by me, as the result of my investigation and research.

"Paragraph 12 of Plaintiffs' Complaint appears to discuss two invitations to bid. The first, ITB 2130174, is one that relates to pest control services for the Alabama Department of Corrections. The second, ITB 213074, is either an error or misprint. ITB numbers contain seven digits. The number '213074' contains only six digits and is not a valid ITB number.

"The invitations to bid that relate to pest control service for the Department of Transportation, and are pertinent to this lawsuit, are those that are numbered 03-X-2130153 and 03-X-2132146.

"The bids resulting from ITB 2130153 were opened on March 27, 2003. The bid from Cook's Pest Control was initially accepted. The bid from C & J Pest Control failed to meet specifications as set forth in my memo to Pat Antle of April 21, 2003. (See 'Attachment B': Memo of April 21, 2003.) Subsequent to my memorandum to Ms. Antle, she realized that the pricing had been bid incorrectly by both Cook's Pest Control and Terminix. After correcting the pricing structure, Ms. Antle re-bid the contract. The ITB issued pursuant to this decision to re-bid the contract was number 03-X-2132146.

"Prior to the issuance of the second ITB mentioned above, I researched other information regarding available termidicides. As part of this research, I reviewed a paper from the University of Florida entitled, *Termite Baits* (see 'Attachment C'), a paper from the University of Kentucky entitled, *Consumer Update: Termite Baits* (see 'Attachment D'), product literature from Dow AgroSciences [the makers of Sentricon] (see 'Attachment E'), and environmental evaluations located at www.scorecard.org. I also reviewed my notes from an Examiners of Public Accounts publication entitled, *Alabama Competitive Bid Laws* (see 'Attachment F').

"The reviewed materials indicated that Sentricon was the only available termidicide which: (1) offered total colony elimination, (2) was recommended as a 'stand-alone' product, and (3) offered complete termite elimination without invasive treatment protocols as required for liquids, gels, and foams.

"The basis for my selection of the Sentricon product was the feature of total colony elimination, the fact that it was a stand-alone product, its non-intrusive delivery system, and its apparent



2

environmental friendliness. My selection of the Sentricon product was neither arbitrary nor capricious, nor was it based upon Mr. Duncan's race.

"At the time I drafted the specifications in question, I had no knowledge of any vendor's ethnicity.

"The Sentricon vendor listing for the dealers in Defendants' Hornsby and Harris' area does not reflect the race of the dealers or their employees (see 'Attachment G'). Product licensing is administered by DowAgro, not by ALDOT. Mr. Duncan had the same opportunity to apply for a Sentricon dealership as any other licensed operator. The contract specifications eliminated all pest control operators who were not Sentricon Authorized operators, regardless of their race."

_____
Stan Carlton

SWORN TO AND SUBSCRIBED before me on this 28ᵗʰ day of July, 2006.

_____
Notary Public, State at Large
My Commission Expires: 9/18/2006



b. Duty Statement:    (*Complete Column "C" first*).
● In column A, indicate PERCENTAGE of time spent on each duty (total should not exceed 100%).
● In column B, rate the duties as to their IMPORTANCE. **VI**-Very Important **I**-Important **SI**-Somewhat Important
● In column C, describe in detail each of the position's PERMANENT duties and responsibilities using your OWN
words.

| A % | B rating | C Description of Duties |
|---|---|---|
| 20 | VI | 1. Review requisitions, quotes and specifications for accuracy and completeness, and monitor through approval process so that purchase orders are issued expediently and correctly. |
| 15 | VI | 2. Approve and/or process emergency equisitions for purchases and repairs in accordance with all laws and regulations so that work is expedited and the safety and welfare of employees and the traveling public is assured. |
| 15 | VI | 3. Answer requests for advice, assistance and information concerning the procurement process, procedures and legalities so that purchases are expedited and accomplished in accordance with all legal and regulatory guidelines. |
| 15 | VI | 4. Write or revise specifications as needed for equipment, supplies and services, so that the department receives the best quality product and/or service at a reasonable price in accordance with applicable laws and regulations. |
| 15 | VI | 5. Review bid files and make purchase recommendations so that commodities, products, equipment and services are purchased from the lowest responsive bidder, in accordance with state laws and purchasing regulations. |
| 5 | I | 6. Enter requisitions into computer system so that emergency requisitions are approved, bureau products and equipment are procured and assistance provided to bureaus and divisions as needed. |
| 5 | I | 7. Train departmental employees in all aspects of requisitioning process so that each division and bureau has competent personnel to enter requisitions. |
| 10 | I | 8. Manage personnel resources of Procurement Bureau including recruitment, hiring, training, work assignments, evaluations, and discipline so that work is completed effectively and efficiently in accordance with all applicable personnel laws, regulations and policies. |
| | | **ATTACHMENT A** |

(Attach additional sheets if necessary)

④



# ALABAMA DEPARTMENT OF TRANSPORTATION
1409 Coliseum Boulevard, Montgomery, Alabama 36130-3050



Bob Riley
Governor

Joe McInnes
Transportation Director

April 21, 2003

TO:     Pat Antle
        Division of Purchasing

FROM:   Stan Carlton
        Procurement Bureau

RE:     ITB #:  03-X-2130153             _TA464_
        SNAP #: 1268327
        Agency Req. #:  101-310431 / 1264823


        We have evaluated the attached bid file as requested and recommend-
dation is attached. I concur in the Division's review of the bid file and the
conclusions they have reached. Please see product documentation attached.

        The low bid was submitted by **C & J Associates**,  of Montgomery, AL in
the sum calculated price of $13,299.84. An evaluation of the vendor's product
indicates that this bidder does not meet published specifications. The **Outpost
TBR** product bid by this vendor does not offer total colony elimination as does
the specified **Sentricon** system. Furthermore, the primary active ingredient in
**Outpost TBR** is listed by the EPA for environmental toxicity. And, upon request
during the evaluation process, this vendor failed to provide documentation of
the required damage protection warranty. Therefore, this bid is rejected.

        The second low bid was submitted by **Cook's Pest Control, Inc.**, of
Albertville, AL, in the total calculated bid price of $23,515.20. This vendor bid
the specified product, including a warranty for damage repair of future structure
damage. We hereby recommend award as indicated.

        Thank you for your assistance.



ATTACHMENT B

Whole Document Navigator (Click Here)





UNIVERSITY OF
**FLORIDA**
IFAS EXTENSION





# Termite Baits[1]

B. J. Cabrera, N.-Y. Su, R. H. Scheffrahn, and P. G. Koehler.[2]

## Introduction

Up until the early 1990s, liquid termiticides were the main treatments for subterranean termite infestations. However, the development of termite baits gave homeowners another option for controlling subterranean termites. Baits are now widely used and offer an alternative for those who may not want liquid treatments applied to the soil around their homes.

## Know the Enemy: Termites

Before we start, some background on termites and termite behavior will help you understand how baits work.

### What Are Termites?

Termites are small insects that eat wood and live in colonies. The colony is headed by a king and queen who mate and produce more termites. Soldier termites defend the colony against invaders and predators. Worker termites search for food and are responsible for feeding and taking care of the king and queen, the young (larvae), and the soldiers. Termites have microscopic organisms (called protozoa) living in their digestive tract that help them to digest wood. Termites are very important in nature because they break down wood and return nutrients to the soil. They become a problem only when they attack our homes and structures.



Figure 1. Some members of a termite colony: Reproductives (king and queen), Soldier, Immature (larva), and Worker. (Drawing adapted from Su & Scheffrahn, 2000. Formosan subterranean termite. *In*: Featured Creatures. http://creatures.ifas.ufl.edu).

**ATTACHMENT C**



### Termite Behavior

Termites are highly social insects. Within the colony hundreds, thousands, and sometimes millions of termites work and live together. They feed and clean each other and exchange liquid chemical signals as part of their communication. They also share droplets of fluid to keep themselves supplied with the tiny organisms needed for digesting wood. You will learn that termites feeding on a bait will share it with their nestmates and end up destroying their own colony.

### Different Kinds of Termites

There are two main termites in Florida that infest structures - subterranean and drywood. Subterranean termites usually live underground where they tunnel in the soil in search of wood. When searching and feeding above ground they build mud shelter tubes. Subterranean termites also cover the wood they infest with mud and use carton - a substance made from their droppings - as nest material.

Drywood termites live completely inside dead wood and never tunnel in the soil. They produce dry, gritty fecal pellets that are often found scattered or in piles near the wood they infest.

Correct identification of the termites infesting a structure is extremely important because baits only work against subterranean termites.

## What is a Termite Bait?

A termite bait is usually a paper-, cardboard-, or sawdust-like material containing the active ingredient (or AI) that kills termites. The bait is kept inside a plastic bait station. As termites feed on the bait, the termite-killing AI gets into their bodies. The AI is spread through the colony as the termites feed each other. As more workers feed on the bait, more AI gets into the colony. Eventually the amount of AI in each termite increases until it kills them and the colony dies or is reduced.

### Bait Stations

There are two types of bait stations: above-ground and in-ground. Above-ground stations are installed directly over shelter tubes or infested wood so that termites can begin to feed immediately on the bait.



Figure 2. Above-ground bait station installed directly on an active termite shelter tube.

In-ground stations are placed in the soil. Most stations are cylindrical tubes with disk tops. The disks makes the stations easier to find and keeps them from sinking into the ground. The tubes



have numerous holes or slits through which termites enter to get to the wood and bait inside.



Figure 3. Typical in-ground station. Some bait products do not use pieces of wood for monitoring.

### What Makes a Good Bait?

Obviously, a good bait kills termites. It should also taste good so termites will eat plenty of it. Remember, the more bait that is eaten, the more AI gets into the termites and is shared with the colony. Effective baits should also have these qualities:

- The AI should work slowly. If not, the termites will die before they can feed it to others.

- The AI should not make the termites sick or act abnormally soon after they start eating the bait. Abnormal termites are often avoided or cast out of the colony by their nestmates. This would prevent them from spreading the AI to others.

- They should not easily mold or decay. Termites will not eat spoiled bait.

## How Do Baits Kill Termites?

The active ingredient is what actually kills termites. Currently there are two types of AIs used in termite baits: stomach poisons and insect growth regulators. The two stomach poisons currently used in baits are sulfluramid (sul-flu-ra-mid) and hydramethylnon (hy-dra-meth-il-non). Insect growth regulators are compounds that act like the natural hormones that control development. They prevent termites from forming normal cuticle (skin) during the growth process known as molting. Hexaflumuron (hex-a-flu-mu-ron) and diflubenzuron (di-flu-ben-zu-ron) are the growth regulators used in some baits.

## How Do Termites Find the Bait?

Termite baits do not lure or attract termites. Instead, termites must find the bait station as they tunnel blindly through the soil in search of food. Thus termite baiting is a "hit or miss" process. However, studies have shown that subterranean termites dig a network of branching tunnels. This allows termites to completely search a given area. Eventually, they find wood and other material to feed on. Termites can begin feeding once they find a bait station. When a station is "hit," bait is added for the termites to eat.

## What Is the Procedure for Baiting?

Baiting for subterranean termites is a relatively simple process. The pest management professional (PMP) installs stations containing small pieces of wood or similar material in the



ground around the base of the home. These are spaced from 6 to 20 feet apart. Stations may also be placed in areas where termites are likely to be such as near tree stumps, wood used in landscaping, and in planting beds. Multiple stations are used to increase the chances that termites will find them.



Figure 4. Bait stations in the ground around a home.

Once installed, the PMP comes on regular visits to check the stations for termites. If termites are found, a bait is placed inside for the termites to feed on. The PMP returns periodically to inspect and to add or replace baits as needed. Baiting is stopped when termites are no longer found in the stations. At this point, the colony is considered to be reduced or eliminated. Monitoring continues in case termites return.



Figure 5. General procedure for baiting: A.) holes made for the stations B.) stations are installed C.) stations checked periodically for termites D.) bait added when termites appear and as needed until termites disappear from all stations.

## Advantages/Disadvantages of Baits

Baits have many advantages over liquid termiticides. However, they have some limitations. Here are some points to consider when trying to decide between using baits or termiticides:

**Advantages**

- very small amount of AI per treatment (less than an ounce)

- baits are inside bait station, hard for children or pets to get to them

- AI does not get into soil or water

- no odor

- no large holes drilled through walls or floors

- no chemicals left in soil after treatment is finished

- colony is completely eliminated in many cases

**Disadvantages**

- several weeks to several months needed to take effect, sometimes more than a year

- works only if termites find and eat the bait

- no chemical residues left after treatment to protect from further infestations

- can be more expensive than liquid termiticides

# What Bait Products Are Available Now?

Currently there are six different subterranean termite bait systems available for commercial use. Several others are in development and should be on the market within the next few years. Below are brief descriptions of the baits now being used:

## Sentricon®

This was the first termite bait available for commercial use. It is marketed by Dow AgroSciences as the Sentricon® Colony Elimination System. Stations containing wood or wood-like monitoring pieces are installed in the ground. When termites appear, the pieces are replaced with Recruit$^{TM}$ bait. For infestations in structures, above-ground stations baited with Recruit AG$^{TM}$ are used. The active ingredient in Sentricon® is hexaflumuron.

Sentricon® is the only bait product labeled for stand-alone pre-treatment of structures. This means it can be used as a preventive (pre-construction) treatment without using a liquid termiticide.

## Outpost$^{TM}$

Bayer features the Outpost$^{TM}$ Termite Detection System and Outpost Termite Bait Response. These are part of Bayer's Home Health$^{TM}$ program which combines liquid, dust, foam, and gel termiticides with baiting for treating subterranean termite infestations. The bait is a powder (made of alpha-cellulose) containing diflubenzuron as the AI.

## Exterra$^{TM}$

The Exterra Termite Interception and Baiting System is made by Ensystex. The active ingredient in their Labyrinth$^{TM}$ bait is diflubenzuron.

One big difference between the design of Exterra's Quarterra bait station and its competitors is the Quarterra station holds wood monitoring pieces and bait at the same time. The wood fits into slots in the inside wall of the station leaving the center of the station empty. When termites appear, the shredded paper-like bait is placed in this open space. The wood is left in place so the termites can continue feeding without interruption. This is a useful feature because sometimes termites will abandon a station if they are disturbed. Because of this design, the Exterra station has a larger diameter (about four inches) than competing brands



(two to two-and-a-half inches). Above-ground stations are also available for direct application to termite-infested areas in or on a structure.

Exterra also makes bait bags. These are used in hard to reach areas or places where plastic stations will not fit.

### FirstLine®

Baiting is one part of FMC's FirstLine® Termite Defense System. For infestations in or on a structure, a localized treatment with liquid termiticide or above-ground FirstLine® Termite Bait stations is used. Around the structure, SMARTDISC$^{TM}$ Locators and monitoring stations are placed in the ground to detect termites. If they are found, the monitoring station is replaced with a FirstLine® GT Plus Termite Bait station. The bait is corrugated cardboard that contains sulfluramid as the active ingredient. FMC also makes the Defender$^{TM}$ unit. This is a large bait station (about six inches in diameter) that can hold any combination of four wood monitor pieces and bait tubes.

### Terminate$^{TM}$

This is a bait product made by Spectracide that homeowners install and monitor themselves. The other five termite bait products can only be applied by licensed pest control operators. The Terminate$^{TM}$ bait stations are smaller than professional brands and lack a disk top. The AI is sulfluramid.

Spectracide does not guarantee termite control when Terminate is used by itself. According to the label, a liquid termiticide must be used with the bait for complete control.

Buying and using do-it-yourself termite bait products generally **IS NOT RECOMMENDED**. Effective termite baiting requires training, experience, and an understanding of termite biology and behavior.

### Subterfuge®

This product is manufactured by BASF Corporation. One difference between the Subterfuge® bait system and the others is no wood or cardboard monitor is used. Baits are added when stations are first placed in the ground. This way, termites can begin feeding on the AI as soon as they find the bait. BASF does not make an in-ground station but any approved commercially-available station that the bait cartridge will fit in can be used. The bait is a dry material that looks like fine, shredded sawdust. The AI is hydramethylnon.

## Is Baiting More or Less Expensive than Using Termiticides?

Generally, termite baiting is more expensive. The price of a bait treatment includes an installation fee, sometimes the cost of the bait and stations, plus the service of having the pest management professional (PMP) perform routine inspection of the bait stations both during and after baiting. A liquid termiticide treatment generally costs less because it usually is done in a single visit.

## So What's Better, Baits or Liquid Termiticides?



This is the most common question asked by homeowners. Unfortunately, there isn't a simple answer. Baiting and liquid termiticides both have certain advantages and disadvantages. One may be more practical than the other in some situations (for example, liquid termiticides are necessary when immediate control is needed for real estate transactions). Two big factors to consider when choosing between the two are cost and time. Baiting can be more expensive and take longer for control, but it is closely watched by the pest management company. Baits also may eliminate the colony. Personal feelings toward insecticides may also be a factor. Baits would be ideal for those who do not want liquid pesticides used around their home (see the last section of EDIS publication ENY-210 "Subterranean Termites" http://edis.ifas.ufl.edu/IG097 for additional information on whether to use baits).

## Tables

Table 1. Subterranean Termite Baiting Systems Now Available

| Product | Company | Active Ingredient | How It Kills Termites | Use | Above-ground Stations | Can Be Used Without Liquid Termiticide |
|---|---|---|---|---|---|---|
| Exterra | Ensystex | Diflubenzuron | Prevents formation of cuticle | Professional | Yes | Yes |
| First Line® | FMC® | Sulfluramid | Stomach Poison | Professional | Yes | Yes |
| Outpost™ | Bayer | Diflubenzuron | Prevents formation of cuticle | Professional | No | Yes* |
| Sentricon® | Dow AgroSciences | Hexaflumuron | Prevents formation of cuticle | Professional | Yes | Yes |
| Subterfuge® | BASF | Hydramethylnon | Stomach Poison | Professional | No | Yes |
| Terminate™ | Spectracide | Sulfluramid | Stomach Poison | Homeowner | No | No |
| * Bayer recommends using Outpost with their other termite control products. | | | | | | |

## Footnotes

1. This document is ENY-2001, one of a series of the Entomology and Nematology Department, Florida Cooperative Extension Service, Institute of Food and Agricultural Sciences, University of Florida. Publication date: July 1998. First revision: February 2002. All graphics by B. Cabrera except Figure 1 by J. Perrier, Ft. Lauderdale-REC. Formosan Subterranean Termite, ENY-216. Please visit the EDIS Web site at http://edis.ifas.ufl.edu. Additional information on these organisms, including many color photographs, is available at the Entomology and Nematology Department Web site located at http://entnemdept.ifas.ufl.edu/



2. B. J. Cabrera, assistant professor, Ft. Lauderdale-REC, N.-Y. Su, professor, Ft. Lauderdale-REC, R. H. Scheffrahn, professor, Ft. Lauderdale-REC, P. G. Koehler, professor/Extension entomologist; Entomology and Nematology Department, Cooperative Extension Service, Institute of Food and Agricultural Sciences, University of Florida, Gainesville, 32611.

---

The Institute of Food and Agricultural Sciences (IFAS) is an Equal Opportunity Institution authorized to provide research, educational information and other services only to individuals and institutions that function with non-discrimination with respect to race, creed, color, religion, age, disability, sex, sexual orientation, marital status, national origin, political opinions or affiliations. For more information on obtaining other extension publications, contact your county Cooperative Extension service.

U.S. Department of Agriculture, Cooperative Extension Service, University of Florida, IFAS, Florida A. & M. University Cooperative Extension Program, and Boards of County Commissioners Cooperating. Larry Arrington, Dean.

---

## Copyright Information

This document is copyrighted by the University of Florida, Institute of Food and Agricultural Sciences (UF/IFAS) for the people of the State of Florida. UF/IFAS retains all rights under all conventions, but permits free reproduction by all agents and offices of the Cooperative Extension Service and the people of the State of Florida. Permission is granted to others to use these materials in part or in full for educational purposes, provided that full credit is given to the UF/IFAS, citing the publication, its source, and date of publication.





# University of Kentucky Entomology

 Field Crops

 Fruit

 Vegetables

 Home and Health

 Livestock

 Land- scape Plants

 Misc.

 Search

 List of All Entfacts

 #5

# CONSUMER UPDATE: TERMITE BAITS

**by Michael F. Potter, Extension Entomologist**

**University of Kentucky College of Agriculture**

A growing number of pest control firms are now using termite baits as an alternative form of treatment. As more companies offer this option, homeowners will be seeking information and advice as to which approach— bait or conventional 'barrier' treatment— is most effective. Additional questions will be raised about the new "do-it-yourself" termite bait being sold through retail outlets. This publication provides an update on termite baits for consumers.

For years, the standard method of controlling subterranean termites was to apply a liquid pesticide (termiticide) to the soil. The goal was to block all potential routes of termite entry into the structure. Termites attempting to penetrate the treated soil were either killed or repelled. While the majority of liquid barrier treatments are successful, at times they have failed to provide adequate protection.

There are, in fact, many obstacles to achieving a continuous termiticide barrier around and beneath a building. It is hard to uniformly wet soil, and many potential termite entry points are hidden behind walls, floor coverings, and other obstructions. Termites can tunnel through small untreated gaps as narrow as pencil lead, so it is understandable that conventional liquid treatments sometimes fail to correct a termite problem.

**The Bait Concept**

Termite baiting is an entirely different concept. With this approach, tiny amounts of insecticide are deployed like edible "smart missiles" to knock out populations of termites foraging in and around the structure. Foraging termites consume the bait and share it with their nest mates, resulting in a gradual decline in termite numbers. Some baits may even eradicate entire termite colonies. A comprehensive baiting program then seeks to maintain a termite-free condition on the customer's property through ongoing monitoring and rebaiting as needed.

The baits consist of paper, cardboard, or other "termite-friendly" food, combined with a slow-acting ingredient lethal to termites. The bait-toxicant combo must be slow acting in order to maximize distribution among the termite population, which may contain hundreds of thousands of individuals. Some bait stations are installed below ground out in the yard, while others are

 (14)

**ATTACHMENT D**

placed within the structure in the vicinity of active termite mud tubes. Because paper and cardboard decompose rather rapidly in soil, most below-ground installations initially utilize untreated wood stakes or monitors. Once termites are detected in the monitors, the toxicant-laced paper or cardboard baits are added. On some properties, termite baits may constitute the only form of treatment. In other cases, the baits may be supplemented with a partial or complete barrier application.

## The Products

There currently are four bait products on the market. Three are sold by professional pest control firms, while one is marketed directly to homeowners.

*Sentricon* - The most widely used termite bait is the Sentricon Colony Elimination System. Despite only being marketed for three years, hundreds of thousands of structures have already been baited with Sentricon, including thousands here in Kentucky. The product has been installed on such national treasures as the Statue of Liberty and the White House. While there is still much to learn about Sentricon, dozens of independent research trials have confirmed its effectiveness when properly installed and diligently serviced by an authorized pest control firm. A detailed description of this baiting system can be found in our entomology extension publication ENT-65, Termite Baits: A Guide for Homeowners.

*FirstLine*- Some pest control firms are using this product as an alternative to Sentricon. Most are using the bait in combination with other forms of treatment, rather than as a "stand alone," as is often done with Sentricon. Research trials with Firstline have been inconclusive, and it has been difficult to determine what impact the bait, alone, is having on active termite infestations. As with all of the baits, the manufacturer is continuing to modify the product in hopes of optimizing performance (for more on FirstLine, see ENT-65).

*Exterra*- The newest bait on the market is the Exterra Termite Interception and Baiting System. This product was introduced late last year and is now being installed by a small, but growing, number of pest control firms. As with Sentricon, Exterra is often used as a stand-alone treatment. Both products kill by disrupting the molting process in termites. In terms of appearance, Exterra's in-ground plastic stations are brown and box-shaped (Sentricon's are green and cylindrical), and the untreated wood monitors are flat and affixed to each of the four sides of the station. When termites are found feeding on the wood monitors, the bait— consisting of loosely wadded, shredded paper toweling— is stuffed into the center of the station without removing the monitors. This feature is intended to reduce disturbance to termites already present.

It's too early to know how well Exterra will perform. Preliminary reports from some areas of the country have been encouraging, but there have been few such studies performed in Kentucky.

*Spectracide Terminate*- This do-it-yourself termite bait is discussed at length in our entomology extension publication Entfact-642: Do-It-Yourself Termite



Baits: Do They Work? Late last year, the Federal Trade Commission (FTC) and eight state Attorneys General (including Kentucky) filed a complaint in U.S. District Court alleging that the advertising claims about the product are deceptive and unsubstantiated. As part of a recent (3/18/99) settlement agreement, the manufacturer will be permitted to sell Terminate in 1999, but with substantial modifications in their advertising claims. Notably, they will no longer be able to state that use of the product *alone* is effective in preventing or eliminating termite infestation or damage to homes. The manufacturer can advertise that the product "kills termites," but they must also state that Terminate is not recommended as sole protection against termites, and for active infestations, homeowners should get a professional inspection. For these and other reasons discussed in Entfact-642, we remain cautious about recommending the product, especially to homeowners with an existing termite problem.

**To Bait or Not to Bait...**

The most common question I receive from homeowners is: "Which form of treatment — baits or barriers — is more effective, and which would you choose if it were your home?" The question is a difficult one with no "pat" answer. Factors to consider in the decision are discussed at length in extension publication ENT-65, Termite Baits: A Guide for Homeowners. Clients considering a bait treatment are usually relieved to learn that their carpeting won't have to be pulled back, their floors automatically drilled or their stored items moved. No drilling, no noise, no dust, and no pesticide in the house are other often-cited advantages of termite baits.

Furthermore, some structures have construction features that make it difficult or impossible to treat with conventional methods (e.g., wells, cisterns, drainage systems, sub-slab heating ducts, inaccessible crawl spaces). Buildings with hard-to-treat construction elements are logical candidates for baits, since foraging termites are as likely to encounter bait stations installed around the foundation exterior as beneath the structure. Since baits are non-volatile, non-leachable solids, they can be used in the most sensitive treatment situations.

The biggest complaint, common to all of the current systems, is that baiting is a slow, prolonged process. Several months may pass before the termites find the untreated, below ground monitoring stations and begin to feed on the bait. Consequently, it is not uncommon for the elimination procedure to take more than a full year to complete. Although usually minimal, some degree of termite feeding and damage may occur before the slow-acting bait takes effect.

Baiting programs often are more expensive than conventional treatments. This is because the process requires multiple visits to the structure to monitor for termites, and to add or replenish baits as needed. Homeowners should consider both the initial treatment price and the annual renewal fee in making their purchasing decision. **Failure to maintain their annual service agreement is a prescription for disaster with baits, since there is no residual pesticide left in the soil after the termites have been eliminated.** Ongoing structural protection depends upon diligent monitoring for new evidence of termites in the future.



So.... if the homeowner (1) has limited income, (2) straightforward construction, (3) is amenable to having their wall-to-wall carpeting pulled back and their basement/slab floor, patio, porch, etc. drilled, and (4) is offered a renewable service agreement (guarantee) by the pest control company, a conventional 'barrier-type' treatment may be desirable. If one or more of these criteria cannot be met, the situation may warrant a bait job — but, ultimately, the customer must make the decision.

In closing, termite prevention and control is a very complex topic. Further information is provided in University of Kentucky entomology extension publications, Entfact-604: Termite Control: Answers for the Homeowner, Entfact-605: Protecting Your Home Against Termites, ENT-65: Termite Baits: A Guide for Homeowners, and Entfact-642: Do-It-Yourself Termite Baits: Do They Work?

For further information about the termite bait products mentioned in this publication, contact the manufacturer, your local termite control professional, the Kentucky Department of Agriculture (or state or other regulatory agency responsible for termiticide usage in your area), or your county Cooperative Extension office.

*CAUTION! Pesticide recommendations in this publication are registered for use in Kentucky, USA **ONLY***! *The use of some products may not be legal in your state or country. Please check with your local county agent or regulatory official before using any pesticide mentioned in this publication.*

*Of course, **ALWAYS READ AND FOLLOW LABEL DIRECTIONS FOR SAFE USE OF ANY PESTICIDE!***

[Field Crop Pests] [Fruit Pests] [Vegetable Pests][Pests Affecting Home and Health] [Livestock Pests][Landscape Pests] [Miscellaneous Factsheets] [Search Our Site][Complete List of Factsheets][Home]

*Issued: 4/99 Revised: 4/99*



## COOPERATIVE  EXTENSION  SERVICE

UNIVERSITY OF KENTUCKY, KENTUCKY STATE UNIVERSITY, US DEPARTMENT OF AGRICULTURE, AND KENTUCKY COUNTIES, COOPERATING

Educational programs of the Kentucky Cooperative Service serve all people regardless of race, color, age, sex, religion, disability, or national origin.



**Dow AgroSciences**



**Sentricon**
Colony Elimination System



## Termite Colony Elimination
Media/News Center

## Not All Termite Treatments Are Created Equal
### *Sentricon Breaks the Mold by Eliminating the Termite Colony*

**Q&A**
Since 1995, hundreds of thousands of property owners have chosen the Sentricon® *Termite Colony Elimination System* as their termite treatment of choice. It is currently protecting many of our national treasures, including the White House, the Statue of Liberty and Independence Hall. It's the best possible way to protect a home from subterranean termites.

The answers to the following questions demonstrate why the Sentricon System surpasses other termite baits and older technology such as basic liquid termiticide treatments.

**CONTACT:**
Jenifer McGill
jmcgill@bader-rutter.com

262-784-7200

**Help! I've Got Termites!**
Enter ZIP code.

| Go |

**OVERVIEW SECTION**

Sentricon News
News Archives
Success Stories
Online Media Kit
Slides With Captions

**ATTACHMENT E**

**The Sentricon System vs. Other Termite Baits**
**Q. What's the difference between termite baits? Aren't they all pretty much the same?**
**A.** No, not at all. Even products within the same class of chemistry have different effects on a termite colony. The active ingredient in the Sentricon System – hexaflumuron – affects termites slowly, allowing them to recruit their nestmates to feed on the bait, ultimately causing termite colony elimination. With most other termite baits, the active ingredients may cause termites to die or become ill near the bait station. In these cases, termite nestmates tend to avoid the baited area, reducing the effectiveness of the bait on the colony. Many pest management professionals use a basic liquid termiticide treatment along with these baits.

In addition, the Sentricon System is not just a termite bait, it's a complete system designed to protect homes. Authorized Operators for the Sentricon System can use an unlimited number of system components – at no extra charge – so homeowners can be sure their property is protected. Among these components is the Prolinx™ Information Management System – a customer data tracking tool which gives homeowners the added security of knowing the Sentricon System is being tracked by their Authorized Operator and periodically reviewed by the manufacturer, Dow AgroSciences LLC.

**Q. Does the Sentricon System eliminate the termite colony?**
**A.** Yes. The Sentricon System was designed to eliminate termite colonies and has proven its ability to do so in the United States and other countries.

**Q. Is there any independent research to back up the claims that this termite baiting system really works?**
**A.** The Sentricon System has been tested by 15 universities and the United States Department of Agriculture against all economically important subterranean termite species. More than 30 scientific papers have been published on the Sentricon System and/or its components.

**Q. Can the Sentricon System be used by itself or must a liquid termiticide be used with it?**
**A.** The Sentricon System is a stand-alone termite treatment, which means it does not have to be used with a liquid termiticide. Not all termite baits can be used alone.

**The Sentricon System vs. Liquid Termiticide Treatments**
**Q. Which is a better method to protect a property – a liquid termiticide treatment or the Sentricon System?**
**A.** The Sentricon System is the best option because it eliminates the termite colony. In addition, it provides long-term protection by detecting and eliminating new colonies that might invade the area. Old technology, such as basic liquid termiticide barrier treatments, has little or no effect on the termite population. While basic liquid treatments degrade over time, the Sentricon System is serviced routinely to ensure it remains effective. What's more, it is nearly impossible to complete a uniform barrier around a structure with a liquid termiticide. An opening



as small as 1/16 inch is like an open door to allow termites to enter the property. In addition, the Sentricon System is environmentally responsible, with its termite bait used only when it's needed, to treat termites only where they have been located by trained and authorized technicians.

**Q. How will a liquid termiticide treatment affect a property or lifestyle?**
**A.** Basic liquid barrier termiticide treatments require digging a trench around the foundation of the home and drilling holes approximately every 12 inches into the floor or foundation inside the property. Then, large volumes of a liquid chemical are injected into the soil to keep individual termites from gaining access to the structure. It kills or repels only the termites which come into contact with the barrier. This type of treatment typically causes significant disruption to the homeowner, plus his or her family and home. The Sentricon System eliminates termite colonies and provides protection for the home with less disruption than basic liquid termiticide treatments.

**Q. Is the Sentricon System more environmentally friendly than basic liquid termiticide treatments?**
**A.** The active ingredient in the Sentricon System – hexaflumuron – is delivered to termites through Recruit™ II and Recruit AG termite bait. It is used in very small quantities, only when and where it is needed. Hexaflumuron was the first product accepted under the Environmental Protection Agency's Reduced Risk Pesticide Initiative. In 2000, it became the first termite treatment product to receive the highly respected Presidential Green Chemistry Challenge Award from the EPA.

**Q. How much chemical is used in a liquid treatment compared to the Sentricon System?**
**A.** Liquid treatments may use more than 200 gallons of diluted chemical. The Sentricon System uses less than one ounce of termite bait, only when and where termites are present.

**Q. How will the property be monitored for the ongoing threat of termites if a homeowner were to consider a liquid termiticide treatment?**
**A.** Most companies will provide just one annual, visual inspection following a liquid treatment, or they may not inspect at all. However, Authorized Operators for the Sentricon System provide a service (at least several times per year) monitoring the Sentricon System for termites, baiting to eliminate termite colonies and then monitoring again for any new termite colonies that might invade the area.

Site Navigation:    | Sentricon Home: Media/News Center: Online Media Kit: Not All Termite Treatments Are Created Equal

(1998-2005) © Dow AgroSciences LLC
*®™ Trademark of Dow AgroSciences LLC

Privacy Statement | Internet Disclaimer



#3

# I.

## DISCUSSION OF COMPETITIVE BID LAW

Cited are cases dealing directly with the Alabama Competitive Bid Law. Perhaps the two most significant cases interpreting this law are the Alabama Supreme Court cases of *White v. McDonald Ford Tractor Co., Inc.*, 248 So. 2d 121 (1971) whose point of law was expounded and reiterated in the case of *International Telecommunications Systems v. State*, 359 So. 2d 364 (1978) culminating in the now famous *Mobile Dodge, Inc. v. Mobile County*, 442 So. 56 case of 1983.

The *McDonald* case, *supra*, is cited for it's ruling on the use of restrictive specifications in an invitation to bid. The Supreme Court noted the legislative intent in passing the Competitive Bid Law. The law's purpose is to get the best quality equipment at the lowest possible price, and the executive authorities should carry out this intent of the Legislature.

The proceeding in the *McDonald* case, *supra*, was brought by a tractor company against the state purchasing agent and others to enjoin the purchase of tractors by the state at a higher bid than had been submitted by petitioner. The lower court granted the injunction. On appeal the sole question was whether, under Alabama's Competitive Bid Law, specifications could be drawn to fit a particular article or piece of equipment which had been determined to be suitable for the needs and purposes required prior to the time the equipment is requisitioned. It seems that the state wrote their specifications around a particular Massey-Ferguson turf tractor after the Highway Department engineers determined that this type tractor was best suited for the purposes for which the tractors were required. The bid invitation also contained a clause which stated that the brand names and catalog numbers were only used to indicate a desired level of quality. It further allowed all bidders who submitted substitutes, other than the item specified, to include information showing that their substitute was of equal or better quality and equally or better suited for the purported use than the item specified by the awarding authority.

McDonald Ford was in fact the lowest bidder. However, they were not adjudged to be the lowest "responsible" bidder. The awarding authority deemed that the Ford tractor did not meet the desired specifications. McDonald Ford challenged the use of the Massey-Ferguson tractor as a model from which specifications were drawn. In this regard the court said:

> "We think that State authorities should have discretion in determining who is the lowest responsible bidder. This discretion should not be interfered with by any court unless it is exercised arbitrarily or capriciously, or unless it is based on a misconception of the law or upon ignorance through lack of inquiry or in violation of law or is the result of improper influence . . . The single most important requirement of the Competitive Bid Law is the good faith of the officials charged in executing the requirements of the law. A bad motive, fraud, or a gross abuse of discretion will vitiate an award whether made with specifications which are quite general or very precise."

28



ATTACHMENT F

The court also noted that in reaching its decision it did not mean to imply that a court would not have the authority to declare a contract as being void because the specifications were written in such a manner that full and fair competition would be excluded.

The effect of this decision is to uphold the principle of the use of restrictive specifications under certain circumstances. It is the interpretation of the Department of Examiners of Public Accounts that, although approved by the Supreme Court, such specifications were approved on the basis that they were justified in advance of the proposal to bid and, in fact, other bidders were allowed to submit bids together with their own specifications on the basis that the specifications drawn by the awarding authority were to indicate a level of quality only. The use of restrictive specifications without any justification in the purchase file and/or without any allowance in the invitation to bid for equipment of equal or better specifications to be considered should result in an exception by the Examiner.

During the October 1983-84 term, the Alabama Supreme Court decided the *Mobile Dodge* case in which it held that Mobile County did not violate the competitive bid law when a contract for the purchase of automobiles was given to another bidder even though Mobile Dodge submitted the lowest bid.

On September 14, 1982, the Mobile County Commission gave notice that it would receive bids per specifications on thirty-nine 1983 police package automobiles for the Mobile County Sheriff's Department. By stipulation of the parties, this litigation involves only the 36 units that were to be delivered between January 15 and February 1, 1983. The invitations to bid contained specifications calling for, among other things, heavy-duty full-length frames and front and rear coil-spring suspension systems. Both Mobile Dodge and Treadwell Ford submitted bids on the 36 units involved. Mobile Dodge submitted a bid of $289,199.89, and Treadwell Ford submitted a bid of $340,989.63. Although Mobile Dodge submitted the lowest bid of those responding, the contract was not awarded to the company because it had submitted its bid on police units having frames with unibody construction and torsion bar suspension systems, and those units were determined by county officials not to be suitable for the needs and purposes for which the units were required.

Upon the recommendation of Mobile County Sheriff Thomas J. Purvis, and over the objection of Mobile Dodge, the Mobile County Commission awarded the contract to Treadwell Ford, which had submitted the lowest responsible bid, its units having met the frame and suspension requirements, and otherwise conforming to the bid specifications.

On November 15, 1982, Mobile Dodge filed its petition for injunctive relief in the Circuit Court of Mobile County against Mobile County and Treadwell Ford, seeking to enjoin Mobile County from purchasing for the Sheriff's Department the 36 police package automobiles from Treadwell Ford.

In its complaint, Mobile Dodge alleged that it was the lowest responsible bidder, that the specifications were drawn so as to deliberately exclude Mobile Dodge as a competitor, and that Mobile County acted arbitrarily, capriciously, and in bad faith in awarding the contract to Treadwell Ford.

29



At trial, Mobile Dodge adduced evidence showing that the Mobile Police Department uses as patrol cars Dodge police packages having torsion bar suspension and unitized bodies, and is satisfied with their performance. Mobile County put on evidence, however, indicating that due to the unpaved roads and rougher terrain found in the rural areas of the county, over which the Sheriff's Department patrol cars routinely travel, having sturdier frames and more flexible suspension systems on its vehicles was a necessary and often critical consideration, especially when a vehicle is wrecked or involved in a collision. Based on the experience the Sheriff's Department had with vehicles with full-frame and coil-spring suspension systems, they proved more durable, cheaper to maintain, and longer lasting, and offered more protection to the patrolmen in the event of a collision.

The Alabama Supreme Court made the following findings:

1.   When purchases are required to be made through competitive bidding, awards shall be made to the lowest responsible bidder taking into consideration the qualities of the commodities proposed to be supplied, their conformity with specifications, the purposes for which required, the terms of delivery, transportation charges and the dates of delivery.

2.   State authorities should have discretion in determining who is the lowest bidder. This discretion should not be interfered with by any court unless it is exercised arbitrarily or capriciously, or unless it is based upon a misconception of the law or upon ignorance through lack of inquiry or in violation of law or is the result of improper influence.

3.   If specifications are intentionally drawn so as to exclude others in order to purchase from a favored bidder because of some bad or improper motive on the part of State officials, the practice cannot be condoned.

4.   Though bid specifications herein excluded all cars which did not have a full frame and which did not have coil-spring suspension on all four wheels, it cannot be said that Ford products were preferred when the specifications were drawn. It may be an unfortunate result that some cars are in fact excluded by this process but this does not make the process illegal.

The Court's decision ended with the following:

"While it is true that, due to the fact that all Chrysler products are manufactured with unitized bodies and torsion bar suspension system, Mobile Dodge is effectively excluded from bidding on patrol cars for the Mobile County Sheriff's Department, we cannot upon the record conclude that the specifications calling for full frames and coil spring suspension systems are unreasonable, impulsive, or irresponsible,

30



and thus arbitrary and capricious. *International Telecommunications Systems v. State, supra.* Nor are we able to find any evidence in the record that would support a conclusion contrary to the trial court's finding that the county officials engaged in a reasonable and rational process in selecting the requirements most suitable to meet their needs, and acted in good faith from proper motives, without any showing of a gross abuse of their discretion in awarding the contract to Treadwell Ford. Consequently, we conclude that the order of the trial judge is due to be affirmed. It is so ordered."

The decision in the *Mobile Dodge* case is equally applicable to the bidding of other biddable items such as office equipment, vehicles or heavy construction equipment. The basic rationale seems to be that while county officials may not draw bid specifications narrowly just to ensure that only one bidder will meet those specifications, they may impose any specifications that are reasonably related to the job or function to be performed by the bid items. This is true even though in effect, only one bidder can meet the specifications. While there is no requirement that bid specifications be drawn so broadly that all bidders can meet the bid specifications, county officials should be prepared to defend their reasons for the selection of any particular bid specifications especially when those specifications prevent some bidders from meeting them. (This excellent brief of the *Mobile Dodge* case was prepared by Reginald L. Sorrells).

*Maintenance Inc. v. Houston County,* 438 So. 2d 741 (Ala. 1983) wherein the court had held "maintenance cannot, however, by way of estoppel, endow with validity a transaction which is illegal and against public policy. Where the 1980 contract between maintenance and the county was void for noncompliance with the bid law, the principle of estoppel could not be utilized to create the contract anew."

In the 1986 case, *Pate Contractors,* the court held that the Competitive Bid Law did not apply to contract to construct new airport terminal building, as Airport Authority which awarded the contract came within statutory exemption of *Code of Alabama 1975,* § 4-3-60. This was a Department of Transportation assisted contract and there were certain Minority Business Enterprise (MBE) obligations. The specifications set a goal of 13.5% participation for business owned and operated by minorities. *Pate's* bid listed MBE subcontract participation of 14.03%. *Dunn's* bid listed participation of 7.67%. The contract expressly stated that "meeting MBE subcontract goals or making a good faith effort to meet such goals are conditions to being awarded this DOT assisted contract." The authority awarded the contract to *Dunn,* the low bidder by a half million dollars. *Pate* filed suit based upon the MBE participation. The court was satisfied that *Dunn* had made a "good faith effort" to meet the MBE participation and upheld the awarding authority and trial court.

In the 1986 case, *Kennedy v. City of Prichard,* the court held that a concession type contract should be bid, but not just because of the bid law.

Plaintiff argued that the contract (awarded to City Wrecker Service) constituted an exclusive grant of special privileges in violation of the Alabama Constitution, Article I, Section 22; further, that the contract was void for failing to comply with the Competitive Bid Law.

31



*Layman's* performed its contractual obligations until it was notified by a letter from the Board dated March 15, 1987, that the contract was terminated as of that date. On July 31, 1987, Layman filed suit seeking damages for breach of contract.

The circuit court held that the contract was not in compliance with the bid law and was void. Summary judgment was entered for the Board. The court ruled "that the providing of security does not constitute a service where the individual's personality is a decisive factor. Therefore, the contract does not fall within this exception to the Competitive Bid Law."

*Layman's* appealed seeking enforcement of the contract under the equitable doctrine of estoppel.

The Alabama Supreme Court cited several previous decisions relating to the doctrine of estoppel and in particular, relied upon the precedent case of *Maintenance, Inc. v. Houston County*, 438 So. 2d 741 (Ala. 1983).

The court concluded: "Applying those prior decisions to this case, we hold that the judgment of the trial court is due to be affirmed. Because *Layman's* presented no proof that it materially and detrimentally changed its position in reliance on the contract, estoppel will not apply. While we do not condone the use of the Competitive Bid Law as a means for a party to escape liability for a contract it voluntarily entered into, we are, nonetheless, under the facts of this case, compelled to affirm the trial court's judgment."

The Alabama Supreme Court held in the case of *General Electric Co. v. City of Mobile*, 585 So. 2d 1311 (Ala. 1991) that the existence of an emergency allows the awarding authority to forego the public advertising of the solicitation for bids otherwise required by *Code of Alabama 1975*, § 41-16-54. HOWEVER, the Court further held that the awarding authority is still required to utilize competitive bids in the actual awarding of the contract. Justice Kennedy, writing for the Court, stated that "the provisions [§ 41-16-53] dispenses with the requirement of public advertising, not competitive bidding." [Original emphasis]. This contradicts the position taken by the Attorney General heretofore that the existence of an emergency eliminates the necessity of competitive bids.

*Beavers v. County of Walker*, 645 So. 2d 1365 (Ala.1994). This case involves a county commission's approval of a site for the development of a landfill. It is a continuation of the line of cases beginning with *Kennedy v. City of Prichard*, 484 So. 2d 432 that state that the award of an exclusive franchise must be made in compliance with the Alabama Competitive Bid Law.

*Ericsson GE Mobile Communications, Inc. v. Motorola Communications & Electronics*, et al., 657 So. 2d 857 (Ala. 1995). The practice of requesting alternative bids is consistent with the Alabama Competitive Bid Law. The City of Birmingham sought to purchase a new public safety radio system. The request for bids included four alternatives that were formulated around competing technologies. The Court upheld the use of alternate bids as within the discretion of the awarding authority. The awarding authority is not required under the Competitive Bid Law to award the contract to the overall low bidder but must award the bid to the lowest responsible bidder after weighing the relative merits of the competing technologies. The following



hypothetical, totally unrelated to the facts of this case, is illustrative. A public agency attempting to purchase a computer could request bids with two alternatives, one based upon an Apple MacIntosh system and the other based upon an IBM compatible system. Although the IBM bid is actually lower than the Apple bid, the contract could be awarded to Apple based upon an evaluation of the competing technologies utilizing the factors stated in the Competitive Bid Law such as the qualities of the commodities proposed to be supplied.

See *Code of Alabama 1975*, §§ 41-16-27 and 41-16-57. This case places great emphasis upon the good faith of the awarding authority and should be read very closely before attempting to formulate requests for bids in the alternative.

*Spring Hill Lighting & Supply Co., Inc. v. Square D. Co., Inc.*, 662 So. 2d 1141 (Ala. 1995). A tort action alleging intentional wrongful conduct by persons involved in the bidding process is not necessarily barred by the potential availability of injunctive relief pursuant to *Code of Alabama 1975*, §§ 41-16-31 and 41-16-61. The remedy of injunctive relief provides no sanctions against intentional wrongful conduct by individuals involved and the court held that there was no reason why such individuals should be shielded from a responsibility for such intentional wrongful conduct. Cases which have held that injunctive remedy is the only remedy for violation of the Competitive Bid Law were not intended to create a license for persons to permit fraud and other intentional torts.

*Play Fair Racing, Inc. v. Birmingham Racing Commission and Jefferson County Racing Association, Inc.*, (Ala. 1995). The Birmingham Racing Commission is a public corporation and not a governmental entity. Section 22 of the Alabama Constitution does not apply to the conduct of the Commission. The selection process for the award of a license by the Commission established by *Code of Alabama 1975*, § 11-65-14(f) does not violate Section 22 of the Constitution.

34







## Closest Matches To: Guntersville, AL



**Termite Colony Elimination**

Results

Help! I've Got

Enter ZIP cod

- Cook's Pest Control - Albertville
  175 AL Hwy 75N
  Albertville, AL 35950
  205-878-5541
  http://www.cookspest.com/sentricon.html

- Sand Mountain Pest Management, Inc
  694 AL Hwy 75 North
  Albertville, AL 35951
  256-891-7400

- A-1 Exterminating Co, Inc
  1801 W Meighan Blvd
  Gadsden, AL 35904
  256-547-9868

- Cook's Pest Control - Gadsden
  1524 W Gramd Ave
  Gadsden, AL 35904
  256-547-4954
  http://www.cookspest.com/sentricon.html

- Cook's Pest Control - Cullman
  2025 Cherokeen Ave, SW
  Cullman, AL 35055
  256-734-0353
  http://www.cookspest.com/sentricon.html

- Cook's Pest Control - Huntsville
  335 W Park Loop
  Huntsville, AL 35806
  256-837-3100
  http://www.cookspest.com/sentricon.html

- Cook's Pest Control - Madison
  Commercial
  9582 Hwy 20 West, Ste 11
  Madison, AL 35758
  256-772-2440
  http://www.cookspest.com/sentricon.html

- Terminix International - Huntsville
  3411 Trade Drive, Lot #6
  Huntsville, AL 35810
  205-852-3151

- Cook's Pest Control - Decatur
  1741 Fifth Avenue Southeast
  Decatur, AL 35602
  256-355-3285
  http://www.cookspest.com/sentricon.html

Site Navigation: | Sentricon Home: Results

(1998-2003) © Dow AgroSciences LLC
*®™ Trademark of Dow AgroSciences LLC

Privacy Statement | Internet Disclaimer



**ATTACHMENT** G

